# Exhibit E

**General Terms & Conditions of Sale (GTCS)**

**for the delivery of Marine Fuels from**

**Three Fifty Markets Ltd**

**Effective date: 1st July 2022**

With effect from 1st July 2022 ("the Effective Date") and until further revision these General Terms & Conditions of Sale (GTCS) shall apply to all Contracts for the sale of Marine Fuels, Lubricants and related products and services by Three Fifty Markets Ltd.

**1. DEFINITIONS**

The following expressions, where mentioned in these GTCS or in the Contract, shall have the meanings as shown below and unless the GTCS otherwise require, any words denoting the singular shall include the plural and vice-versa:

a) "Affiliate" means a company, partnership, or other legal entity which controls, is controlled by, or is under the indirect ownership of fifty per cent (50%) or more of the issued share capital or any kind of voting rights in a company, partnership, or legal entity, and "controls", "controlled" and "under common control" shall be construed accordingly

b) "Agent" means the entity acting on behalf of the Buyer, or the Vessel and/or both.

c) "Arrival Notice" means the notice sent from the Buyer to the Seller that shall contain the following information (which may be updated as necessary): 1) Call sign, 2) Vessel's Name, 3) Owners, 4) Flag, 5) Agents, 6) Length Overall, 7) Gross tonnage, 8) Net Tonnage, 9) Deadweight, 10) Ex-Names, 11) Expected time of arrival, 12) Lloyds Register Number, 13) Requirements.

d) "Bunker Delivery Receipt or BDR" means a document issued by the Seller or the Seller's agent at the point of delivery describing the quantities and specification of the Marine Fuel delivered to a Vessel, whether or not signed on behalf of the Vessel.

e) "Buyer" means the entities or persons identified on the Order Confirmation who have contracted with the Seller to buy Products, which shall include its assignees or successors, Managers (the entity that is operationally or technically or commercially managing the Vessel), Operators (the entity that may be commercially operating the Vessel), Trader (the entity that is buying the Products from the Buyer and selling such to the Owner/Managers/Operator), Owner (the owner of the vessel).

f) "Contract" means the Contract between the Seller and the Buyer which consists of these GTCS and the Order Confirmation that is issued by the Seller for each supply of Products.

g) "Designated Bank Account" means the bank account identified in the invoice related to the Contract as the account designated by the Seller for receipt of payment.

h) "Independent Surveyor" means an independent survey Company or a surveyor appointed from time to time by the Seller in its sole discretion or jointly appointed by the Seller and the Buyer, as the case may be.

i) "Lubricants or related products" means all Products supplied by the Seller which are not Marine Fuel

j) "Marine Fuel" means oil products supplied for use in a Vessel's engines and generators;

k) "Order Confirmation" means a written confirmation issued by the Seller to the Buyer setting out the details of the supply of Products including i.e. Supply Place, supply date, volume and grade of the Products and the agreed price.

l) "Price" means (i) the price stated in the Order Confirmation for the Products; and (ii) any applicable taxes, VAT or other duties whether or not identified in the Order Confirmation; and (iii) any delivery costs including any charges for delivery outside normal working hours at the Supply Place or for rescheduled delivery whether or not identified in the Order Confirmation;

m) "Products" means the Marine Fuel, Lubricants or related products to be delivered or that have been delivered.

n) "Sanctions Laws" means the various export controls and economic sanctions regulations, including but not limited to, those maintained by various European Governments and the EU, Switzerland, the US Government as enforced by

the US Office of a Contract Foreign Assets Control, the US Department of State, and the US Department of Commerce, and various UN sanctions as implemented into local laws.

o) "Seller" means the entity that appears as the Seller in the Contract.

p) "Supply Place" means the location where the supply operation takes place or is intended to take place.

q) "Supply Equipment" or "SE" means the Seller's or the physical supplier's barges, tankers, trucks, pipes and pumps as the case may be used to supply the Vessel.

r) "Vessel" means the Vessel to which the Products are being delivered to, or for which the Buyer has contracted to buy the Products.

## 2. TERMS

a) These GTCS supersede and replace any previous General Terms & Conditions of the Seller and shall be effective from the Effective Date. No variation shall be binding unless agreed in writing by the Seller. In the event of a conflict between the Order Confirmation and the GTCS the Order Confirmation shall prevail to the extent of the conflict only but in all other respects the GTCS shall apply.

b) It is agreed that the Buyer has bought and the Seller has sold the Products as per the terms of the Contract and the GTCS.

## 3. ORDER CONFIRMATION

a) A Contract shall only be concluded and binding when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTCS whether or not the Order Confirmation includes an express reference to the GTCS. If the Seller for whatever reason fails to issue or send an Order Confirmation to the Buyer these GTCS shall govern the sale nonetheless and a contract pursuant to these GTCS shall be deemed to have come into existence.

b) Should the Contract be entered into by any party acting as an Agent for the Buyer and/or acting for or on behalf of the Buyer, whether such is disclosed or undisclosed, then such Agent with actual or constructive notice of the existence of these GTCS in addition to the Buyer and or holder of any interest in the Vessel receiving the Products shall be jointly and severally liable for and guarantees the proper performance of all the obligations of the Buyer under this Contract, and shall be deemed as a principal and not only acting as an Agent.

c) It is agreed that all orders of all Products are considered to be emanating from the Master of the vessel, even if relayed by the Buyer to the Seller and even if no written request for the Master of the vessel exists, the dues and cost of such supplies and/or deliveries shall be treated as a primary lien on the Vessel.

## 4. PRICE / PAYMENT / RISK AND PROPERTY

a) The Buyer shall pay the Price in accordance with the terms of the Contract. Promptly upon delivery the Seller shall issue its invoice for the Price, but the Buyer's liability to pay the Price shall not be dependent upon the issue of an invoice.

b) Any tax, VAT or other duties or other charge of whatever nature and however named, or any additional costs borne by the Seller whatsoever caused by any change in the Seller's contemplated source of supply or otherwise, coming into existence after the Contract has been concluded, shall be added to the Price if necessary by raising an additional or revised invoice.

c) All sums payable in accordance with a Contract for Products delivered to a Vessel shall constitute a lien on the Vessel.

d) The Buyer shall become liable for the Marine Fuel immediately upon the Marine Fuel passing the SE's manifold, and risk of the Marine Fuel shall pass to the Buyer at that time. The Buyer shall become liable for Lubricants and related products immediately upon them passing the Vessel's rail or being delivered to the designated place of delivery, and risk shall pass to the Buyer at that time. Title to the Products shall pass only when the Products have been fully paid for by the Buyer and until such time the Seller shall retain title to the Products.

e) Payment shall be made in United States Dollars (or any equivalent currency as the Seller may require) by telegraphic or telex transfer to the Designated Bank Account. If payment is made to any other account, the Buyer shall not be released from its obligation to make payment to the Seller. All payments shall be made net of transfer charges which shall be for the Buyer's account. Payment shall be deemed to have been made on the date the payment is credited to the Designated Bank Account.

f) Payment shall be made in full without any discount or deduction, and there shall be no withholding either in part or in full by reason of any set-off, counter-claim or for any other reason, whether relating to the Contract or past agreements or Contracts.

g) If in breach of the preceding clause payment is withheld or set-off by the Buyer, partly or in full, due to alleged short delivery, quality dispute or any other reason whatsoever or if any sum due pursuant to any Contract is not paid within the agreed time, the Buyer shall pay, in addition to the outstanding amount and any interest that accrues until the due date, compensation to the Seller of 20% of the outstanding amount. The Buyer recognizes that such compensation is a reasonable pre-estimate of the Seller's loss, taking account of factors including but not limited to the additional management time incurred in dealing with late payment, the loss of opportunity to reinvest the missing funds and currency exchange fluctuations.

h) Except where the Seller has agreed in its Order Confirmation to grant credit payment of the Price shall be due immediately upon delivery of the Products, or in all other cases immediately upon an invoice being issued. The Buyer shall not be entitled to insist upon provision of a BDR before making payment, but the Seller shall nevertheless use reasonable endeavours to provide a BDR with its invoice.

i) Where credit is granted such that payment is deferred beyond the period stated in the preceding clause such credit is entirely discretionary and the Seller shall at all times be entitled to withdraw credit and demand immediate payment by giving written notice without providing reasons. For example, but without limitation, credit may be withdrawn if the Seller has reason to believe that the Buyer's (or companies related to the Buyer) financial circumstances have deteriorated or the Seller receives information that causes it to alter its assessment of the credit risk. Where credit is withdrawn prior to delivery of Products then the Seller shall be entitled to withhold delivery until payment of the Price is made or alternatively the Seller may cancel the order, without recourse by the Buyer.

j) Without prejudice to any other rights or remedies available to the Seller the Buyer shall pay interest to the Seller at the rate of 2 (two) per cent per month (compounded monthly for each month, or part thereof,) on all balances that remain unpaid from the date that they were due or, upon the withdrawal of credit, became due for payment. The Seller shall provide regular interest notes which shall be binding as to the amount of interest that is due, but the Buyer's obligation to pay interest shall not be conditional upon such interest notes being issued.

k) The Seller shall be entitled to allocate payments from the Buyer at its sole discretion and regardless of any allocation stipulated by the Buyer and shall be entitled to extinguish claims for compensation, interest, legal fees or any other sums due from the Buyer in priority to invoices for Products and regardless of the date that the respective obligations arose.

l) In the event that any sums are overdue from the Buyer and the Seller incurs costs in relation to the collection of such overdue sums then the Buyer shall indemnify the Seller and pay to the Seller upon demand such costs, which shall include but not be limited to attestation and translation costs, fees of third party debt collection agencies, and lawyer's fees and regardless of whether such costs led to the collection of the overdue sums. Furthermore, the Buyer shall pay an administration fee of USD 250.00.

m) Seller may from time to time without need for prior consent of Buyer, assign any of its rights under the Contract to any third party and the assignee shall enjoy and be entitled to exercise against Buyer any and all rights herein conferred upon Seller.

n) If at any time an amount is payable by Buyer to Seller, such amount may at the sole discretion of Seller be fully or partially paid by set-off against any amounts payable to Buyer by Seller and any Affiliate of Seller.

o) The Buyer shall make payment from an account in its own name, or otherwise seek prior written approval from the Seller for any alternative payment arrangements by providing full details and verification documents. Seller reserves all rights to reject any proposed or alternative payment arrangements and instead require the Buyer to make payment in a manner acceptable to the Seller.

## 5. ARRIVAL NOTICE

a) The Buyer shall send to the Seller within 24 hours of the Contract being concluded a written Arrival Notice confirming, inter alia, arrival in accordance with the delivery period stated in the Order Confirmation and thereafter further Arrival Notices 72, 48 and 24 hours before the Vessel's arrival at the Supply Place. If the Contract is entered less than 72 hours before delivery then Arrival Notices shall be provided in daily countdown from the date of the Contract.

b) The Buyer shall ensure that the Vessel's port agent at the Supply Place shall comply with any and all requests from the physical supplier appointed by the Seller for information of the Vessel's arrival.

c) Failure to provide Arrival Notices as aforesaid shall entitle the Seller to cancel the Contract.

d) If the Vessel fails to arrive within 12 hours of the agreed delivery period stated in the Order Confirmation or within 2 hours of the arrival time as stated in the last Arrival Notice submitted in accordance with clause 5a the Seller shall have the right to revise the Price and the date of supply and other terms and alternatively shall have the right to cancel the Contract.

## 6. DELIVERY

a) The Buyer and Vessel and all of their personnel and Agents shall obtain any necessary permits and comply with all regulations applicable to the receipt, handling and use of the Products to be supplied at the Supply Place and a failure to do so shall entitle the Seller to cancel the Contract. The Buyer shall indemnify the Seller for all consequences, losses and or damages (including fine and penalties) suffered by the Seller as a result of the Buyer or the Vessel or its crew failing to observe any such regulations or obtain any such permits.

b) The Buyer shall comply with all requests for information from the Seller, the Seller's agents or sub-contractors and from any port agent appointed in accordance with clause 6(l).

c) The Buyer shall indemnify and hold harmless the Seller against all damage and liabilities arising from any acts or omissions of Buyer or its servants, ship's officers or crew in connection with the delivery of Products or the bunkering operations.

d) Notwithstanding any other provisions of the Contract the Seller's obligation is to use reasonable endeavours to commence delivery promptly in accordance with the agreed delivery period stated in the Order Confirmation but the Seller does not guarantee the time of delivery or the pumping rate at which the Marine Fuel is to be delivered to the Vessel and the Seller shall not be liable for any consequences, losses or damages including demurrage howsoever caused suffered by the Buyer arising from the time of delivery or the rate at which Marine Fuel is pumped into the Vessel.

e) The Buyer will make all connections and disconnections of the delivery hose and will render all other necessary assistance and equipment to receive delivery of Marine Fuels. The Buyer shall ensure that the Vessel provides a free,

safe and always accessible side for the delivery of Marine Fuels and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery of Products. For safety reasons it is solely the master of the supply barge that determines whether mooring alongside the Vessel is safe, taking weather, swell and forecasts into decision. If clear and safe berth is unavailable, delivery may be delayed or cancelled by the Seller and all costs incurred will be for the Buyer's account.

f) In the event that the supply is made by ship-to-ship transfer, any damage caused by contact, collision, swell or any other weather or sea related condition shall be dealt with by the Buyer directly with the owners of the supply barge. The Seller shall not be held liable for any such damages and the Buyer shall indemnify the Seller against any claims arising out of such incident.

g) Where lightering/barging is employed, lightering/barging charges shall be for the account of Buyer. The Buyer will be liable for all demurrage or additional expenses incurred by Seller if Buyer causes delay in the supply of Products. Buyer will also pay for mooring, unmooring and port dues incurred.

h) If Buyer fails to take delivery, in whole or in part, of the quantities specified in the Order Confirmation, Buyer shall be responsible for any costs resulting from Buyer's failure to take full delivery, as well as for any losses incurred by Seller including but not limited to any loss of profit and any loss on the resale of the Products. The Buyer shall bear the risk of the return transport, demurrage on the barge or trucks, storage or selling of the Products.

i) Seller will not be liable for any loss incurred by Buyer due to a failure or delay in supply due to (a) congestion affecting the physical supplier of Products at the delivery facilities, (b) prior commitments of available barges, (c) local customs, pilots, port or other authorities or (d) shortage of Products of the required specification or (e) failure or under-performance of the SE, or (f) any circumstances out of the direct control of the Seller.

j) The Buyer is obliged to keep Marine Fuel supplied pursuant to a single Contract segregated from any other bunker fuels delivered to the Vessel. The Buyer is obliged to keep all Lubricants and related products in such manner that they can be identified to the Contract.

k) The Buyer undertakes to take delivery and leave the Supply Place with all due dispatch. In the event that the supply is delayed by the Buyer for whatever reason, or if after the supply, the Vessel fails to leave the Supply Place immediately, the Buyer shall indemnify the Seller for any loss or damage suffered by the Seller resulting from such delay, including any claims incurred or arising due to the delay in the supply of other vessels.

l) Where it is necessary according to the regulations or practice of the Supply Place that a port agent be appointed to facilitate the delivery of Marine Fuel and the Buyer does not have an appointed agent for that purpose then the Seller may appoint a port agent on the Buyer and Vessel's behalf or the Seller may authorize its sub-contracted supplier to appoint said port agent. Any such appointment by Seller shall be strictly on behalf of the Buyer and the Vessel who shall be jointly and severally liable for the port agent's fees and for any expenses, charges, taxes, duties or fines incurred by the port agent on behalf of the Vessel and Buyer.

## 7. QUALITY

a) The Buyer shall have the sole responsibility of the nomination of the grade of Products requested for the Vessel. The Seller excludes any express or implied warranties as to the fitness for any purpose, stability or compatibility of the Products.

b) Unless otherwise stated in the Order Confirmation Marine Fuel sold shall conform to those specifications defined under the prevailing ISO Standard or in the absence of such Marine Fuel being available at the Supply Place the Marine Fuel shall be of the same quality generally offered for sale at the Supply Place for the grade of Marine Fuel specified by the Buyer. The Marine Fuel shall be used exclusively for the operation of the machinery of the Vessel identified in the Contract.

c) Where the Buyer nominates Marine Fuel above the sulphur limits set out in MARPOL Annex VI, the Buyer shall be fully responsible for, and on the Buyer's request provide confirmation in writing, that the Vessel has working

Abatement Technology (as defined in MARPOL Annex VI) installed in compliance with MARPOL Annex VI or must include a copy of a valid Fuel Oil Non Availability Report (FONAR) and the relevant authorisation granted to the Vessel for that specific delivery of Products. The Buyer shall indemnify the Seller of all cost or losses incurred as a result of Seller's breach of this Clause 7 (c).

## 8. VALIDITY OF THE CONTRACT

Notwithstanding anything contained herein, the Buyer accepts that even if it is established that the Seller is in breach of its contractual obligations including those as to quantity, quality or specification this shall not nullify any part of the Contract in any way, neither shall it affect the duties, liabilities and obligations of the Buyer towards the Seller, irrespective of any claim made or proven of whatsoever nature by the Buyer.

## 9. QUANTITY

a) The quantity of Marine Fuel delivered by the Seller to the Buyer shall be measured by measurements taken on the SE's tanks or shore tanks or by SE's meters by SE's personnel which shall be conclusive evidence of the quantities delivered and shall be included in the BDR to be signed by a representative of the Buyer. Failure by the Buyer to sign the BDR to verify the measurement shall not alter the binding nature of the quantities as recorded. Subject only to the following clause, measurements by any other means shall not be binding on the Seller.

b) The Buyer shall have the right to call upon an Independent Surveyor to measure the quantity of Marine Fuel delivered; the Independent Surveyor shall be appointed by the Seller or jointly appointed by both the Buyer and the Seller and shall only measure the SE tanks or shore tanks or by SE's meters only to determine the quantity and shall issue his survey report. If such Independent Surveyor is requested by the Buyer, they shall pay the Independent Surveyor's expenses and costs in relation to the measurements of the quantity of Marine Fuel delivered. The measurement carried out by the Independent Surveyor shall then be conclusive evidence of the quantities delivered and shall be included in the BDR to be signed by a representative of the Buyer. Both the Seller and Buyer shall have the right to witness the measurement operations. Failure by the Buyer to sign the BDR to verify the measurement shall not alter the binding nature of the quantities as recorded. The quantity of Marine Fuel to be delivered shall be the quantity specified in the Order.

## 10. SAMPLING

a) The Seller or its representatives shall arrange for samples to be drawn at the time of delivery of the Marine Fuel. Unless otherwise agreed between the Seller and Buyer prior to entering a Contract, the samples shall be drawn from a point and in a manner chosen by the Seller or its representatives in accordance with the customary sampling procedures at the Supply Place.

b) The sampling mentioned in clause (a) shall be performed in the presence of the Seller or its representatives and the Buyer or its representatives, but the absence of the Buyer or its representatives during all or any part of the sampling process shall not prejudice the validity of the samples.

c) On completion of sampling, all samples drawn by the Seller or its representatives are to be sealed, labelled and signed by both Seller or its representatives and Buyer or its representatives and their numbers shall be recorded on the BDR. Two samples shall be retained by the Buyer or its representatives, one of these shall be the MARPOL compliant sample. The remaining samples shall be retained by the Seller or its representatives.

d) In the event of a dispute concerning the quality of the Marine Fuel, one, and only one, of the samples retained by the Seller with a seal number reflected on the BDR, shall be forwarded for testing to an independent laboratory mutually appointed by the Buyer and Seller. The testing shall be limited to analysis of the disputed properties, which must be amongst the properties that formed part of the Contract specification. The results of the analysis of the sample shall be conclusive to determine the quality of the Marine Fuel supplied. Analysis results of the Seller's or its representative's drawn samples will be the sole binding evidence for the quality of the Marine Fuel supplied to the

Vessel. The conformity of the Marine Fuel shall be determined in accordance with ISO 4259 and to the extent that the components detected are within the allowed tolerances in respect of reproducibility or repeatability as set out in ISO 4259 the Product shall be deemed to be compliant according to ISO 8217.

e) If the Buyer's complaint concerning the quality of the Product is based on the presence of substances which are not part of the quality specifications set out in Table 1 or Table 2 of ISO 8217, the Buyer shall show that the substances in question without a reasonable doubt jeopardize the safety of the Vessel or adversely affect the performance of the machinery.

f) No samples drawn by the Buyer's personnel or samples subsequently taken shall be allowed as evidence of the quality of the Marine Fuel. If any seals have been removed or tampered with by an unauthorised person, such samples shall be deemed to have no value as evidence.

g) If the Seller and the Buyer cannot agree on an independent laboratory to perform mutual analysis or if the Buyer fails to reply to the Seller's notice hereof within 7 days from receipt of such notice, the Seller can at its sole discretion decide which laboratory to perform the analysis, which shall be final and binding for all parties involved.

**11. CLAIMS**

a) The quantity of Marine Fuel delivered shall be determined in accordance with clause 9. Any dispute regarding the quantity of the Marine Fuel delivered shall be notified by telephone as well as in writing by the Buyer or the master of the Vessel to the Seller immediately that the dispute occurs and while the delivery hoses are still connected. In the event immediate verbal as well as written notice is not made, such claim shall be deemed to be waived and barred. A notification inserted in the BDR or in a separate protest handed to the physical supplier of Marine Fuel shall not qualify as notice. The Seller shall under no circumstances be deemed to have accepted such notice or protest handed to the physical supplier.

b) Any claim regarding the quality of the Marine Fuel delivered shall be presented in writing to the Seller as soon as an alleged quality problem has occurred or the Buyer is notified of any alleged problem and in any event no later than within 15 days from the date of delivery to the Vessel. Should the Buyer fail to make timely notification as stipulated herein of any claim regarding the quality of the Bunker Fuel the claim shall be deemed waived and barred.

c) A written claim for the purposes of clauses (a) and (b) must provide a complete and comprehensive explanation of the circumstances and basis of the claim, including where applicable the quantities short and/or the discrepancies in quality, a full test report for a test performed on one of the official samples mentioned in the Bunker Delivery Receipt performed by an independent laboratory along with copies of all correspondence with the independent laboratory and include copies of all supporting documents including the vessel's logs evidencing the matters complained of.

d) To the extent that the Buyer's test report evidence that the components detected are within the allowed tolerances in respect of reproducibility or repeatabilty as set out in ISO 4259, the Product shall be deemed to be compliant and the Buyer cannot require further testing of the Product.

e) In the event of any claim presented in accordance with clauses (a) and (b) the Buyer shall:

- Cooperate with the Seller and make all necessary arrangements for the Seller or its representatives to investigate such claim, including but not limited to the boarding and inspection of the Vessel, the interviewing of crew and the review and copying of Vessel documents.

- Take all reasonable steps and actions to mitigate any damages, losses, costs and expenses related to any claim of alleged offspecification or defective Marine Fuel. If the Marine Fuel deviates from specifications, the Buyer shall use all reasonable endeavors to mitigate the consequences hereof and shall burn the Marine Fuel if possible even if this requires employment of purification tools or other similar measures.

- Take all reasonable steps to preserve the Seller's recourse against the physical supplier of Marine Fuel or any culpable third party.

f) In the event that the Buyer has made a valid claim regarding the quality of the product, which cannot be mitigated in accordance with 11.e) the Seller shall have the option to debunker the product and perform redelivery of on-spec product in accordance with the terms of the Contract.

g) A breach by the Buyer of any part of this clause will entitle the Seller to set off losses caused by the breach against any liability to the Buyer.

h) Any claims against the Seller in respect of a Contract, including those notified in accordance with the provisions of these GTCS, shall be brought before the relevant court within 6 months of the date of delivery of the Products, failing which such claims shall be deemed waived and time barred.

i) Buyer's submission of any claim does not relieve it of responsibility to make full payments as required under the Contract and Buyer shall not be entitled to set off any claim from payment.

## 12. LIABILITY

a) The Seller's liability for any damage whatsoever arising under a Contract howsoever caused and including the negligence of the Seller, its servants, sub-contractors or agents and whether based in tort or contract and including claims for product liability and pollution shall be limited to the lesser of

   i. US$500,000; or

   ii. the Price of the Products giving rise to the claim on which the Seller's liability is based. For example, where a Contract provided for the supply of two grades of Marine Fuel and liability arises from one grade being off-specification then only the Price for the off-specification Marine Fuel shall be taken into account in calculating the limit of the Seller's liability.

b) The Seller shall under no circumstances be held liable for any consequential losses whatsoever whether direct or indirect and whether or not foreseeable at the time of formation of the Contract, including, without limitation, delay, detention, demurrage, charter hire, crew wages, pilotage, towage, port charges, lost profits or increased cost or expenses for obtaining replacement fuel and neither shall the Seller be liable under any circumstances for punitive damages.

c) When assessing liability for damage to the Vessel and compensating for replacement parts there shall be a reduction in the replacement value payable by the Seller of 20 percent for each year or fraction thereof for which the replaced part has been in use.

d) The Buyer shall indemnify the Seller against any claims, losses, fines, penalties or costs of whatever kind related to the Contract, including the legal costs of dealing with such claims, instituted by third parties against the Seller to the extent that such claims exceeds the Seller's liability towards the Buyer according to this clause.

e) The Buyer shall hold harmless and indemnify the Seller in respect of any liability, costs, losses, fines, penalties and costs arising from any acts or omissions of the Buyer or its servants in connection with the delivery of Products or the bunkering operations, including the failure to obtain necessary permits or comply with applicable law.

## 13. ENVIRONMENTAL PROTECTION

a) The Buyer shall be responsible for ensuring that it complies with all national and international trading and pollution regulations, and all environmental and health and safety regulations with regard to the receipt and use of Products and shall indemnify the Seller for all financial consequences, including clean-up costs and fines, of a breach of this provision.

b) If an escape, spillage or discharge of Products ("Spill") occurs while a delivery of Products is being made to the Vessel, the Buyer and the Vessel shall promptly take all such action as is reasonably necessary to mitigate the effects

of such Spill. However, notwithstanding the cause of such Spill, the Seller is entitled at its option to take such measures and incur such expenses (whether by employing Seller's own resources or by contracting with others) as are reasonable in the sole judgment of the Seller to remove the oil and mitigate the effect of such Spill. If the Seller has exercised its option to itself take measures in response to a Spill the Buyer agrees to cooperate and render such assistance as is required by the Seller in the course of such action. The Buyer shall indemnify and hold the Seller and its representatives harmless against any damages, expenses, claims or liabilities of whatever nature, unless such Spill or discharge is proven to be caused solely by the Seller's negligence. The Buyer agrees to give or cause to be given to the Seller upon demand or as required by applicable laws or regulations all documents and information concerning any Spill.

**14. LIEN**

a) In addition to any other security the Seller may have, and as this Contract is entered into and product is supplied upon the faith and credit of the Vessel, it is agreed and acknowledged that a lien over the Vessel is created for the price of the Products supplied together with any interest accrued. The Buyer, if not the Owner of the Vessel, hereby expressly warrants that they have full authority of the Agents/Traders/Owners/Managers/Operators/Charterers to pledge the Vessel in favor of the Seller and that they have given notice of the provisions of this Contract to them. The Seller shall not be bound by any attempt by any person to restrict, limit or prohibit its lien(s) attaching to a Vessel. The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity, or otherwise, in any jurisdiction where the Vessel may be found.

b) Any notice or any stamp added to the Bunker Delivery Receipt or similar shall be invalid and cannot waive the Seller's maritime lien on the Vessel unless the Buyer has notified the Seller of its intention to exclude the liability of the Vessel at least 12 hours in advance of the supply by sending written notice to accounts@threefiftymarkets.com. Notification to the physical supplier of Marine Fuel shall not be effective notice and any stamp or notice applied to the Bunker Delivery Receipt after the supply of Marine Fuel shall also be ineffective and shall not vitiate the Seller's lien on the Vessel.

**15. SUBSTITUTION**

Seller reserves its right to substitute for itself a third party for the performance of all or part of its obligations.

**16. FORCE MAJEURE**

Neither Buyer nor Seller shall be responsible for any loss or damage resulting from any delay or failure in delivery or receipt in Products hereunder due to fire, explosion or mechanical breakdown, flood, storms, earthquakes, tidal waves, war, military operations, national emergency, civil commotion, strikes or other differences with workmen unions, or from any delay or failure in delivery or receipt of Products hereunder when the supplies of Buyers or Sellers or the facilities of production manufacture, consumption, transportation, distribution of Buyer and Seller are impaired by causes beyond Buyer's or Seller's control, or by the order, requisition, request or recommendation of any governmental agency or acting governmental authority, or Buyer's or Seller's compliance therewith, or by governmental proration, regulation or priority, or from any delay or failure due to any causes beyond Buyer's or Seller's control similar or dissimilar to any such cases. When such cause or causes exist, the party affected shall have the right, upon notice without delay as soon as practicable to the other of the nature and probable duration of such cause or causes, to restrict or cease deliveries or acceptance hereunder in a fair and equitable manner for the duration of such cause.

**17. COMPLIANCE CLAUSE**

a) By accepting the Seller's offer and Order Confirmation, the Buyer thereby confirms and warrants that the Buyer is in full compliance with the Sanctions Laws; that the Buyer is purchasing the Products as principal and not as agent, trustee or nominee of any person or entity with whom transactions are prohibited or restricted under the Sanctions Laws; and the Products purchased will not be used in any manner whatsoever directly or indirectly in connection with any entities, persons, projects, contracts, transactions or payments that contravenes any Sanctions Laws. Further in relation to these Sanctions Laws, the Buyer confirms and warrants that the Vessel to be supplied is not and/or will not be:

   i. A designated vessel or flagged by a sanctioned country;
   ii. Owned or chartered by or related to any designated entity or person;
   iii. Coming from or on its way to visit countries or regions designated under the Sanctions Laws;
   iv. Involved in the transfer of goods that may be prohibited under the Sanctions Laws; or
   v. Engaged in any conduct designed to evade any Sanctions Laws, including but not limited to turning off transponders, reporting false travel plans, deviating from reported travel plans and engaging in ship-to-ship transfers to hide the origin of goods.

b) If at any time during the performance of the Contract the Seller becomes aware or have reasonable grounds to believe that the Buyer, the Vessel and/or any related parties are in breach of the warranty as aforesaid, the Seller shall have the option to immediately cancel the Contract for the Buyer's account and risk. Under such circumstances, the Seller shall not be held liable for any loss, delays, claims or damages incurred by the Buyer, and the Buyer shall be liable to indemnify the Seller against any and all claims, including return of any payment, losses, damages, costs and fines whatsoever suffered by the Seller resulting from any breach of warranty as aforesaid and in accordance with the Contract.

c) The Buyer must inform the Seller immediately if the Buyer becomes aware of or has reasons to believe that any of the above items are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damaged.

d) The Buyer acknowledges that anticorruption and anti-money laundering laws and regulations, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), shall apply to the parties. The Buyer and Seller shall comply with all applicable anticorruption laws and regulations and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Contract and in the sole discretion of the Seller any other Contract between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for any and all costs or losses incurred by the Seller due to such breach and/or a Contract becoming void as a consequence.

e) The Buyer must comply with all national and international trading, pollution, environmental and health and safety regulations concerning the receipt and use of Products and shall indemnify the Seller for all financial consequences, including clean-up costs and fines, of a breach of this provision.

f) The Buyer is deemed to have read and be in compliance with the Seller's Code of Conduct (copy available upon request).

**18. CANCELLATION**

a) In the event that the Seller cancels a Contract by reason of (i) the Buyer's breach of the Contract or (ii) conduct on the part of the Buyer entitling the Seller to cancel (iii) the Seller establishing that sanctions against the Buyer were in force at the date of the Contract then the Buyer shall have no recourse to the Seller and the Buyer shall be responsible for all losses, costs and expenses suffered by the Seller by reason of the cancellation, which shall include but not be limited to:

   i.    The Seller's loss of profit on the Contract;
   ii.   Costs or charges reasonably incurred to the Seller's sub-contractors or suppliers;
   iii.  Administration costs.

b) If the Buyer cancels the supply after the Order Confirmation any costs, expenses or charges incurred by the Seller with its supplier/sub-contractors are for Buyer's account, and the Buyer shall be liable to pay to the Seller the difference between its selling price to the Buyer and the price payable to the Seller's supplier, such sum to be paid immediately.

**19. LAW AND JURISDICTION**

a) These General Terms and Conditions and each Contract to which they apply shall be governed by the general maritime law of the United States of America and disputes shall be determined by Arbitration in London. If there are any gaps in the general maritime law of the United States or if the general maritime law of the United States does not address a disputed issue, the law of the State of New York shall apply. The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. In cases where the claim or any counterclaim does not exceed the sum of USD 2,000,000 (or such other sum as the parties may agree) the arbitration shall be referred to a sole arbitrator and the arbitrator's appointment shall be subject to the LMAA Terms.

b) In all other cases the reference shall be to three arbitrators and the provisions of this Clause 19 c) shall apply. A Party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party requiring the other Party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other Party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other Party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the Party referring a dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of the sole arbitrator shall be binding on both Parties as if the arbitrator had been appointed by agreement.

c) The 1980 united Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.

d) The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action. In case of breach of contract by the Buyer, the Seller shall moreover be entitled to take such legal action in any court of law in any state or country which the Seller may choose and which the Seller finds relevant in order to safeguard or exercise the Seller's rights in pursuance of this present Agreement. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity, or otherwise, in any jurisdiction where the Vessel may be found.