UNITED STATES DISTRICT COURT FOR

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THREE FIFTY MARKETS LTD.<br><br>*Plaintiff*<br><br>VERSUS<br><br>M/V ARGOS M, her engines, machinery, boilers, tackle, etc., *in rem*<br><br>*Defendants* | CIVIL ACTION<br><br>NO. 2:23-cv-00595<br><br>C/W 2:23-cv-00623<br><br>**ADMIRALTY**<br>SECTION "L"<br>(Judge Eldon E. Fallon)<br><br>MAG. (5)<br>(Magistrate Judge Michael B. North)<br><br>**(Pertains to Civil Action No. 2:23-cv-00623)** |

**MEMORANDUM OF PMG HOLDING SRL IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

*MAY IT PLEASE THE COURT*:

Plaintiff, PMG Holding SRL ("PMG"), respectfully submits this memorandum in support of its' Motion for Summary Judgment. This motion should be granted for the following reasons.

PMG is entitled to summary judgment to enforce its maritime lien because it supplied necessaries (i.e., marine fuel bunkers) to the M/V ARGOS M on the order of the vessel's charterer and its agent. Under the general maritime law and the federal maritime lien act, a vessel charterer and its agent are presumed to have authority to procure necessaries for a vessel on the credit of the vessel. As explained below, under U.S. Fifth Circuit precedent, this presumption can only be overcome by showing that the supplier of the necessaries had actual knowledge that the charterer and its agent lacked authority to bind the vessel. In this case, there is no such evidence and the vessel owner here cannot defeat PMG's maritime lien. Accordingly, because there are no genuine issues of material fact, PMG is entitled to summary judgment as a matter of law.

**Facts**.

On or about November 14, 2022, PMG, a marine fuel oil trading company, accepted a bunker order and agreed to supply and deliver approximately 250 MT of Intermediate Fuel Oil (i.e., "Bunkers") to be loaded aboard the M/V ARGOS M ("ARGOS M") while she was moored in the Port of Triconamalee, Sri Lanka.[1] At that time, the ARGOS M was owned by Argos Bulkers, Inc. ("Argos Bulkers")[2] and time chartered to Shimsupa GMBH ("Shimsupa")[3].

The bunker order was placed by AUM Scrap and Metals Waste Trading LLC ("AUM") with full authority of the ARGOS M's charterer Shimsupa.[4] According to AUM's and Shimsupa's respective websites, both companies are owned and controlled by Mr. Annamalai Subbiah.[5] It was widely known that AUM acted as agent for and on behalf of the vessel charterer Shimsupa.[6] In addition, correspondence provided to PMG before and after the transaction involving AUM and Shimsupa confirm that AUM was acting on the account of and for Shimsupa.[7]

PMG issued an Order Confirmation No. 22244811Tri including Terms and Conditions which state, in pertinent part, that the "General Maritime Law of the United States apply with respect of maritime lien".[8] The Order Confirmation was sent to AUM by the bunker broker, Dean

---

[1] See **Exhibit "A"**, Declaration of PMG at ¶ 1-6 and Exhibit 1 thereto, Order Confirmation.
[2] R. Doc. 24, Claim of ownership; also see R. Doc. 28-1, Declaration of Nickos Kekridis at ¶ 2.
[3] R. Doc. 28-1, Declaration of Nickos Kekridis at ¶ 7 and Exhibit 1 (Charter Party) attached thereto pages 6 thru 85 of 108.
[4] See **Exhibit "A"**, Declaration of PMG at ¶¶ 10, 11, 12, 19 and 20 and Exhibits 3, 4, 5 and 6 (Email exchanges) attached thereto.
[5] See **Exhibit "B"**, Bios of Mr. Subbiah, https://aum-metals.com/annamalai-subbiah/, https://www.shimsupa.de/founder-shimsupa-gmbh-co-kg/ ; See **Exhibit "A"**, Declaration of PMG at ¶ 11 and Exhibit 3 thereto; also see also see R. Doc. 50-4 at ¶ 5, Declaration of Dean Tenant to Motion for Summary Judgment by Three Fifty Markets Ltd.
[6] See **Exhibit "A"**, Declaration of PMG at ¶ 10-11; also see R. Doc. 50-4 at ¶ 4, Declaration of Dean Tenant to Motion for Summary Judgment by Three Fifty Markets Ltd.;
[7] See **Exhibit "A"**, Declaration of PMG at ¶¶ 10, 11, 12, 19 and 20 and Exhibits 3, 4, 5 and 6 (Email exchanges) attached thereto.
[8] See **Exhibit "A"**, Declaration of PMG at ¶ 4-7 and Exhibit 1 (Order Confirmation) thereto.

Tenant of BunkerEx.[9]  The Order Confirmation was signed by AUM and endorsed with the company's seal.[10]

Thereafter, PMG made arrangements with a sub-contractor, Lanka IOC PLC, for the physical delivery of the Bunkers to the vessel.[11]  On November 17, 2022, the Bunkers were delivered to and loaded aboard the ARGOS M.[12]  Delivery and acceptance of the Bunkers by the ARGOS M is evidenced by a Bunker Delivery Note which is signed by the ARGOS M's Chief Engineer, as the authorized representative of the vessel's Master, and which is endorsed with the ARGOS M's seal.[13]  PMG subsequently paid Lanka IOC PLC to deliver the Bunkers to the ARGOS M.[14]

On November 18, 2022, PMG Holding issued an invoice No. 22244811Tri in the amount of $217.927.86 to AUM and the ARGOS M's master, owners, managers, charterers, and operators for the Bunkers that were supplied to the vessel in the Port of Triconamalee, Sri Lanka.[15]  The Invoice as well as the Bunker Delivery Note were sent to AUM and Shimsupa.[16]  On December 20, 2022, Shimsupa acknowledged that the balance for the Bunkers supplied to the Vessel was outstanding due to banking issues and assuring that payment was forthcoming.[17]  On January 11, 2023, in lieu of payment, AUM, on behalf of Shimsupa, offered an assignment of a commercial

---

[9] See **Exhibit "A",** Declaration of PMG at ¶ 6 and Exhibit 2 at page 2 (Email exchanges) thereto.
[10] See **Exhibit "A",** Declaration of PMG at Exhibit 1 (Order Confirmation) thereto.
[11] See **Exhibit "A"**, Declaration of PMG at ¶ 13.
[12] See **Exhibit "C"**, Bunker Delivery Note; also see **Exhibit "D"**, Ullage reports.
[13] *Id*.
[14] See **Exhibit "A",** Declaration of PMG at ¶ 15.
[15] See **Exhibit "A",** Declaration of PMG at ¶ 16-17, and Exhibit 9 (Invoice) thereto.
[16] See **Exhibit "A",** Declaration of PMG at ¶ 18, and Exhibit 4 (Email exchanges) at page 3 through 7 of 7.
[17] See **Exhibit "A",** Declaration of PMG at ¶ 19, and Exhibit 4 (Email exchanges) at pages 2 and 3 of 7 thereto.

Letter of Credit to PMG to guarantee payment of the PMG invoice.[18]  Notably, Shimsupa is identified as the beneficiary of the Letter of Credit offered to PMG to guarantee payment for the Bunkers.[19]  The assignment was not accepted in lieu of payment.

Despite the ARGOS M accepting the Bunkers and receiving the beneficial use of them, PMG has not been paid for supplying and delivering the Bunkers to the vessel in the Port of Triconamalee, Sri Lanka.[20]  The full amount of the invoice of $217.927.86 plus late fee penalties through August 2, 2023 of $40,839.08, and ongoing, remains due and owing. [21]

**Procedural Background**.

On February 17, 2023, PMG filed a Verified Complaint seeking to enforce its maritime lien against the ARGOS M arising from the supply and delivery of the Bunkers.[22]  In conjunction with the complaint, PMG also filed a Motion for Admiralty Arrest of the ARGOS M upon her port call in the Port of New Orleans.[23]  The Court subsequently granted the motion for arrest deputizing Alan Swimmer of National Maritime Services, Inc. to execute and serve the warrant of vessel arrest.[24]  The Court also granted PMG's motion appointing National Maritime Services, Inc. as the substitute custodian of the vessel.[25]  On February 22, 2023, Mr. Swimmer served the warrant of vessel arrest upon the master of the ARGOS M at Nashville Avenue wharf.[26]  After PMG filed a Motion for Interlocutory Sale of the Vessel, R. Doc. 19, the ARGOS M's owner appeared and filed an answer to PMG's complaint, R. Doc. 27.  On March 24, 2023, Argos Bulkers also filed a

---

[18] See **Exhibit "A",** Declaration of PMG at ¶ 20 and Exhibit 5 (Email exchanges) thereto.
[19] *Id*. at page 20; also see **Exhibit "E"**, Shimsupa Letter of Credit.
[20] See **Exhibit "A"**, Declaration of PMG at ¶ 21-23.
[21] *Id*.
[22] R. Doc. 1 (Civil Action No. 2:23-cv-00623).
[23] R. Doc. 4 (Civil Action No. 2:23-cv-00623).
[24] R. Docs. 10, 11 and 12. (Civil Action No. 2:23-cv-00623).
[25] R. Doc. 13 (Civil Action No. 2:23-cv-00623).
[26] R. Doc. 18 (Civil Action No. 2:23-cv-00623).

Release Bond as substitute security in place of the vessel for PMG's claim, R. Doc. 33. The vessel arrest was lifted shortly thereafter, R. Doc. 42.

A scheduling conference was conducted, and a bench trial set for February 26, 2024, at 9:00 a.m., R. Doc. 44. Argos Bulkers propounded written discovery which has been answered.

### Consolidated Action.

On March 16, 2023, the Court consolidated PMG's lawsuit with Civil Action No. 23-cv-00595 entitled *Three Fifty Markets Ltd. v. M/V ARGOS M, her engines, tackle, equipment, appurtenances, etc, in rem*.[27] On August 1, 2023, Three Fifty Markets Ltd. filed a motion for summary judgement to enforce its maritime lien for a separate supply of bunkers against the ARGOS M.[28] Three Fifty Markets Ltd.'s motion for summary judgment is set for submission on September 27, 2023 at 9:00 a.m.[29]

### Law and Argument.

### Summary Judgment Legal Standard.

Summary judgment is appropriate when there is no genuine issue as to any material fact in the case, and it appears from the pleadings and any supporting affidavits or depositions that the moving party is entitled to judgment as a matter of law.[30] To defeat a motion for summary judgment, the nonmoving party must show the existence of genuine factual disputes that are material to the issues to be decided.[31]

---

[27] R. Doc.1.
[28] R. Doc. 50.
[29] R. Doc. 57.
[30] *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[31] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

To defeat a motion for summary judgment, the nonmoving party cannot rely on "mere belief or conjecture" or the allegations in the pleadings, but must show genuine factual issues for trial by setting forth specific facts in affidavits, depositions, discovery responses, or other evidence.[32] When the nonmoving party has the burden of proof on a particular issue and fails to provide sufficient evidence on that issue, then there is no genuine issue of material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.[33]

**PMG has a valid and enforceable Maritime Lien in the ARGOS M**.

PMG is entitled to summary judgment on its maritime lien claim under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, because it supplied fuel bunkers to the ARGOS M on the order of the Charterer, Shimsupa.

Pursuant to the general maritime law of the United States, a maritime lien is a privileged claim upon maritime property such as a vessel arising out of services, supplies or other "necessaries" provided to that property or vessel.[34] The lien is a proprietary right in the vessel itself as distinct from any personal liability of the vessel owner.[35] Federal courts have explained that a maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim subsisting from the moment the debt arises.[36] Maritime liens are governed by the

---

[32] *See Celotex*, 477 U.S. at 322-24.
[33] *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 254.
[34] 1, Thomas J. Schoenbaum, Admiralty & Mar. Law § 9:1 (6th ed.).
[35] *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) citing *Riffe Petroleum Co. v. Cibro Sales Corp.*, 601 F.2d 1385, 1389 (10th Cir. 1979); *see also World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F. Supp. 3d 792, 808 (E.D. Va. 2014), aff'd sub nom. *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507 (4th Cir. 2015) ("[i]n the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated") (internal citations omitted).
[36] 1, Thomas J. Schoenbaum, Admiralty & Mar. Law § 9:1 (6th ed.). (citations omitted.).

Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, and general maritime law.

Sec. 31301 of CIMLA defines "necessaries" as "repairs, *supplies*, towage, and the use of a dry dock or marine railway" provided to a vessel.[37] For the purposes of the CIMLA, federal courts have consistently held that fuel bunkers are "necessaries".[38] Regarding the establishment and enforcement of a maritime lien for providing "necessaries" to a vessel, the CIMLA states in pertinent part that:

> (a) A person providing necessaries to a vessel on the order of the owner or a person authorized by the owner-
>
> > (1) has a maritime lien on the vessel;
> >
> > (2) may bring a civil action in rem to enforce the lien; and
> >
> > (3) is not required to allege or prove in the action that credit was given to the vessel.[39]

Importantly, pursuant to Sec. 31341 of the CIMLA, a vessel's Master and Charterer or its agents are presumed to have authority to order and procure "necessaries" for the vessel.[40]

---

[37] 46 U.S.C. § 31301(4). (emphasis added.).
[38] 1, Thomas J. Schoenbaum, Admiralty & Mar. Law § 9:3 (6th ed.). (citing Gulf Oil Trading Co. v. M/V Caribe Mar, 757 F.2d 743 (5th Cir. 1985, among other cases)); See *e.g.*, *World Fuel Servs. Singapore, Pte., Ltd. v. M/V BULK JULIANA*, 13-cv-5421, 2014 WL 2719252, at *2 (E.D. La. June 16, 2014). *See also ING Bank, N.V. v. M/V Voge Fiesta*, 741 F.App'x 18 (2d Cir. 2018); *Marine Oil Trading Ltd. v. Motor Tanker PAROS*, 287 F. Supp. 2d 638, 641 (E.D. Va. 2003); *World Fuel Servs.*, 12 F. Supp. 3d at 809.
[39] 46 U.S.C. § 31342.
[40] 46 U.S.C. § 31341.

Considering the forgoing, to establish its lien, PMG only must show that (1) it supplied "necessaries" to the ARGOS M; and (2) the "necessaries" were on order from someone with authority to bind the vessel. It is undisputed that the Bunkers in question were supplied, delivered and accepted by the ARGOS M in the Port of Triconamalee, Sri Lanka as evidenced by the bunker delivery note which is signed by the vessel's Chief Engineer, as authorized by the Master, and endorsed with the vessel's seal.[41] Consequently, the only remaining issue is whether AUM and Shimsupa had authority to order the Bunkers, which they did.

### Both AUM and Shimsupa had authority to Order the fuel bunkers.

Pursuant to U.S. maritime law, a Charterer such as Shimsupa is presumed to have authority from the vessel owner to purchase the bunkers.[42]

"It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'" *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 414 (4th Cir. 2009) (quoting *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1127-28 (9th Cir. 2008)); *see also* 46 U.S.C. § 31341(a). This presumption is rebuttable if the owner is able to demonstrate that the seller of the necessaries had actual knowledge that the person ordering the necessaries lacked authority to bind the vessel. *See Gulf Oil Trading Co. v. M/V CARIBE MAR,* 757 F.2d 743 (5th Cir. 1985).

"Maritime law embraces the principles of agency." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985). Under these principles, "[a]pparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person

---

[41] See **Exhibit "C"**, Bunker Delivery Note; also see **Exhibit "D",** Ullage reports.
[42] 46 U.S.C. § 31341.

purporting to act for him." *Id.* (citing Restatement (Second) of Agency § 27). A party relying on apparent authority is therefore required to show that (1) the principal's conduct caused it to believe that the agent had this authority and (2) as a direct consequence thereof, it reasonably relied on the agent's purported authority. *Armit v. Eleni Intern., Shipping*, 201 F.3d 556, 559 (5th Cir. 2000). "While the existence of an agency relationship often turns on questions of fact, the issue is properly resolved as a matter of law where, as here, the relevant facts are uncontroverted." *Johnson v. Priceline.com*, 711 F.3d 271, 275 (2d Cir. 2013).

As stated above, the Order Confirmation including its Terms and Conditions was sent to both AUM and Shimsupa and neither objected.[43] Shimsupa and AUM are majority owned and controlled by the same principal, Mr. Annamalai Subbiah.[44] It was well known in the industry that AUM acted as agent for and on behalf of the vessel charterer Shimsupa.[45] The agency relationship between AUM and Shimsupa was known in the industry and to Argos Bulkers because, in conjunction with the charter of the ARGOS M, AUM executed a BIMCO Guarantee personally guaranteeing performance of the vessel charter.[46] The BIMCO Guarantee states in pertinent part:

> In consideration of the execution by you, at my request, of a charterparty, a copy of which is attached, chartering for a period of 120 days to 200 days the vessel M/V "ARGOS M" to Shimsupa GmbH hereinafter called Time Charterer I hereby agree as follows:
>
> (1) I hereby unconditionally guarantee, and become surety for, the full and timely performance by Time Charterer of each and every obligation of the charterer of every nature under said charter party, and in the event of any one or more defaults in

---

[43] See **Exhibit "A",** Declaration of PMG at ¶ 6, 7 and 8, and Exhibit 2 (Email exchanges) thereto.
[44] See **Exhibit "B"**, Bios of Mr. Subbiah, https://aum-metals.com/annamalai-subbiah/, https://www.shimsupa.de/founder-shimsupa-gmbh-co-kg/ ; See **Exhibit "A"**, Declaration of PMG at ¶ 11 and Exhibit 3 thereto; also see also see R. Doc. 50-4 at ¶ 5, Declaration of Dean Tenant to Motion for Summary Judgment by Three Fifty Markets Ltd.
[45] See **Exhibit "A",** Declaration of PMG at ¶ 10-12; also see R. Doc. 50-4 at ¶ 4, Declaration of Dean Tenant to Motion for Summary Judgment by Three Fifty Markets Ltd.
[46] **Exhibit "F"**, BIMCO Guarantee.

>performance by the charterer, I will promptly meet such obligation or obligations. I further agree that my liability hereunder to you shall be directly enforceable by you without any action of any nature by you against Time Charterer. …[47]

The guarantee further substantiates AUM's agency relationship with Shimsupa and Argos Bulkers' knowledge of it.

In addition, after the Bunker Delivery Note and Invoice 2244811Tri for the Bunkers were sent to AUM and Shimsupa,[48] Shimsupa confirmed that AUM was acting as its agent when the subject Bunkers were purchased by acknowledging that the payment for the bunkers provided to ARGOS M was outstanding and due to be paid.[49] Shimsupa explained that its payment was delayed because of banking issues but otherwise assured that payment would be forthcoming.[50] Thereafter, AUM offered a letter of credit on the account of Shumsupa to guarantee payment of PMG's invoice.[51]

The evidence is clear that AUM was acting as the agent of the vessel charterer, Shimsupa, when purchasing the Bunkers. Pursuant to the CIMLA, Shimsupa and its agent AUM are presumed to have authority to order and procure the Bunkers supplied by PMG for the ARGOS M.[52]

---

[47] **Exhibit "F"**, BIMCO Guarantee.
[48] See **Exhibit "A",** Declaration of PMG at ¶ 18, and Exhibit 4 (Email exchanges) at page 3.
[49] See **Exhibit "A",** Declaration of PMG at ¶ 19-20, and Exhibit 4 (Email exchanges) at pages 2 and 3 thereto.
[50] See **Exhibit "A",** Declaration of PMG at ¶ 19, and Exhibit 4 (Email exchanges) at pages 2 and 3 thereto.
[51] See **Exhibit "A",** Declaration of PMG at ¶ 20 and Exhibit 5 (Email exchanges) thereto; also see **Exhibit "E"**, Shimsupa Letter of Credit.
[52] 46 U.S.C. 31341(a)(4)(B); also see *Ocean Marine Contractors, Inc. v. OC-260, et al.*, 1996 WL 156780 *1 (E.D. La. 1996). (person entrusted with the management of the vessel, such as a charterer, is presumed to have authority to procure necessaries for a vessel.).

Moreover, to the extent that Argos Bulkers may argue that AUM and Shimsupa lacked authority to order Bunkers and bind the ARGOS M, the Fifth Circuit has consistently held:

> The ship's master or other person, such as a **charterer**, to whom the vessel is entrusted is presumed to have authority to purchase necessaries to the credit of the vessel.  The materialman who furnishes necessaries in response to a request from a master, **charterer** or other person in custody of the vessel **has no duty to inquire about that person's authority to bind the vessel**.[53]

Under U.S. Fifth Circuit precedent, a vessel owner seeking to defeat the maritime lien must show that the party supplying the necessaries to the vessel had actual knowledge that the person ordering the necessaries had no authority to bind the vessel.[54]  Here, there is no such evidence to establish that PMG had actual knowledge that the charterer, Shimsupa, and/or its agent, AUM, lacked authority to order necessaries or to bind the vessel.  After Shimsupa and AUM procured the subject fuel Bunker supplied by PMG, the ARGOS M received the beneficial use of them during the vessel's subsequent voyages including to New Orleans where she was arrested for failure to pay for them.

Accordingly, because fuel bunkers are necessaries under U.S. maritime law and because AUM and Shimsupa had authority to order the Bunkers in question on behalf of the ARGOS M, PMG has a valid and enforceable maritime lien in the ARGOS M and this case is ripe for summary judgment in PMG's favor.

---

[53] *Ferromet Resources, Inc. v. Chemoil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993) (emphasis added.).
[54] *Ferromet Resources, Inc. v. Chemoil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993) (citing *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir. 1985)).

**PMG is Entitled to Damages in the amount of $217,927.86, plus Expenses of *Custodia Legis*, and Prejudgment Interest**.

    A.    **PMG is Entitled to recover $217,927.86 for the Unpaid Bunkers**.

Pursuant to PMG Invoice No. 22244811Tri, PMG supplied 250 MT of marine fuel Bunkers at a price of $873 per MT, for a total of US $217.927.86.[55] This amount was due on or before December 17, 2022, but was never paid.[56] As a result, the ARGOS M still owes PMG $217.927.86 for the Bunkers supplied.

    B.    **PMG is Entitled to Recover *Custodia Legis* Expenses in the Amount of $31,000.73**.

It is hornbook admiralty law that the expenses of *custodia legis* are paid before any other liens. "Generally, competing maritime lien claims are first ranked according to class. The classes are, from highest priority to lowest, the following: 1. Expenses of justice during *custodia legis* – expenses arising from the care and operation of the ship while it is in the custody of the Court through the U.S. Marshal (not regarded as a lien, but given priority)."[57] PMG is entitled to its *custodia legis* expenses, which were paid to the court-appointed substitute custodian.

> When a vessel is in *custodia legis*, expenses and costs incurred while the vessel is under arrest cannot create a maritime lien. Further, seizure revokes all authority to incur liabilities on behalf of the vessel. Utilizing the court's inherent equitable power where "equity and good conscience" require, expenses incurred while in *custodia legis* may be recovered, however, as an "expense of justice" if the services or property furnished upon the authority of the court serves the common benefit of all those parties having an interest in the vessel. Moreover, in order to receive reimbursement for products or services provided to a vessel in *custodia legis*, the products or

---

[55] See **Exhibit "A"**, Declaration of PMG, and Exhibit 9 attached thereto, Invoice.
[56] See **Exhibit "A"**, Declaration of PMG at ¶ 16, 17-20, and Exhibit 9 attached thereto, Invoice.
[57] *United States v. One (1) 254 Ft. Freighter, the M/V Andoria*, 570 F.Supp. 413, 415 (E.D. La. 1983).

services must be necessary for the due care and preservation of the ship.[58]

PMG incurred and paid *custodia legis* expenses totaling $31,000.73 to the court-appointed substitute custodian, National Maritime Services.[59]

This Court authorized the U.S. Marshal Service to arrest the ARGOS M and deputized National Maritime Services to execute the warrant of arrest.[60] The Court also appointed National Maritime Services as the substitute custodian of the vessel.[61] The services performed by National Maritime Services were furnished to the vessel in accordance with this Court's Order and for the due care and preservation of the vessel during the period of its arrest.[62]

Accordingly, PMG is entitled to recover $31,000.73 in *custodia legis* expenses.

### C.  PMG is Entitled to Prejudgment Interest.

PMG is entitled to prejudgment interest. In admiralty cases, although an award of prejudgment interest is within the court's discretion, such an award is "the rule rather than the exception, and in practice, is well-nigh automatic."[63] "Prejudgment interest is awarded 'as compensation for the use of funds to which the claimant was rightfully entitled.'"[64] Prejudgment

---

[58] *Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland plc*, 817 F.Supp. 1254, 1259-60 (E.D. Pa.), *aff'd sub nom. Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 176 (3d Cir. 1993), and *aff'd sub nom. Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015 (3d Cir. 1993) (citing *New York Dock Co. v. Steamship POZNAN*, 274 U.S. 117, 120-22 (1927); *Kingstate Oil v. M/V GREEN STAR*, 815 f.2D 918, 922-23 (3D Cir. 1987); 2 Benedict on Admiralty § 48, at 3-86-87 (7th ed. 1992)); *see also Transamerica Commercial Fin. Corp. v. F/V Smilelee*, 944 F.2d 186, 189 (4th Cir. 1991).
[59] See **Exhibit "G"**, National Maritime Services statement and invoice.
[60] R. Docs. 10, 11 and 12 (Civil Action No. 2:23-cv-00623).
[61] R. Doc. 13 (Civil Action No. 2:23-cv-00623).
[62] R. Doc. 13 (Civil Action No. 2:23-cv-00623).
[63] *World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F.Supp.3d 810, 813 (E.D. Va. 2014) (quoting *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir. 1992)).
[64] *Id*. (quoting *U.S. Fire Ins. Co.*, 966 F.2d 828).

interest is generally awarded from the date of the loss.[65] In this case, the date of loss is December 17, 2022, the date that payment on the invoice was due but not paid.[66]

Under the applicable Order Confirmation's Terms and Conditions, which were sent to the vessel charterer Shimsupa and its agent AUM, provides that interest will accrue at the rate of 2.5% per month on all balances that remain due.[67] Accordingly, PMG is entitled to prejudgment interest on the unpaid amount at the rate of 2.5% per month beginning on the invoice due date of December 17, 2022 through September 11, 2023 of $48,003.84.[68]

The total clam amount is calculate as follows:

| | | |
|---|---|---|
| 1. | Principal Amount Due | $217.927.86 |
| 2. | Interest from December 17, 2022 to August 2, 2023 | $ 48,003.84 |
| 3. | *Custodia Legis* Costs | $ 31,000.73 |
| | TOTAL | $296,932.43 |

## CONCLUSION

Because there are no genuine issues of material facts with respect to the sale and supply of the subject Bunkers to the M/V ARGOS M, plaintiff PMG is entitled to summary judgment on its maritime lien claim against the vessel and is therefore entitled to execute its maritime lien and collect the sum owed of $289,767.67.

---

[65] *World Fuel Servs.*, 12 F.Supp.3d at 816.
[66] See **Exhibit "A"**, Declaration of PMG at ¶ 16 and Exhibit 1 thereto.
[67] *Id*.
[68] See **Exhibit "A"**, Declaration of PMG at ¶ 23. The rate at which prejudgment interest is awarded is also within the court's discretion. *World Fuel Servs.*, 12 F.Supp.3d at 813. In *World Fuel Servs.*, Judge Davis elected to award prejudgment interest to the bunker supplier using the prime rate, after concluding that "the prime rate best compensates a plaintiff because the prime rate represents the cost of borrowing money, which is a better measure of the harm suffered as a result of the loss of the use of money over time." *Id*. at 815 (internal citations omitted). While PMG believes that the rate provided for under its agreement is the most appropriate in this case, the court may wish to consider, in the alternative, awarding prejudgment interest at the prime rate.

WHEREFORE, PMG Holding SRL respectfully requests that this Court grant its motion for summary judgment; allow plaintiff to execute its maritime lien and collect the sum of $289,767.67 from the funds held in the Court's registry; and grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

BROOKS GELPI HAASÉ, L.L.C.

*/s/ Philip S. Brooks, Jr.*

_____
PHILIP S. BROOKS, JR. (#21501)
RONALD J. KITTO (#28638)
909 Poydras Street, Suite 2325
New Orleans, LA 70112
Telephone:   (504) 224-6723
Facsimile:    (504) 534-3170
E-mail:        pbrooks@brooksgelpi.com
                 rkitto@brooksgelpi.com

*Attorneys for Plaintiff, PMG Holding SRL*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2023, the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.

*/s/ Philip S. Brooks, Jr.*

_____
PHILIP S. BROOKS, JR. (#21501)
Brooks Gelpi Haasé, L.L.C.
909 Poydras Street, Suite 2325
New Orleans, LA 70112
Telephone:   (504) 224-6723
Facsimile:    (504) 534-3170
E-mail:        pbrooks@brooksgelpi.com

*Attorneys for Plaintiff, PMG Holding SRL*