## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THREE FIFTY MARKETS LTD.** | * | **CASE NO. 2:23-cv-00595** |
| | * | **c/w  2:23-cv-00623** |
| | * | |
| **VERSUS** | * | **JUDGE ELDON E. FALLON** |
| | * | |
| **M/V ARGOS M, her engines, tackle,** | * | **MAGISTRATE JUDGE NORTH** |
| **equipment, appurtenances, etc.,** *in rem* | * | **APPLIES TO 23-cv-00623** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### OPPOSITION TO PMG HOLDING SRL'S MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

"Because a maritime lien is deemed to encumber commerce, it is disfavored in the law and its requisites are construed *stricti juris* by the courts." *ING Bank N.V. v. Temara*, 203 F.Supp.3d 355, 366 (S.D.N.Y. 2016) (quoting *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 14 (1st Cir. 2010)), *aff'd*, 892 F.3d 511 (2d Cir. 2018). Between this required strict construction of maritime liens and the fact-intensive nature of any apparent authority inquiry, the Motion for Summary Judgment (R. Doc. 58) filed prematurely by plaintiff, PMG Holding SRL ("PMG"), against the M/V ARGOS M, *in rem*, must be denied now for several reasons.

Overarchingly, despite even PMG recognizing that any success in seeking a maritime lien against the M/V ARGOS M hinges entirely upon the existence of apparent authority, it fails to present any competent documentary evidence whatsoever that either it or its bunker broker, Dean Tennant of BunkerEx Ltd., received the requisite manifestations of authority from the charterer-principal here, Shimsupa GmbH ("Shimsupa"), and its inability to carry its burden on apparent authority under the applicable law is fatal to its summary judgment effort. Further, because PMG's success on its alleged maritime lien claim rests exclusively on witness credibility, the credibility issues with the recent testimony and the lack of *any documentation whatsoever* on the authority question cannot be resolved at the summary judgment stage, as the Court previously noted with

respect to the summary judgment motion of Three Fifty Markets.

Briefly put, the myriad genuine issues of material fact in tandem with the applicable law warrants that PMG's premature Motion for Summary Judgment be denied in its entirety.

**Factual Background**

The M/V ARGOS M is a Liberian-flagged bulk cargo vessel owned by claimant vessel owner Argos Bulkers, Inc. ("Argos") at all pertinent times.[1] On or about 28 July 2022, Argos, as owner, time chartered the ARGOS M to Shimsupa.[2] The recap for the charter party fixed on that date incorporated main body terms from another ARGOS M form charter as well as riders.[3] AUM Scrap and Metals Waste Trading, LLC ("AUM") guaranteed Shimsupa's financial obligations under the charter.[4] Importantly, review of the charter party itself and all incorporated documents confirms *it is undisputed that the relevant charter for the ARGOS M was solely between Argos and Shimsupa*, such that AUM undisputedly was <u>not</u> a party to the charter.[5]

Several provisions of the governing charter are relevant to this case. First, as noted above, the Argos-Shimsupa recap clearly incorporates the terms of the form charter that had been attached to the recap, along with the riders to same.[6] Critically, the governing charter here contains a "no lien" clause at ll. 112-113 of the Main Body, which in no uncertain terms precludes the charterer from allowing a lien on the vessel: **"Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."**[7]

Multiple clauses within the Riders also underscore this prohibition. At Clause 52, Owners

---

[1] See Declaration of Nikos Kekridis, attached hereto as Exhibit A, ¶ 3.
[2] See Exhibit A, ¶ 4, and Exhibit A-1.
[3] *Id.* (illustrating the incorporated attachments to the Shimsupa fixture recap).
[4] Exhibit A, ¶¶ 7-8, and Exhibit A-2.
[5] Exhibit A, ¶ 4.
[6] Exhibit A-1, p. 8, ¶ 18.
[7] Exhibit A-1, ARGOS M 000139 (ll. 112-113) (emphasis added).

disclaim all responsibility for unpaid bills, and the language of that clause requires charterers to instruct their agents and bunker suppliers (as well as others involved with provision of services to the vessel) to countersign the Master's stamp that acceptance of services is on behalf of Charterers only.[8] And then Clause 109 repeats the "no lien" provision and adds additional limitations, including *disallowing specifically any lien for bunkers* and requiring that Charterers inform bunker sellers in writing regarding the "Non-Lien Notice."[9] These unambiguous contractual provisions confirm Shimsupa lacked actual authority to bind the vessel when it came to provision of bunkers.

Moving to the pertinent sequence of events here, as time charterer of the ARGOS M, Shimsupa controlled the vessel's route and the ports to which it called and/or where the vessel traded, and bunkers were its responsibility under the charter party.[10] In mid-November 2022, the vessel evidently needed bunkers. Purportedly, Shimsupa did not handle bunker arrangements on its own. Instead, for a fee, it hired a separate and discrete company to do so – AUM, allegedly on behalf of Shimsupa, though no documentary evidence exists to resolve this factual question.[11]

Candidly, there is much that is unknown as to how PMG came to provide bunkers to the ARGOS M. But apparently, sometime in November 2022, a bunker broker – Dean Tennant of London-based BunkerEx, Ltd. ("BunkerEx") – contacted PMG, seeking to obtain bunkers for the ARGOS M that were to be stemmed at the Port of Trincomalee in Sri Lanka.[12] It is unknown whom Tennant initially spoke with at PMG (which is where he had formerly been employed)[13] with respect to the November 2022 bunkering at Trincomalee, but he evidently relayed to PMG that he

---

[8] Exhibit A-1, ARGOS M 000156.
[9] Exhibit A-1, ARGOS M 000185.
[10] Exhibit A, ¶ 5.
[11] *See* excerpts from deposition of Dean Tennant, attached hereto as Exhibit B, p. 18:22 – 19:23, 21:24 – 22:6, 60:12-24; *see* excerpts from deposition of Anna Malamen, attached hereto as Exhibit C, p. 17:20 – 18:25, 19:1-11, 35:9 – 36:16; *see also generally* R. Doc. 58 and exhibits thereto (revealing said lack).
[12] *E.g.*, *generally*, R. Doc. 58-2; *see* Exhibit C, p. 5:21 – 6:10 (testifying she was involved only on the credit side).
[13] Exhibit B, p. 8:9-16.

had been retained by AUM to obtain bunkers for the ARGOS M at the aforementioned port.[14] While Tennant has testified that he would typically reach out to a number of bunker traders to fulfill a stem, PMG has not produced any documentation to date that would detail whether he did on this occasion. Of note, the only pre-stem communication between Tennant and AUM that PMG has produced to date appears to be the trade confirmation that Tennant sent to Fahim Shamsi of AUM on 16 November 2022.[15] The trade confirmation email reflects a price of $873 per metric ton of VLSFO, but it is unknown whether Tennant shopped around and/or whether AUM instructed Tennant to obtain the bunkers from a particular subcontractor.[16] Ultimately, the bunker confirmation listed as "Buyer" "AUM Scrap and Metals Waste Trading LLC"."[17] And of note, PMG's bunker nomination lists the Customer as "AUM Scrap and Metals Waste Trading LLC C/O ARGOS BULKERS INC c/o Pontos Marine Inc[,]" such that noticeably missing from that "Buyer" line on the bunker confirmation is any reference to Shimsupa, the actual charterer of the vessel, indicating that PMG and Tennant thought at the time of the stem that AUM was the charterer of the vessel (which it undisputedly never was).[18]

The bunkers were ultimately stemmed aboard the ARGOS M at Trincomalee, and then on 18 November 2022, an invoice from PMG was issued to "AUM Scrap and Waste Metals Trading LLC" at its Dubai address, for 249.631 metric tons of VLSFO fuel at $873.00 per metric ton, with a due date of 17 December 2022 for the invoice total, by way of BunkerEx.[19] Evidently, 17 December 2022 came and went without any payment from AUM, as did the following months, with AUM **never** paying PMG for the bunkers stemmed at Trincomalee in November 2022.[20]

---

[14] *See generally* R. Doc. 58-2.
[15] *See* R. Doc. 58-2, p. 24.
[16] *Id.*
[17] R. Doc. 58-2, p. 24.
[18] *See* R. Doc. 68-2, p. 6 (PMG Bunker Nomination dated 14 November 2022).
[19] R. Doc. 58-2, p. 62.
[20] R. Doc. 58-2, p. 4.

After months of nonpayment by AUM, PMG filed its Verified Complaint in this Honorable Court on 17 February 2023, seeking a maritime lien against the M/V ARGOS M due to AUM's nonpayment for the bunkers stemmed at Trincomalee.[21] Despite PMG purportedly knowing prior to the transaction at issue that Shimsupa was the charterer of the vessel and that AUM was the entity with which it contracted for this particular bunker stem, neither entity is mentioned in PMG's Verified Complaint, with PMG instead electing to vaguely allege only that "PMG Holding entered into a marine fuel oil supply agreement with those individuals and/or entities acting on behalf of the M/V ARGOS M" as the basis for the maritime lien and arrest sought.[22] Regardless, given that it is undisputed that AUM was PMG's customer and contractual partner[23] yet was not the charterer of the ARGOS M at the pertinent time (or any time, for that matter), PMG's pursuit of a maritime lien against the vessel depends on the existence of AUM's authority (or lack thereof, here) to bind the vessel. As such, communications and manifestations among the parties are key.

First, both Tennant and Malamen testified that neither ever dealt with or had any communications directly with Argos, the owner of the ARGOS M.[24] For her part, Malamen testified that she and/or PMG did not have any communications whatsoever with anyone at AUM or anyone at Shimsupa – all PMG communications relating to the stem were only with Tennant at BunkerEx, in Tennant's role as bunker broker.[25] Furthermore, any and all beliefs, assumptions and "understandings" that Malamen had regarding AUM's authority to act as agent for Shimsupa came from Tennant, as did any beliefs, assumptions and "understandings" regarding which entity was the charterer of the ARGOS M.[26] Apparently, her understanding of the relationship between the

---

[21] Civ. A. No. 23-00623, R. Doc. 1.
[22] Civ. A. No. 23-00623, R. Doc. 1, p. 2, ¶ 6.
[23] Exhibit C, p. 28:8-12, 45:21-24.
[24] Exhibit B, p. 13:7-9; Exhibit C, p. 27:2 – 28:25, 29:1-8, 29:22-25.
[25] Exhibit C, p. 9:5 – 10:7, 15:6-24, 17:20 – 18:25, 19:1-11, 33:1-11, 35:9 – 36:16, 40:17-21.
[26] *Id.*

two entities led her to believe that AUM was a disclosed agent for the disclosed principal Shimsupa (despite the lack of information in PMG's Verified Complaint, and the bill being directed to AUM, not Shimsupa).[27] Malamen readily testified that PMG had no written communication or documentation whatsoever regarding AUM's authority or the existence of any agency relationship between Shimsupa and AUM.[28]

Malamen's testimony makes clear that Tennant served as the only communicator on the buying side of this bunker transaction. But Tennant's testimony in turn illuminates that he only ever communicated with AUM-linked personnel and email addresses, mostly through Fahim Shamsi.[29] And he testified that he "believe[d]" that Shamsi worked for "both" and "believe[d]" he had "email addresses for both companies," yet Tennant's emails in this matter reflect only an "@aum-metals.com" email address for Shamsi.[30] And Tennant testified that he did not have any written communications identifying which entity chartered the vessel, only conveniently recalling that he was told "verbally" that Shimsupa was the charterer while AUM was the entity obtaining the bunkers.[31] Interestingly, Tennant managed this definitive recall that he knew at the time that Shimsupa was the charterer of this particular vessel all these months later, despite his inability to recall which entity chartered other vessels, and even though he testified that he knew *both* AUM and Shimsupa chartered vessels but the WhatsApp messages produced in the litigation do not identify which entity chartered which vessels.[32] Tennant likewise admitted he did not have any written evidence to support his belief that AUM was acting for the benefit of Shimsupa in this particular transaction prior to its occurrence.[33] The only written evidence he could point to that

---

[27] Exhibit C, p. 39:15 – 40:8.
[28] Exhibit C, p. 9:5 – 10:7, 17:20 – 18:25, 19:1-11, 33:8-11, 35:9 – 36:16.
[29] Exhibit B, p. 17:1-3.
[30] Exhibit B, p. 20:18 – 21:10; *compare* R. Doc. 58-2, showing only an "@aum-metals.com" address for Shamsi.
[31] Exhibit B, p. 22:10 – 23:10.
[32] *Compare* Exhibit B, p. 22:10 – 23:10, 40:12-14, *with* Exhibit B, p. 43:8-21.
[33] Exhibit B, p. 31:24 – 32:5.

topic was an email that he sought and received in March of 2023 (*i.e.*, five months *after* the bunker stem transaction) that came from an AUM email address and belatedly (and self-servingly) noted that AUM had had authority to order the bunkers.[34]

Of note here, Tennant admitted that he is aware that charter parties often contain "no lien" clauses, but then confirmed he never bothered to ask AUM or Shimsupa, which he supposedly believed was the charterer, whether there was such a clause in this charter party.[35] Malamen also confirmed that PMG is likewise familiar with the existence of "no lien" clauses in charter parties, so much so that PMG has a policy for addressing same when notified of one's existence – in that case, PMG requires prepayment and refuses to extend credit to the customer.[36] Yet PMG apparently takes something of a "willful blindness" approach to the prevalence of these contractual "no lien" clauses, instead relying on "the other party" to notify it if one exists, as opposed to simply inquiring with its contractual partner as to the possibility of same.[37]

The testimony of Tennant and Malamen together reveals that both harbored the mistaken belief that AUM and Shimsupa were "as good as the same" company and were "linked,"[38] despite Tennant and/or Malamen acknowledging that their countries of incorporation differed, the two were indeed separate commercial entities, both of them *separately* chartered vessels, and the fact that any respective beliefs that the two had the same majority owner were demonstrably false.[39]

First, as alluded to above, Shimsupa is a German corporation based in Frankfurt, Germany, while AUM is organized under the laws of the United Arab Emirates and headquartered in Dubai.[40]

---

[34] Exhibit B, p. 34:1 – 35:21. The very fact that this purported confirmation was sought later by BunkerEx from AUM at that particular interval further evidences that BunkerEx was unaware of the relationship between the companies at the time of the transaction at issue.
[35] Exhibit B, p. 24:12 – 25:9.
[36] Exhibit C, p. 30:4-17.
[37] Exhibit C, p. 30:4-17.
[38] Exhibit B, p. 19:9-12; Exhibit C, p. 17:20 – 18:25.
[39] Exhibit B, p. 7:17-22, 8:1-10, 36:14-18, 39:23 – 40:14, 41:2-5; Exhibit C, p. 9:5 – 15:24, 17:20 – 18:25.
[40] *See* Exhibit A-1 and R. Doc. 60-6.

The two companies also have different ownership structures and/or managing directors, with Annamalai Subbiah ostensibly serving as the founder and director of Shimsupa while Rajendran Nair Biju Rajendran Nair Thankappan Nair served as the Managing Director of AUM,[41] upon information and belief. And the distinct nature of the companies is evidenced by the fact that **AUM is paid for its services in procuring bunkers for vessels chartered by Shimsupa**, rendering AUM a contractor.[42] This premise comes directly from AUM's Managing Director, Biju Nair:[43]

From: **Biju aum** <biju@aum-metals.com>
Date: Fri, Mar 10, 2023 at 20:12
Subject: Re: Shimsupa <> AUM Link
To: Ishaan Hemnani <ishaan@bunker-ex.com>
CC: Anna Aum <anna@aum-metals.com>, Jeya aum <jeya@aum-metals.com>, Dean Tennant <dean@bunker-ex.com>

Dear Ishaan,

Please be informed that Aum Scarp and Metal Waste Trading and Shimsupa GmbH are totally two entities with different partners.

AUM gets facilty from Bunkering companies and traders due to their financial strength and credibility and AUM charges certain percentage for providing Bunkering services for vessels chartered under Shimsupa.

Thanks and Regards,
Biju R Nair

Put another way, Shimsupa evidently contracts with AUM to handle the bunker needs for the vessels it charters, a contractual relationship from which AUM benefits financially.

And while PMG glossed over BunkerEx's involvement in this matter in presenting its factual background to the Court, it plays a consequential role in this matter, as it forms a key link in what will turn out to be a four-party contractor and/or supplier chain. By Tennant's own characterization of his role, when approached by a client seeking a bunker stem in a particular port, a bunker broker will then reach out to one or more bunker traders at or around the subject port,

---

[41] R. Doc. 60-6, at 000015 (listing Nair as General Manager), 000017 (stating majority shareholder is Jamal Nasser Almatrooshi), 000024 (listing Nair as Managing Director).
[42] *See* R. Doc. 60-7 (10 March 2023 email from AUM to BunkerEx).
[43] *Id.*

gathering quotes for the sought-after stem from said bunker traders.[44] The bunker traders, in turn, seek out a physical supplier for the fuel, which can ultimately result in another trader getting involved before a physical supplier is contracted.[45] Here, the bunker supply chain for the ARGOS M at Trincomalee ultimately looked as follows:

**Argos (Owner) → Shimsupa (Charterer) → AUM (third party / intermediary / contractor) → BunkerEx (fuel broker) → PMG (fuel trader) → Lanka IOC (physical supplier)[46]**

Notably, each link in this chain above the charterer makes money over the previous one – with the traders and suppliers, by way of a markup in between each link, and then with a broker like BunkerEx, by way of a brokerage commission that is paid once the trader (here, PMG) is paid.[47] Thus, since PMG has not yet been paid, BunkerEx has not yet been paid (rendering Tennant a biased and interested third-party witness here).[48] And again, AUM also makes money on the bunker-related procurement services it reportedly provides for Shimsupa.[49]

In all, PMG's Motion appears to concede that AUM was never the charterer of the ARGOS M, such that it must establish the requisite element of "apparent authority" in order to prevail against the ARGOS M, *in rem*, in its pursuit of a maritime lien. But in light of the evidence required to do so and the requisite strict construction of maritime liens, PMG cannot do so.

## Law and Argument

### I.   *Applicable Summary Judgment Burdens and Standards*

Axiomatically, summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[44] Exhibit B, p. 27:1 – 29:20.
[45] Exhibit B, p. 28:8 – 29:20; Exhibit C, p. 23:1-16, 40:22 – 42:15.
[46] *See generally id.* As seen, in just the middle of the chain, PMG is four links away from the vessel owner.
[47] Exhibit B, p. 30:1-16.
[48] *Id.* Of note though, PMG did issue payment to Lanka IOC. *See* Exhibit C, p. 40:22 – 41:4.
[49] R. Doc. 60-7.

law." Fed. R. Civ. P. 56(a). It is unquestionably the moving party's burden to establish the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also In re Settoon Towing, L.L.C.*, 720 F.3d 268, 275 (5th Cir. 2013). For summary judgment purposes, "[a]n issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party" and "[a] fact issue is 'material' if its resolution could affect the outcome of the action." *Id.* (quotation omitted); *see also, e.g.*, *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014)). In reviewing a motion for summary judgment, the court is to view the evidence in the light most favorable to the non-moving party, and also must draw any reasonable inferences or resolve any doubts in favor of the non-movant. *See, e.g.*, *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir. 2009); *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 288 (5th Cir. 2008). In short, "summary judgment is improper if a reasonable factfinder could find in favor of the non-movant." *Lay v. Singing River Health Sys.*, 694 F. App'x 248, 253 (5th Cir. 2017).

Here, PMG's claim against the ARGOS M seeks a maritime lien, a fact-intensive question of general maritime law that invokes inquiries into case- and fact-specific principles such as apparent authority, as well as the relationships between and among the numerous parties of the contractual chain. As detailed in depth below, PMG must convince this Court in particular that apparent authority exists, which is generally regarded as question of fact for which summary judgment is inappropriate. *E.g.*, *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71-74 (2d Cir. 2012) (reversing trial court due to disputed issues as to apparent authority); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 176 (5th Cir. 1975) ("Questions of apparent authority are questions of fact, and are therefore for the jury to determine."); *Maymar Marine Supply, Inc. v. Arab Mar. Petroleum Transp. Co.*, No. 4:20-CV-3804, 2021 WL 5155700, at *2 (S.D. Tex. May 4, 2021) (denying summary judgment seeking maritime lien due to questions of

fact regarding the existence of apparent authority and because it was premature).

Considering the foregoing standards and the factual disputes described below, and like with consolidated plaintiff Three Fifty Markets Ltd.'s similar motion that was denied by the Court on 1 November 2023,[50] summary judgment is inappropriate here, and PMG's Motion must be denied.

## II.  *Governing Legal Principles*[51]

### A.  Maritime Liens

Under U.S. maritime law, "[t]he Commercial Instruments and Maritime Liens Act ("CIMLA") governs the circumstances under which a party is entitled to a maritime lien," with CIMLA found at 46 U.S.C. §31341 *et seq. Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018). Extrapolating from 46 U.S.C. §31342(a), to prove that a maritime lien exists under the CIMLA, a lien-pursuing party such as PMG "must show it is: (1) a person providing necessaries; (2) to a vessel; and (3) on the order of the owner or a person authorized by the owner." *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 273 (4th Cir. 2022). Bunkers are necessaries, with nonpayment for same potentially giving rise to a maritime lien (*see id.*), and there is no question that the bunkers were provided to the ARGOS M. Thus, the maritime lien question here turns on the third element for this case – whether these bunkers were ordered by "a person authorized by the owner" of the ARGOS M.

The Fifth Circuit has explicitly instructed courts to "apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not lightly extended by construction, analogy, or inference." *Valero Mktg. & Supply Co.*, 893 F.3d at 292 (quotation omitted); *see also Sing Fuels*, 39 F.4th at 278 (quoting *Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir.

---

[50] R. Doc. 75.
[51] Argos first contends that the Motion should be denied simply because PMG has offered no evidence why U.S. law is applicable. *See* Response to Statement of Undisputed Material Facts, sec. I (10, 13) and II (1, 2).

1979)). This mandated strict construction makes commercial sense – such a security device is often assessed against an entity (the vessel owner) lacking contractual privity and/or communication with the party seeking the remedy, and the jurisprudence recognizes that maritime liens encumber commerce and are disfavored under the law. *E.g.*, *Temara, supra*; c*f. Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switz.) SA*, 239 F.Supp.3d 674, 684 (S.D.N.Y. 2017) (noting this "strict approach" to maritime liens protects against "[p]erverse incentives [that] are also possible; for example, parties confident that they have a lien on a vessel may be less likely to conduct due diligence or carefully memorialize their agreements"), *ultimately aff'd sub nom.*, 745 F. App'x 414 (2d Cir. 2018). And "a maritime lien is ***not*** automatic for suppliers of 'necessaries' but instead depends on the relationships between the parties involved." *ING Bank, N.V. v. M/V Charana Naree*, 446 F.Supp.3d 163, 169 (W.D. La. 2020) (emphasis added).

Section 31341(a) lists a number of individuals "presumed to have authority to procure necessaries for a vessel." That list includes "an officer or agent appointed by … a charterer," but the presumptive authority provided in Section 31341(a) carries with it some commonsense boundaries. On that note, "[w]hile this list is not necessarily exhaustive, a direct contractual or agency nexus between the supplier and the vessel or its agents is typically required." *Clearlake Shipping*, 239 F.Supp.3d at 684. To that end, "[s]ubcontractors who deal with a contractor or a middle-man lack a direct connection to the vessel." *Id.* (citing *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 229 (5th Cir. 1999)).

Critically here, even where the presumption may be applicable, the jurisprudence reflects that it is rebuttable in a few ways, including two that are potentially relevant here: 1) with competent evidence that the entity procuring the necessaries did not act with the requisite authority to encumber the vessel (*see, e.g.*, *Sing Fuels, supra*); and 2) where an entity in the supply chain

had received actual notice of a "no lien" clause in the relevant charter (*see, e.g.*, *M/V Charana Naree, supra*, and *Hampton Bermuda Ltd.*, *infra*). As explained herein, any potential application of presumptive authority is rebutted under the facts here, since neither actual nor apparent authority to bind the vessel existed on the part of either AUM or BunkerEx.

### B.   Actual or Apparent Authority

Maritime law embraces typical agency principles, such that the authority required to warrant a maritime lien can be of the actual or the apparent variety, and the agency inquiry considers the roles of the parties involved in the transaction. *E.g.*, *Lake Charles Stevedores, Inc.*, 199 F.3d at 226; *Sing Fuels, supra*. The persuasive *Sing Fuels* decision (discussed in detail *infra*) notes that actual authority to create a lien on the vessel is negated by the presence of "no lien" clauses in the operative charter party, like here. *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI*, 534 F.Supp.3d 551, 566 (E.D. Va. 2021), *aff'd sub nom.*, 39 F.4th 263 (4th Cir. 2022).

Apparent authority determinations turn on manifestations by the principal to the third-party, and a third party's subjective beliefs are irrelevant to the inquiry. *M/V Charana Naree*, 446 F.Supp.3d at 171. "A party relying on apparent authority is therefore required to show that (1) the principal's conduct caused it to believe that the agent had this authority and (2) as a direct consequence thereof, it reasonably relied on the agent's purported authority." *Id.*

Put another way, "[a]pparent authority is present <u>only</u> when a third party's belief is traceable to **manifestations of the principal**." *Sing Fuels,* 39 F.4th at 275 (quoting Restatement (Third) of Agency § 3.03 cmt. b) (emphasis added). This tenet has been uniformly stressed by federal courts in the context of authority questions. "Just as under the general common law, *see* Restatement (Third) of Agency § 2.03 (2006), 'under maritime law, apparent authority cannot be evidenced by statements of an agent alone[.]'" *Garanti Finansal Kiralama A.S.*, 697 F.3d at 73 (quoting *Coastal Drilling Co., L.L.C. v. Shinn Enters., Inc.,* Civ. A. 05–4007, 2008 WL 907520,

at *2 (E.D. La. Mar. 31, 2008)); *see also, e.g.*, *Maymar, supra* at *1; *Sing Fuels*, 534 F.Supp.3d at 562 ("[I]t is well-established that 'agency can be established, under United States law, only by evidence of overt acts on the part of the principal that would indicate an agency relationship; the subjective beliefs of the persons dealing with the alleged agent are thus irrelevant to the inquiry.'") (quoting *Hawkspere Shipping Co. v. Intamex*, S.A., 330 F.3d 225, 235 (4th Cir. 2003)). In other words, where there are no "manifestations of the principal," there can be no apparent authority.

"The burden of proving an agency relationship is on the party who asserts the existence of the relationship," which here is PMG. *Temara*, 203 F.Supp.3d at 363 (citing *Garanti Finansal Kiralama A.S.*, *supra*). At this summary judgment stage, any and all inferences concerning the existence of apparent authority to bind the vessel must be drawn *in favor of Argos*, as the non-movant. *Garanti Finansal Kiralama, A.S.*, 697 F.3d at 73. And once again, "[g]enerally, the existence of either actual or apparent authority is a question of fact, revolving as it does around the actions by, and relationships between, principal, agent, and third parties." *Id.* at 71. Moreover, timing is everything – the existence or not of apparent authority depends upon what the third party knew and/or relied upon _at the time of the transaction_. *E.g.*, *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 70 (2d Cir. 2003); *Adler v. Solar Power, Inc.*, No. 16-cv1635, 2018 WL 1626162, at *7 (S.D.N.Y. Mar. 30, 2018); *Coffey v. Fort Wayne Pools, Inc.*, 24 F.Supp.2d 671, 682 (N.D. Tex. 1998); *accord GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1128 (8th Cir. 2022) ("Also, apparent authority must be based on facts that exist at the time of the transaction and may not be based on facts that arise later.") (quotation omitted). Application of these governing principles concerning apparent authority reveals that PMG lacks evidence to meet the requisite parameters for apparent authority and several factual questions remain on the topic.

### III.   *PMG is not entitled to a maritime lien not least because several questions of material fact exist as to whether AUM had apparent authority to bind the vessel.*

**A.    The *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI* decisions within the Fourth Circuit are strikingly analogous, which warrants an identical outcome here.**

A marine fuel trader seeks a maritime lien against a vessel based upon dealings *only* with a fuel broker, wherein the governing charter party precluded the charterer from binding the vessel and the fuel trader had no communications with any principal – that is not just the plot of this case, but it was also the plot in the *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI* litigation that took place recently in the Fourth Circuit. Given the striking similarities between the two fact patterns, an identical outcome is warranted here, such that summary judgment must be denied.

Highlighting that the plaintiff, fuel trader Sing Fuels, dealt **exclusively** with a fuel broker in regard to the bunker transaction at issue (like here), the Eastern District of Virginia court further found that: "Sing Fuels never reviewed the Charter Party agreement to verify the Owner and Charter entities and verify it was dealing with the actual subcharterer rather than an affiliate" (like here); "[t]he Sales Confirmation issued by Sing Fuels only states 'MedMar Inc.' without any other identifying details," which (like here) was not the chartering entity; Sing Fuels never communicated with the owner of the vessel, though it could have done so (like here); and the charter party precluded the charterer from binding the vessel (like here). 534 F.Supp.3d at 557-58. Of note, the contractual chain in the Virginia case is markedly similar to the chain in this one:

> **Owner (Autumn Harvest) → charterer (Bostomar) → sub-charterer (MedMar, Inc.) → third party (M.A.C. Shipping) → fuel broker (Mylonakis/Windrose Marine) → fuel trader (Sing Fuels) → physical supplier.**

*Id.* at 557-58, 567-68.

The district court first held that the "no lien" provisions in the governing charter party precluded the existence of *actual* authority on the part of the subcharterer to bind the vessel. *Id.* at 566-67. Reminding that "[a] time charter is controlled by the terms of [the] charter party," the court concluded that the express contractual terms disallowed the subcharterer from binding the

vessel, and in reaching that conclusion, it emphasized that "Sing Fuels ignored the charter party even though it knew that charter parties could contain such no-lien language." *Id.* Which, again, is the situation here – multiple "no lien" provisions in the governing charter prevented Shimsupa from binding the vessel for bunker supply, a fact of which PMG could have easily been aware from the charter party, and thus Shimsupa lacked actual authority to do so.

The *Sing Fuels* court likewise rejected the fuel trader's apparent authority argument, finding that its effort to establish same by way of communications it had with the fuel broker was woefully insufficient in light of the governing law. *Id.* at 567-69. The following facts led to the court's conclusion: i) "the evidence at trial demonstrated that Sing Fuels only communicated with Mr. Mylonakis, the fuel broker," similar to here where PMG testified that it only ever communicated with BunkerEx; ii) "rather than obtain information about the charter party, Sing Fuels only spoke with Mr. Mylonakis, the fuel broker, and relied solely on its interactions with him," like here; iii) the fuel broker "revealed he was only dealing with M.A.C. Shipping and that *he believed* they were the same entity as MedMar Inc.," like here where Tennant dealt only with AUM and merely *believed* AUM and Shimsupa were effectively one and the same; iv) Sing Fuels never made any effort to confirm the relationship between the subcharterer and its supposed affiliate, like here; v) "nothing in the record suggest[ed] that [affiliate] M.A.C. Shipping is the same company as [subcharterer] MedMar Inc.," like here where AUM and Shimsupa are demonstrably separate companies, and vi) "[c]ritically, Sing Fuels admitted that it never dealt directly with MedMar Inc. and always had several intermediaries in the relevant transaction," just like PMG lacked direct contact with Shimsupa. *Id*. at 567-68 (quoted emphasis in original). Ultimately, the court held that "Sing Fuels' unfounded reliance on Mr. Mylonakis' agency cannot meet the requirements of presumed authority under 46 USCS § 31341," defeating its effort to establish a

maritime lien. *Id.* at 568-69.

The Fourth Circuit affirmed, finding that "Sing Fuels failed to carry its evidentiary burden" on apparent authority, thus defeating the existence of a maritime lien. 39 F.4th at 272-73. Relying upon the Fifth Circuit's *Lake Charles Stevedores* decision, the Fourth Circuit reminded that "Section 31341's presumption is not 'conclusive' as to a maritime lien's existence because a party can rebut the statutory presumption with competent evidence," as Argos will do at trial here. *Id.* at 273. Like here, the appellate court recognized that "[u]nder these circumstances, Sing Fuels needed to demonstrate that either Mylonakis or Medmar is 'a person authorized by the owner,' Autumn Harvest," yet "[i]t failed to do so." *Id.* at 274. The court pointed out Sing Fuels itself argued the fuel broker was acting for the subcharterer, *not* the owner, and it submitted no evidence whatsoever linking the owner to the bunker order (identical to the facts of the present case). *Id.* at 274-75.

Turning to the argument that apparent authority on the part of the fuel broker triggered the statutory presumption, the Fourth Circuit affirmed that Sing Fuels failed to meet its evidentiary burden under the governing legal tenets. *Id.* at 275-78. Noting "Sing Fuels emphasized that it *only* worked with Mylonakis for procuring the July bunkers, and never spoke with Medmar," the appellate court found that wholly inadequate, as "[i]t is hornbook law that [broker] Mylonakis cannot deem himself Medmar's apparent agent without any manifestation coming from Medmar." *Id.* at 277. Summarizing the problem, the court decreed: "So we are left wanting for a manifestation from Medmar. Under these circumstances, we believe the district court's decision against apparent authority is well-grounded in the record, particularly with a glaring absence of proof and primarily relying on only witness testimony before it." *Id.* Tellingly, "'no documentation' suggested an agency relationship between Mylonakis and Medmar," which is especially similar here as neither BunkerEx nor PMG had any written documentation whatsoever establishing any kind of agency

relationship between Shimsupa and AUM.[52] Ultimately, the Fourth Circuit held it "cannot conclude that Sing Fuels is entitled to a maritime lien when it has failed to adequately prove an agency relationship between Medmar and Mylonakis," fittingly reiterating that "maritime liens are to be strictly construed." *Id.* at 278.

Considering the significant similarities between the present case and the persuasive *Sing Fuels* decisions discussed above, PMG cannot meet its evidentiary burden for apparent authority, especially at this witness-less summary judgment stage, requiring that its motion be denied.

**B.    Because PMG has not presented any evidence to prove that it received any manifestations whatsoever directly from the charterer-principal, Shimsupa, it cannot meet its evidentiary burden for apparent authority.**

Once again, the dispositive question in this case is one of apparent authority, as Shimsupa could not possibly grant actual authority to any agent to bind the vessel since it did not have such authority to grant because of the unambiguous terms of the charter party.[53] Phrased differently, where a principal does not have authority to take a particular action, it follows that such principal cannot engage an agent to take an action is prohibited from taking; otherwise, an agent would be allowed to circumvent governing contractual terms that bind its principal, which would be an illogical outcome and defy all pertinent law.

As detailed in Section II(B), the question of apparent authority must be analyzed in light of the facts known to the third party *at the time of* the particular transaction. Beyond the importance of timing, the controlling law unmistakably requires the third party – here, PMG – to have received and relied upon manifestations *from the principal* – here, Shimsupa. *E.g.*, *Sing Fuels,* 39 F.4th at 275; *Lake Charles Stevedores*, 199 F.3d at 228; *M/V Charana Naree*, 446 F.Supp.3d at 171.

Yet the deposition testimony establishes that **it never received *any* such manifestations**

---

[52] Exhibit B, p. 19:7-23, 21:18 – 22:6; Exhibit C, p. 9:5 – 10:7, 15:6-24, 17:20 – 19:11, 33:1-11, 35:9 – 36:16.
[53] Exhibit A-1.

– by its own admissions, PMG relied *only* on the fuel broker (Tennant) in blindly believing that BunkerEx was an agent for AUM, which it now conveniently argues in turn was a "widely known" agent for Shimsupa.[54] It did not receive any communications or documentation from Shimsupa (or AUM, for that matter) *prior* to the time of *this* transaction, and even the purported authority email that was concocted in March 2023 (belatedly created merely for the purposes of litigation) came from Biju Nair <u>of AUM</u>, *not* anyone at Shimsupa.[55] Its reliance on the charter party guarantee is likewise misplaced, as the guarantee contains no mention of AUM acting as an agent, PMG lacked this guarantee at the time of the stem, PMG did not even *know* about this guarantee until its recent deposition, PMG would not have relied upon it for credit purposes even if it had known about it, and AUM merely financially guaranteed Shimsupa's performance of the charter party vis-à-vis Argos.[56] Moreover, that would be a manifestation from the agent anyway, *not* from the principal, and be irrelevant to the inquiry on the whole, especially in light of the fact that PMG did not know of the guarantee until sometime after the commencement of this litigation.

The overall dearth of evidence is consequential and precludes apparent authority.[57] And while PMG appears to rely on previous dealings with AUM to claim that its reliance was reasonable despite never communicating with either AUM or the purported principal (Shimsupa), there are two problems with such an approach. First, "[c]ustom is not a substitute for some manifestation traceable to the principal," Restatement (Third) Of Agency § 2.03 (2006), so any

---

[54] *E.g.*, note 52, *supra*.

[55] *See* R. Docs. 58-1, p. 2, 58-9, p. 2. Moreover, any juxtaposition of AUM and Shimsupa's names is not enough to reasonably assume an agency relationship. *E.g.*, *Dinaco, Inc.*, 346 F.3d at 69 ("While the juxtaposition of the two companies' names might suggest some relationship between the two, it does not imply or confirm that one serves as the other's agent.").

[56] Exhibit A-2; Exhibit C, p. 48:9-21. Though irrelevant, neither PMG nor BunkerEx had this guarantee until March 2023, *after* litigation commenced, and PMG has admitted as much.

[57] *Cf. Clearlake Shipping*, 29 F.Supp.3d at 686 ("The Physical Suppliers argue that a contractual or agency relationship to the Vessel Interests is not required so long as the order for necessaries originated with a party that has statutory authority to encumber the vessel. It is a viscerally appealing argument, but it is inconsistent with the strict approach described above.").

assumptions that PMG made concerning AUM based upon what was "widely known in the industry" is not sufficient to overcome its failure to obtain the requisite manifestations from Shimsupa with respect to *this particular* ARGOS M transaction at issue. Second, apparent authority is transaction-specific, especially considering PMG apparently knew that AUM also chartered vessels itself but did not inquire directly with any principal to determine who chartered the ARGOS M.[58] So any prior dealings with AUM involving different vessels cannot save PMG from the "manifestation from the principal" element that the jurisprudence definitively requires.[59]

In all, PMG is wholly incapable of meeting its evidentiary burden as a matter of law. *E.g.*, *Sing Fuels*, 39 F.4th at 276-77; *Maymar Marine Supply, supra*; *Crane, supra*. Without any evidence whatsoever to establish those agency relationships, PMG's apparent authority theory fails, as does its claim for a maritime lien, consequently. Indeed, Argos would argue that PMG's frank admissions that it never spoke with AUM, Shimsupa or Argos foreclose its apparent authority-based claim and warrants dismissal. Nevertheless, the plethora of factual issues concerning apparent authority from PMG's side at least mandates that its Motion be denied.

C.   **Acceptance of the bunkers by the master and/or consumption of the bunkers by the vessel is insufficient to establish a maritime lien against the ARGOS M.**

At the outset, not a scintilla of evidence even tends to suggest that the Master procured the bunkers himself, as all evidence to date establishes that the bunker order flowed from AUM to BunkerEx to PMG and onward. But PMG's reference to the vessel's acceptance and consumption of the bunkers is yet another red herring, as such is inconsequential under the governing law. To that end, the caselaw uniformly reflects that a Master's onboard acceptance of bunkers procured

---

[58] Exhibit C, p. 9:5 – 15:24.
[59] Furthermore, PMG's reliance on BunkerEx likewise does it no favors, as BunkerEx's Tennant only ever communicated with AUM personnel with respect to the transaction at issue, and he conceded had no written documentation to establish an agency relationship between AUM and Shimsupa.

by another party is insufficient on its own to support a maritime lien, especially considering the essential strict construction of same. *E.g.*, *ING Bank N.V. v. Bomin Bunker Oil Corp.*, 953 F.3d 390, 396 (5th Cir. 2020) ("Holding that awareness that necessaries are being supplied is sufficient, even though those necessaries were procured by an entity without authority to bind the vessel, would render CIMLA's authority requirement meaningless.") (quoting *Lake Charles Stevedores*, *supra*); *Clearlake Shipping*, 239 F.Supp.3d at 689 ("Without more, acceptance of performance under a pre-existing contract does not establish a direct relationship giving rise to a lien."). Moreover, the vessel's consumption of same is likewise insufficient because that too "would render CIMLA's authority requirement meaningless," *Bomin Bunker Oil Corp.*, *supra* at 396, as evidenced by cases such as *Sing Fuels*, where a maritime lien did **not** exist despite it being undisputed that the vessel consumed the bunkers at issue. *E.g.*, *Sing Fuels*, *supra* (denying maritime lien although noting that the vessel consumed the bunkers).

Lastly, according to the language that PMG cites from the Fifth Circuit's *Ferromet Resources, Inc. v. ChemOil Corp.* decision, PMG actually had a duty to inquire as to BunkerEx's and/or AUM's authority. PMG quotes this line from *Ferromet Resources*: "The materialman who furnishes necessaries in response to a request from a master, charterer or other person in custody of the vessel has no duty to inquire about that person's authority to bind the vessel." 5 F.3d 902, 904 (5th Cir. 1993). Yet PMG testified in Ms. Malamen's deposition that the bunker order came via BunkerEx (ostensibly) from AUM, but then in turn admitted that neither BunkerEx nor AUM was the master, charterer or in custody of the ARGOS M.[60] As such, because PMG supposedly knew that AUM was not the charterer of the vessel, it had "a duty to inquire as to its authority to bind the vessel." *Id.* PMG cannot have it both ways – it cannot in one breath testify that it somehow

---

[60] Exhibit C, p. 45:21 – 46:19.

knew (though without any supporting documentation or actual recollection) that Shimsupa (not AUM) was the charterer of the vessel, but then in the next breath assert that it had no duty to inquire because the order came from the charterer of the vessel. Consequently, PMG's effort to obtain a lien on this basis must fail under the law.

> **D. PMG has not met its summary judgment burden under the "general contractor" line of cases applicable to maritime liens, and its Motion must be denied.**

Even if apparent authority could possibly be found (which is obviously denied), the fact that Shimsupa reportedly contracts with AUM to handle bunker procurement for its vessels with AUM making money on the transaction is of import here, as it directs that the appropriate line of caselaw governing this suit is the *Lake Charles Stevedores* "general contractor/subcontractor" line of cases. *E.g.*, *Barcliff, LLC v. M/V Deep Blue, Imo No. 9215359*, No. CA14059, 2016 WL 5660934, at *9 (S.D. Ala. Sept. 28, 2016) (finding that evidence of a profit tends to show an entity "was operating as a contractor, not an agent"), *aff'd,* 876 F.3d 1063 (11th Cir. 2017).

Akin to *Lake Charles Stevedores*, PMG is a subcontractor that was engaged by another subcontractor, BunkerEx, for AUM, who was initially contracted by Shimsupa at a brokerage-type percentage payment for its bunker procurement-related services – in other words, it did not enter into a contractual arrangement with the vessel itself. *See* 199 F.3d at 230 ("We view the facts as more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations."). Thus, despite the fact that PMG was not the physical supplier of the bunkers at issue here, Argos submits that the rationale and requirements of *Lake Charles Stevedores* are nonetheless applicable to the type of contractual chain present here because AUM's role and its need to fulfill its apparent contract obligations to Shimsupa places it in "a position no different from that of a general contractor." *E.g.*, *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 846 (9th Cir. 2018) ("We

held that the subcontractors were not entitled to a maritime lien because they had contractual relationships only with the general contractors, and in most cases 'a general contractor does not have the authority to bind a vessel.' … The general rule stated in *Port of Portland* and *Farwest Steel* governs this case because OWB Far East occupied a position no different from that of a general contractor.").

With that "general contractor" line of cases in mind, PMG cannot meet its burden of "show[ing] that 'an entity authorized to bind the ship controlled' its selection or its performance." *Bomin Bunker Oil Corp.*, 953 F.3d at 395 (quoting *Lake Charles Stevedores*, *supra*). PMG has never provided any evidence that AUM selected it or controlled its performance, never mind an entity that was actually authorized to bind the ship having done so, and its motion fails on this front as well. *E.g.*, *Temara*, 203 F.Supp.3d at 366.

> **E.   Critical questions of witness credibility cannot be resolved at the summary judgment stage, and PMG's motion must be denied accordingly.**

"Summary judgment is not appropriate when questions about the credibility of key witnesses loom large and the evidence could permit the trier-of-fact to treat their testimony with skeptical scrutiny." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (cleaned up). That's the case here, as the testimony of BunkerEx's Tennant and PMG's Malamen can well be treated "with skeptical scrutiny." Here, both are key yet self-interested witnesses – PMG is the plaintiff entity that has not been paid for the bunkers, and BunkerEx has not been paid for its part in the transaction at issue, since it only gets paid once PMG does.[61] Moreover, there is *no documentation whatsoever* to support each individual's assertions that he/she somehow "knew" Shimsupa was the charterer of this vessel at this time and that he/she "knew" AUM was acting as agent for Shimsupa, with both having testified that those facts came to them only orally and with no written

---

[61] Exhibit B, p. 30:1-16; R. Doc. 58-2, p. 4.

record of either, as discussed in the foregoing sections.

Other developments cloak Tennant's and Malamen's testimony with some suspicion as well. With Malamen, the credibility issue comes in the form of comparing her signed Declaration dated 12 September 2023 to her deposition testimony recorded on 19 October 2023. While she was somehow able to declare certain things in the summary judgment declaration, just a month later, she suddenly could not remember what she did or did not know in November 2022 prior to the time of the transaction at issue.[62] And then despite failing to mention Tennant's name once in its motion, PMG's success relies solely upon him, for better or worse. Yet his testimony to date suggests he is going along with this suit so as to try to get paid – he admitted that he did not write the declaration he signed for consolidated plaintiff Three Fifty's motion, he did not talk to anyone before it was drafted, and he was just asked to read it and sign it if he "agreed" with it.[63]

In short, not only are there genuine issues of fact still present, but the success of PMG's claim depends solely upon witness credibility, as no documentation exists to support its argued entitlement to a maritime lien based on apparent authority. As such, the credibility issues render this matter unsuitable for summary judgment, further warranting denial of the motion.

IV. *In the unlikely event that the Court is inclined to find the existence of a maritime lien on this fact-deficient record, judgment on the lien amount must be reserved because PMG has not met its burden to show reasonableness of the amount.*

In addition to the elements laid out above to establish the existence of a maritime lien, the pursuit of a maritime lien requires the moving party to also present evidence that the necessaries at issue were provided at a "reasonable price." *E.g.*, *Belcher Co. of Alabama v. M/V Maratha Mariner*, 724 F.2d 1161, 1164 (5th Cir. 1984); *Hampton Bermuda Ltd. v. M/V STAR SIRANGER*,

---

[62] Exhibit C, p. 35:9 – 36:16, 40:2-8.
[63] Exhibit B, p. 14:13 – 15:3.

No. Civ. A. H-05-3074, 2008 WL 1808550, at *5 (S.D. Tex. Apr. 18, 2008) ("The 'reasonable price' requirement is determined by whether the charges are 'customary' and 'in accord with prevailing charges for the work done and the materials furnished.'") (quoting *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.,* 411 F.3d 1242, 1249 (11th Cir. 2005)); *Crescent Ship Serv. v. M/V MITERA VASSILIKI*, No. Civ. A. 94-2691, 1995 WL 389814, at *1 (E.D. La. June 28, 1995).

To satisfy that requirement, "[a] plaintiff must present some modicum of evidence which compares the charges claimed with what other competitors would have charged for similar work or materials." *Hampton Bermuda*, *supra* at *5. Yet, PMG made no effort at all to do so, with that failure requiring that its Motion for Summary Judgment be denied on that front at the very least.[64] *E.g.*, *Sweet Pea Marine*, 411 F.3d at 1249 ("The failure to present such evidence, however, dictates that a plaintiff cannot prevail on its maritime claims.") (citing *TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta,* 696 F.2d 1135, 1141 (5th Cir. 1983)); *Hampton Bermuda*, *supra* at *5.

## Conclusion

Here, PMG is asking this Honorable Court to do something that the general maritime law expressly prohibits it from doing – infer the existence of a maritime lien because Shimsupa and AUM happen to share a shareholder. *E.g.*, *Sing Fuels, supra*. And in light of the factual circumstances, PMG's claim for a maritime lien against the ARGOS M hinges on the existence of apparent authority, but it cannot meet the legal elements of same because it never received any communications – *i.e.*, "manifestations" – from the principal here, Shimsupa, as to authority to bind the vessel. Between PMG's inability to make that showing, the witness credibility problems, the lack of any evidence establishing reasonableness, and the genuine issues of material fact that remain as to authority, summary judgment is inappropriate, and PMG's Motion must be denied.

---

[64] *See* R. Doc. 58-1, pp. 12-14.

Respectfully Submitted,

**MURPHY, ROGERS, SLOSS,**
      **GAMBEL & TOMPKINS**

*/s/ John H. Musser, V*
Peter B. Sloss        (#17142)
psloss@mrsnola.com
John H. Musser, V    (#22545)
jmusser@mrsnola.com
Tarryn E. Walsh     (#36072)
TWalsh@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Telephone:    504.523.0400
Facsimile:     504.523.5574
***Attorneys for Argos Bulkers, Inc., solely as owner and claimant of the M/V ARGOS M, with a full reservation of all rights and defenses pursuant to Supplemental Rule E(8) of the Federal Rules of Civil Procedure***
4895-2053-4162, v. 1

4895-2053-4162, v. 1