UNITED STATES DISTRICT COURT FOR

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THREE FIFTY MARKETS LTD.<br><br>*Plaintiff*<br><br>VERSUS<br><br>M/V ARGOS M, her engines, machinery, boilers, tackle, etc., *in rem*<br><br>*Defendants* | CIVIL ACTION<br><br>NO. 2:23-cv-00595<br><br>C/W 2:23-cv-00623<br><br>ADMIRALTY<br>SECTION "L"<br>(Judge Eldon E. Fallon)<br><br>MAG. (5)<br>(Magistrate Judge Michael B. North)<br><br>**(Pertains to Civil Action No. 2:23-cv-00623)** |

## ORDER & REASONS

Before the Court is a motion by Plaintiff PMG Holding SRL ("PMG") for Summary Judgment. R. Doc. 58. Argos M M/V opposes the motion, R. Doc. 81. PMG has filed a reply. R. Doc. 86. Having considered the briefing and the applicable law, the Court rules as follows.

**I.    BACKGROUND**

On February 16, 2023, Three Fifty Markets Ltd. ("Three Fifty"), a commodity trading company domiciled in the United Kingdom, filed a complaint in this Court against the Argos M M/V ("the Vessel"), a Liberian-flagged vessel that was chartered to AUM Scrap and Metals Trading LLC ("the Charterer"), a company alleged to be organized under the laws of the United Arab Emirates.[1]

In its complaint, Three Fifty alleges that it sold 800 metric tons of Very Low Sulphur Fuel

---

[1] Though Three Fifty alleges that AUM is the Charterer of the vessel in its complaint, the Vessel indicated that the actual charterer of the vessel is Shimsupa. R. Doc. 60.

Oil to Three Fifty on October 11, 2022. R. Doc. 1 at 3. However, Three Fifty alleges, neither AUM nor the Charterer, Shimsupa, has paid Three Fifty for the fuel, leaving a total amount due, including interest, at $663,546.65 as of January 31, 2023. *Id.* at 5. As a provider of "necessaries" to the vessel within the meaning of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31342 *et seq.*, Three Fifty claims an *in rem* maritime lien against the Vessel. In its complaint, Three Fifty sought judgment in the amount of $663,546.65, arrest of the Vessel, sale of the Vessel to pay the judgment due, and other "just and proper" relief. *Id.* at 6.

On February 16, 2023, this Court issued a warrant for the arrest of the Vessel and appointed a substitute custodian.

On February 17, 2023, PMG Holding SRL ("PMG"), a marine fuel supplier based in the United Kingdom and Greece, filed another suit against the Argos M M/V. PMG alleges that, on November 14, 2022, it entered into a contract with "individuals and/or entities acting on behalf of the M/V Argos M" to deliver and supply 250 metric tons of Intermediate Fuel Oil to be loaded aboard the Vessel in Sri Lanka. Case No. 23-623 R. Doc. 1 at 2. PMG further alleges that the Vessel or its owners, operators, managers, or charters, have failed to pay PMG in the amount of $217,927.86 for the fuel invoice plus $10,896 in late fees accrued through February 17, 2023. *Id.* at 3. PMG sought arrest of the Vessel, sale of the Vessel to satisfy its demand, and other "just and proper" relief. *Id.* at 5.

On February 17, 2023, this Court again issued a warrant for the arrest of the Vessel and appointed a substitute custodian. The custodian of the ship is National Maritime Services, Inc.

The Vessel was arrested on February 22, 2023. Case No. 23-623 R. Doc. 18.

Subsequently, both Three Fifty and PMG brought motions for interlocutory sale of the Vessel. R. Doc. 15; R. Doc. 19. In their motions for sale, both Three Fifty and PMG argue that,

2

the fact that it the "Master, Owner, Vessel's Insurer, owner of the cargo loaded aboard, and Ship's Agent" had been notified of the Vessel's arrest, no one had made claim to the Vessel or provided security for its release. R. Doc. 15-1 at 4. Further, claimants allege that the costs to supply the Vessel with "fuel, water, food, and provisions"—split between the two claimants—were already $43,876 and would likely grow to exceed $100,000. R. Doc. 19-1 at 4. Further, both claimants allege that officers on the ship had not been paid their February wages. R. Doc. 15-1 at 2. The abandonment of the vessel warrants immediate sale, Three Fifty and PMG allege. R. Doc. 15-1 at 2; R. Doc. 19-1 at 6.

On March 16, 2023, this Court consolidated the actions against the Argos by Three Fifty and PMG. R. Doc. 18.

On March 20, 2023, ArcelorMittal International (Luxembourg) ("AMIL") and ArcelorMittal (Costa Rica) ("AMCR") sought leave to intervene in the consolidated case. In their complaint, intervenors allege that AMIL entered a contract with Pointer Investment, a Hong Kong-based company, for the purchase and delivery of 20,400 metric tons of steel, in the value of $11,977,248. R. Doc. 22 at 2-3. The cargo was to be loaded in Indonesia and delivered to Costa Rica. *Id.* Intervenors argue that Pointer chartered the vessel from a "disponent owner" of the vessel, and that a Bill of Lading was issued confirming that the steel was on the vessel. *Id.* AMIL and AMCR "threatened and/or anticipated interlocutory sale of the Vessel would cause severe damages and losses to Plaintiffs in the event that its Cargo is detained onboard and/or Plaintiffs are not afforded the right to timely mitigate their damages, discharge the Cargo, and transship the Cargo to Costa Rica." R. Doc. 22 at 5. Intervenors brought claims against Argos for breach of contract of carriage, negligence, and unseaworthiness, and seek a Rule C Arrest. *Id.* at 4-7.

On March 21, Argos Bulkers ("Argos") filed a Verified Statement of Right or Interest, R.

3

Doc. 24, and answered the complaints of both Three Fifty and PMG. R. Doc. 26; R. Doc. 27. In its answers, Argos generally denied liability. With regards to PMG, Argos alleges that the "unsigned 'marine fuel oil agreement' incorporates US law in respect of a maritime lien" because PMG was not the physical supplier of the oil and PMG did not provide the choice of law terms of the physical supplier, Lanka IOC PLC. R. Doc. 27 at 2. Further, Argos alleges that, as the Vessel was not a party to the alleged contract, PMG has not established that a maritime lien exists. *Id.* at 3. Argos claims several defenses against PMG, including that the Vessel does not owe any debt to PMG because "AUM Scrap and Metals Waste Trading LLC lacked actual or apparent authority to bind the vessel as it was not a charterer of the vessel." *Id.* at 4. In its answer to Three Fifty, Argos again states that Three Fifty had not been the physical supplier of the fuel and, because it did not provide the terms of the physical supplier, it did not state a claim that a lien had been created. R. Doc. 26 at 3.

In addition, Argos filed a memorandum in opposition to the motions for sale. Argos argues that Plaintiffs failed to prove the elements necessary to support an interlocutory sale under Rule E(9) of the Supplemental Admiralty Rules. R. Doc. 28 at 1. Argos argues that the vessel is not perishable, or liable to deterioration, decay, or injury because it has a "full crew onboard performing all necessary maintenance and protecting the vessel from weather conditions and maritime perils." *Id.* at 3. Further, it argues, the *custodia legis* expenses have not been, and will not be, "disproportionate to its $10 million value." *Id.* at 8. Finally, Argos argues, the one-month delay in release of the vessel is not "unreasonable." *Id.* at 9. Argos alleges that the Plaintiffs incorrectly stated that the officers crew have not been paid their February wages and that the Vessel is "adequately provisioned." *Id.* at 10. Finally, Argos alleges that it is "actively working" to obtain financing to secure the Vessel's release. *Id.*

On March 23, 2023, Intervenors AMIL and AMCR filed a Motion to Recognize Claim of Ownership and Right to Possession of Steel Cargo Aboard the M/V Argos M. R. Doc. 29. AMIL and AMCR seek to have the Court order that their cargo may be discharged at the Port of New Orleans, and further seek approval of the costs of discharge as *custodia legis* expenses. R. Doc. 29 at 8. On March 27, 2023, this parties notified the Court that bond had been posted and the ship had been released; accordingly, the Court denied AMIL and AMCR's motions. R. Doc. 38. On June 13, 2023, this Court granted AMIL and AMCR's motion to dismiss their complaint. R. Doc. 46.

On August 1, 2023, Three Fifty filed a Motion for Summary Judgment against the Vessel seeking enforcement of its maritime lien against the Vessel, which was opposed by the Vessel. R. Doc. 50; R. Doc. 60. In its motion, Three Fifty argued that it was entitled to $629,600 in damages because it was never paid for the fuel it supplied to the Vessel. R. Doc. 50. In addition, Three Fifty prayed for *custodia legis* expenses and prejudgment interest. *Id.* In opposition, the Vessel argued that the fuel was not purchased by an authorized agent and is thus, not responsible for the damages. R. Doc. 60. On November 1, 2023, the Court hear oral argument on the Motion. R. Doc. 74. The Court ultimately denied the Motion for Summary Judgment reasoning that there are substantial questions of fact that are best left up to the fact-finder to resolve at trial as to whether the fuel was purchased by an authorized agent of the Vessel. *Id.*; R. Doc. 75.

On September 12, 2023, PMG filed the instant Motion for Summary Judgment against the Vessel similarly seeking enforcement of its maritime lien. R. Doc. 58.

## II.     PRESENT MOTION

In its Motion for Summary Judgment, PMG requests this Court to allow it to execute a maritime lien against defendant Vessel pursuant to the Commercial Instruments and Maritime Liens Act ("CIMLA"), expenses of *custodia legis*, and prejudgment interest. *Id.* PMG argues that

5

it has a valid maritime lien against the Vessel because it supplied "necessaries"—fuel bunkers—to the vessel and the bunkers were purchased by someone who had authority to bind the vessel. *Id.* at 5-11. Namely, it argues that it sold the bunkers to AUM, an agent of Shimsupa, the Charterer of the Vessel, with the understanding that AUM had authority to order the bunkers for the Vessel. *Id.* at 8-11. PMG contends that Shimsupa did not provide any evidence to PMG to suggest that they lacked the authority to bind the Vessel. *Id.* Because PMG was never paid for the bunkers, it argues that it is entitled to $217,926.86 in damages from the Vessel through a maritime lien. *Id.* at 12. PMG additionally argues that it is entitled to recover its expenses of *custodia legis* of $31,000.73 from when the Vessel was arrested by the U.S. Marshals Services and kept in the National Maritime Services' custody. *Id.* Lastly, PMG argues that it is entitled to prejudgment interest for their unpaid damages. *Id.* at 13. Totaled together, PMG requests to execute its maritime lien against the Vessel for $296,932.43. *Id.* at 14.

In opposition, the Vessel argues that resolving this issue is a fact-intensive inquiry that cannot be resolved at this stage of the proceedings. R. Doc. 81. It argues that no one with actual or apparent authority to bind the Vessel purchased the fuel. *Id.* at 13-19. The Vessel further argues that though the Vessel's Master accepted delivery of the fuel bunkers and the fuel was consumed by the Vessel, this does not sufficiently allow PMG to execute its maritime lien against the Vessel. *Id.* at 20. It also argues that PMG has not met its burden on the "general contractor" theory applicable to maritime liens. *Id.* at 22. Next, the Vessel raises questions of witness credibility which, it avers, cannot be settled at this moment. *Id.* at 23. It then argues that the damages amount which PMG seeks is unreasonable. *Id.* at 24. Lastly, the Vessel argues that this Court previously denied a similar motion for summary judgment by Three Fifty and accordingly, it requests that this Court deny PMG's motion. *Id.* at 25.

In response, PMG argues that the Vessel's reliance on the Court's earlier order on Three Fifty's motion is dispositive of the issue because there are documents ratifying the agency relationship here, which were lacking in Three Fifty's motion. R. Doc. 86 at 1-3. It further argues that resolution of this matter is appropriate on summary judgment because the factfinder in this matter is the judge and not a jury. *Id.* at 4-5.

### III.   APPLICABLE LAW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

### IV.   ANALYSIS

"The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986). Under CIMLA, a person providing necessaries to a vessel on the order of the owner, or a person authorized by the owner (1) has a maritime lien on the vessel; (2) may bring a civil action *in rem* to enforce the lien; and

7

(3) is not required to allege or prove that credit was given to the vessel. 46 U.S.C. § 31342.

Accordingly, to determine if PMG can execute a maritime lien on the Vessel is a two-part test. First, PMG needed to have provided "necessaries" to the Vessel. Second, PMG must have done so at the order of either the owner of the Vessel or an individual authorized by the owner.

### a. Necessaries

It is undisputed that PMG provided "necessaries" to the Vessel. Section 31301(4) of CIMLA defines "necessaries" to include "supplies." 46 U.S.C. § 31301(4). Law binding on this Court holds that "supplies"—thereby "necessaries"—includes bunkers that a vessel uses for fuel. *See World Fuel Servs. Singapore, Pte. Ltd. v. M/V BULK JULIANA*, 822 F.3d 766, 769 (5th Cir. 2023). On or about November 14, 2022, PMG sold and delivered fuel bunkers to the Vessel. R. Doc. 58 at 1. Thus, PMG has met the first factor of the inquiry.

### b. Legal Authority

Moving on to whether AUM was authorized to purchase the bunkers from PMG requires a deeper look into agency law. Pursuant to 46 U.S.C. § 31341, charterers and their agents are presumed to have the authority to "procure necessaries for a vessel." 46 U.S.C. § 31341(a)(4). Accordingly, maritime law embraces the principles of agency. *West India Industries, Inc. v. Vance & Sons AMC–Jeep*, 671 F.2d 1384 (5th Cir. 1982). "Actual authority is the power of an agent to do an act on behalf of his principal which he is privileged to do because of the agent's manifestations to him." *Chilsan Merchant Marine Co., Ltd. v. M/V K Fortune*, 220 F. Supp. 2d 492, 497 (E.D. La. 2000). Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him. Restatement (Second) Agency of § 27. "Apparent authority is distinguished from actual authority because it is the

manifestation of the principal to the third person rather than to the agent that is controlling." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985).

Further, the Fifth Circuit has consistently held that maritime liens are enforceable against a non-party to the contract. *World Fuel Servs. Singapore, Pte. Ltd.*, 822 F.3d at 773 ("[W]e must follow this court's [previous] decision. . . which unabashedly enforced, against a non-party to the contract a maritime lien. . .") (citing *Liverpool & London S.S. Protection & Indemnity Ass'n v. QUEEN OF LEMAN M/V*, 296 F.3d 350 (5th Cir. 2002)).

Because the parties do not argue on whether an individual with actual authority to bind the Vessel purchased the bunkers, the Court focuses its discussion on whether an entity had apparent authority to bind the Vessel.[2] *See* R. Doc 58; R. Doc. 81. PMG argues that both the Charterer Shimsupa and its agent, AUM, had apparent authority because they are majority owned and controlled by the same individual, Annamalai Subbiah. R. Doc. 58 at 9. Further, it argues that it is recognized in the industry that AUM acts as an agent for Shimsupa and that AUM executed a BIMCO Guarantee for the instant bunker transaction. *Id.* Additionally, it contends that despite producing several documents showing that the Vessel was aware of the transaction, the Vessel did not produce any evidence to demonstrate that either Shimsupa or AUM lacked the necessary authority to purchase the bunkers or bind the Vessel. *Id.* at 11.

On the other hand, the Vessel argues that no one with apparent authority purchased the bunkers. It first argues that AUM was not a party to the charter between the Vessel and Shimsupa. R. Doc. 81 at 2. It acknowledges that Shimsupa was responsible for purchasing the Vessel's

---

[2] PMG alleges that the Vessel's Chief Engineer—as the authorized representative of the Vessel's Master— acknowledged delivery and acceptance of the fuel bunkers. R. Doc. 58 at 3. However, it does not argue that this act alone demonstrates that the Chief Engineer had actual authority to bind the Vessel for the purchase of the bunkers in question. The Vessel similarly argues that the Chief Engineer's role does not satisfy PMG's burden to establish a maritime lien. R. Doc. 81 at 20-22. Because the parties do not dispute actual authority of the Chief Engineer, the Court finds that further discussion of such authority is unnecessary.

9

bunkers; however, it avers that Shimsupa did not handle such arrangements by itself but through a separate company, AUM. *Id.* at 2-3. The Vessel explains that the bunkers were purchased through a brokerage process between an AUM employee, Fahim Shamsi, and a BunkerEx, Ltd. bunker broker, Dean Tennant. *Id.* at 3-4. This exchange, the Vessel argues, ultimately led to AUM—instead of Shimsupa—purchasing the bunkers from PMG. *Id.* at 3-8. In PMG's email confirming the transaction, the Vessel further avers that Shimsupa's name was missing and instead identified AUM as the Charterer.[3] *Id.* at 8. Accordingly, the Vessel contends that AUM lacked the apparent authority to bind the Vessel because it was mischaracterized as the Charterer, when in fact the Charterer was Shimsupa. *Id.* It stresses that because AUM was never a party to the charter and that AUM was not the charterer, AUM could not have had the apparent authority to bind the Vessel in a contract with PMG. *Id.*

After non-payment, PMG additionally argues Shimsupa ratified the agency relationship between the parties in email communications dated December 20, 2022. R. Doc. 86. In that email—which was subsequently forwarded to PMG—a Shimsupa representative contacted BunkerEx Ltd. to explain the financial difficulties it was facing at the time. *Id.* at 2-3. PMG avers that this email demonstrates that Shimsupa was on notice of the transaction and further ratifies BunkerEx Ltd.'s authority to purchase the fuel from PMG on behalf of the Vessel vis-à-vis Shimsupa. *Id.* at 3.

The Court finds that though there were necessaries procured for the Vessel, broken links to the chain of apparent authority needed for the bunker purchase still exist. Even if the Court were to find that the fuel was purchased by someone with apparent authority from the Vessel, the issue

---

[3] Much of the Vessel's brief maintains that Shimsupa and AUM, though majority-owned by the same individual, are distinct companies by which AUM financially benefits from its role as Shimsupa's agent. R. Doc. 81 at 4-9.

of damages and the reasonability of PMG's calculations is factually pregnant. This task is best resolved at trial. Because PMG has not met its burden of showing that no genuine issue of material fact exists in this matter, the Court denies the instant motion for summary judgment. Accordingly, the Court declines to make findings on the remainder of the parties' arguments, including the enforceability of the no-lien clauses and witness credibility.

V.  CONCLUSION

Accordingly, PMG Holding SRL's Motion for Summary Judgment, R. Doc. 58, is **DENIED**.

New Orleans, Louisiana, this 29th day of November, 2023.

_____
United States District Judge