## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THREE FIFTY MARKETS LTD.** | * | **CASE NO. 2:23-cv-00595** |
| | * | **c/w  2:23-cv-00623** |
| | * | |
| **VERSUS** | * | **JUDGE ELDON E. FALLON** |
| | * | |
| **M/V ARGOS M, her engines, tackle,** | * | **MAGISTRATE JUDGE NORTH** |
| **equipment, appurtenances, etc.,** *in rem* | * | |
| | * | **APPLIES TO 23-cv-00595** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

**MAY IT PLEASE THE COURT:**

"Just as under the general common law, [] 'under maritime law, apparent authority cannot be evidenced by statements of an agent alone[.]'" *Garanti Finansal Kiralama A.S.*, 697 F.3d 59, 73 (2d Cir. 2012) (quoting *Coastal Drilling Co., L.L.C. v. Shinn Enters., Inc.,* Civ.A. 05–4007, 2008 WL 907520, at \*2 (E.D. La. Mar. 31, 2008) and internally citing Restatement (Third) of Agency § 2.03 (2006)). Instead, "[a]pparent authority is present <u>only</u> when a third party's belief is traceable to **manifestations of the principal**." *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 275 (4th Cir. 2022) (emphasis added).

Here, it cannot be questioned that authority is an essential element of the maritime lien claim advanced by Plaintiff, Three Fifty Markets Ltd. ("Three Fifty"), against the M/V ARGOS M, *in rem*. *E.g.*, *Sing Fuels*, 39 F.4th at 273-77; *Three Fifty Markets Ltd. v. M/V ARGOS M*, No. 2:23-CV-00595, 2023 WL 8283689, at \*4 (E.D. La. Nov. 30, 2023). But because Three Fifty lacks any admissible evidence to affirmatively meet its burden on this essential element of its claim, it cannot survive summary judgment. As such, dismissal is warranted, as set forth herein.

### <u>Factual Background</u>

The M/V ARGOS M is a Liberian-flagged bulk cargo vessel owned at all pertinent times

by Argos Bunkers, Inc. ("Argos").[1] On or about 28 July 2022, Argos, as owner, time chartered the ARGOS M to Shimsupa, as charterer.[2] The charter party was fixed on that date with a recap that incorporated main body terms from another ARGOS M form charter as well as riders.[3] AUM Scrap and Metals Waste Trading, LLC ("AUM") guaranteed Shimsupa's financial obligations under the charter.[4] Importantly, review of the charter party itself and all incorporated documents confirms that ***it is undisputed that the relevant charter for the ARGOS M was solely between Argos and Shimsupa***, and AUM definitely was <u>not</u> a party to the charter, although it received a copy of it.[5]

Several provisions of the governing charter are relevant to this case. Critically, the governing Argos-Shimsupa charter here contains a "no lien" clause at lines 112-113 of the Main Body, which in no uncertain terms precludes the charterer from allowing a lien on the vessel:

**"Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."**[6]

Multiple clauses within the Riders also underscore this prohibition. At Clause 52, Owners disclaim all responsibility for unpaid bills, and the language of that clause requires charterers to instruct their agents and bunker suppliers (as well as others involved with provision of services to the vessel) to countersign the Master's stamp that acceptance of services is on behalf of Charterers only.[7] And then Clause 109 repeats the "no lien" provision and adds additional limitations, including *disallowing specifically any lien for bunkers* and requiring that Charterers inform bunker

---

[1] *See* Declaration of Nikos Kekridis, attached hereto as Exhibit A, ¶ 3.
[2] *See* Exhibit A, ¶ 4, and Exhibit A-1.
[3] *Id.* (illustrating the incorporated attachments to the Shimsupa fixture recap).
[4] Exhibit A, ¶¶ 7-8, and Exhibit A-2.
[5] Exhibit A, ¶¶ 4 and 7.
[6] Exhibit A-1, p. 8, ¶18, and ARGOS M 000139 (ll. 112-113) (emphasis added).
[7] Exhibit A-1, ARGOS M 000156.

sellers in writing regarding the "Non-Lien Notice."[8] These unambiguous contractual provisions confirm Shimsupa lacked actual authority to bind the vessel when it came to provision of bunkers.

Moving to the pertinent sequence of events here, as time charterer of the ARGOS M, Shimsupa controlled the vessel's route and the ports to which it called and/or where the vessel traded, and bunkers were its responsibility under the charter party.[9] In early October 2022, the vessel needed bunkers. Purportedly, Shimsupa did not handle bunker arrangements on its own. Instead, a separate and discrete company did so, and for a fee – AUM, allegedly on behalf of Shimsupa, although Three Fifty possesses no documentary evidence on this point.[10]

Apparently, sometime in early October 2022, Fahim Shamsi of AUM (and with a "@aum-metals.com" email address) contacted a bunker broker, Dean Tennant of London-based BunkerEx, Ltd. ("BunkerEx"), seeking to obtain bunkers for the ARGOS M that were to be stemmed at the Port of Las Palmas, in the Canary Islands, Spain.[11] To accomplish that service for which he was retained, Tennant then reached out to, supposedly among others, bunker trader Aaron Loveman of Three Fifty, which had only been in business less than four (4) months at that point.[12] Perhaps because of AUM's known payment problems, Tennant was only able to receive one over-market quote, which he relayed to Shamsi via WhatsApp message on 11 October 2022 and which Shamsi instructed him to confirm (despite the quoted price exceeding current market conditions).[13] AUM did not direct Tennant to contact or to utilize Three Fifty, and at the time that Tennant fixed the stem, AUM was unaware of which trader had offered the (above market) $787/mt price for the

---

[8] Exhibit A-1, ARGOS M 000185.
[9] Exhibit A, ¶ 5.
[10] *See* excerpts from deposition of Dean Tennant, attached hereto as Exhibit B, p. 18:22 – 19:23, 21:24 – 22:6, 60:12-24; *see* excerpts from deposition of Aaron Loveman, attached hereto as Exhibit C, p. 9:18 – 11:21, 13:5-18, 14:3-10, 17:14 – 18:13, 22:4-18; *see also generally* R. Doc. 50 and exhibits thereto (revealing said lack).
[11] *E.g.*, R. Doc. 50-4.
[12] Exhibit C, p. 6:5-18; Exhibit B, p. 26:2 – 28:24.
[13] *See* messages attached hereto as Exhibit D, *in globo*, Bates labeled THREEFIFTYMARKETS 000109-000113 and discussed/authenticated at Exhibit B, p.44:12 – 57:13.

stem.[14] Tennant then confirmed the stem, and he forwarded the bunker confirmation to Shamsi at his "@aum-metals.com" email address.[15] The bunker confirmation listed as "Buyer" "AUM Scrap and Metals Waste Trading LLC and/or Owner and/or Master of Vessel ARGOS M."[16]

The bunkers were ultimately stemmed aboard the ARGOS M at Las Palmas, and then on 7 November 2022, an invoice from Three Fifty was issued to "AUM Scrap and Waste Metals Trading LLC" for 800 metric tons of VLSFO fuel at $787.00 per metric ton, with a due date of 10 November 2022 for the invoice total, by way of BunkerEx.[17] Evidently, 10 November 2022 came and went without any payment from AUM, as did the following months, with AUM never paying Three Fifty for the bunkers stemmed aboard the ARGOS M at Las Palmas in October 2022.[18]

After months of nonpayment by AUM, Three Fifty filed its Verified Complaint in this Honorable Court on 16 February 2023, seeking a maritime lien against the M/V ARGOS M due to AUM's nonpayment for the bunkers stemmed at Las Palmas.[19] As the basis for the maritime lien and arrest sought, Three Fifty represented to the Court under oath that the vessel was chartered to AUM at the pertinent time.[20] In fact, despite its subsequent inconsistent testimony that it (purportedly) "knew" Shimsupa was the charterer of the vessel, the word "Shimsupa" does not appear once in Three Fifty's Verified Complaint.[21] Nevertheless, given that it is undisputed that AUM was not the charterer of the ARGOS M at the pertinent time (or any time, for that matter), Three Fifty's pursuit of a maritime lien against the vessel depends on the existence of AUM's

---

[14] Exhibit B, p. 55:20 – 57:13; see also Exhibit D, *in globo*.
[15] R. Doc. 50-4, pp. 14-15.
[16] R. Doc. 50-4, p. 28. Noticeably missing from that "Buyer" line on the bunker confirmation from Three Fifty is the word "Charterer," indicating that Three Fifty and Tennant thought at the time of the stem that AUM was the charterer of the vessel (which it undisputedly never was).
[17] R. Doc. 50-4, p. 34; Exhibit C, p. 33:12-21.
[18] Exhibit C, p. 12:21-23
[19] Civ. A. No. 23-00595, R. Doc. 1. AUM neither chartered nor operated the ARGOS M. *See* Exhibit A and A-1.
[20] *Id*. at ¶ 4. Of note, Three Fifty's Verified Complaint does not use the word/name "Shimsupa" anywhere.
[21] *See generally* Civ. A. No. 23-00595, R. Doc. 1.

authority (or here, lack thereof) to bind the vessel. As such, communications and manifestations (or here, the lack thereof) among the parties are key.

First, both Loveman and Tennant testified that neither ever dealt with or had any communications directly with Argos, the owner of the ARGOS M.[22] Critical to this motion, for his part, Loveman testified that Three Fifty did not have any communications whatsoever with anyone at Shimsupa or anyone at AUM – all its communications relating to the stem were only with Tennant at BunkerEx, in Tennant's role as bunker broker.[23] Furthermore, any and all beliefs, assumptions and "understandings" that Three Fifty had regarding AUM's authority to act as agent for Shimsupa and which entity was the charterer of the ARGOS M came only from Tennant.[24] Loveman readily testified that Three Fifty had absolutely no written communication or documentation whatsoever regarding AUM's authority or the existence of any agency relationship between Shimsupa and AUM, and Tennant served as the only communicator to him on the buying side of this bunker transaction.[25]

But Tennant's testimony in turn illuminates that he too only ever communicated with AUM-linked personnel and email addresses with respect to this bunker transaction, mostly through Fahim Shamsi; yet AUM was undisputedly not the charterer of the vessel, and Tennant possessed no written documentation whatsoever identifying which entity chartered the ARGOS M.[26] Tennant likewise admitted he did not have any written evidence to support his belief that AUM was acting for the benefit of Shimsupa in this particular transaction *prior* to its occurrence.[27] The only written evidence he could point to on that topic was an email he sought and received from an AUM email

---

[22] Exhibit B, p. 13:7-9; Exhibit C, p. 22:19-22.
[23] Exhibit C, p. 10:18 – 11:15, 12:24 – 13:7.
[24] Exhibit C, p. 7:14 – 8:3, 14:3-10, 17:14-24.
[25] Exhibit C, p. 17:14-24, 22:4-11, 30:18-21, 38:7-15, 44:19-22.
[26] Exhibit B, p. 17:1-3; *see also generally* Exhibit B, p. 20:18 – 21:10, 22:10 – 23:10, 40:12-14, 43:8-21.
[27] Exhibit B, p. 31:24 – 32:5.

address in March of 2023 (*i.e.*, five months *after* the bunker stem transaction and post-arrest) that belatedly and self-servingly assured BunkerEx that AUM had had authority to order the bunkers.[28]

And while the key question here asks what conduct or manifestations third-party Three Fifty received from charterer-principal Shimsupa (or even intermediary AUM), BunkerEx's involvement consequentially forms a key link in what turned out to be a six-party contractor and/or supplier chain and was the agent between third-party Three Fifty and principal Shimsupa or intermediary AUM:

> **Argos (Owner) → Shimsupa (Charterer) → AUM (third party / intermediary / contractor) → BunkerEx (fuel broker) → Three Fifty (fuel trader) → Ducat Maritime (fuel trader) → Sing Fuels (fuel trader/supplier) → Oryx (physical supplier)[29]**

The import of this chain is that it reveals there were two links in between the charterer, Shimsupa, and the bunker trader, Three Fifty – the third-party intermediary, AUM, and the fuel broker, BunkerEx. Put another way, from Three Fifty's perspective, BunkerEx was an agent for AUM, with AUM supposedly acting as an agent of principal Shimsupa. And for one thing that simply cannot be disputed in good faith – Shimsupa (a German company) and AUM (a Dubai entity) are separate, independent, and distinct corporate entities, with different majority shareholders and distinct Managing Directors.[30]

---

[28] Exhibit B, p. 34:1 – 35:21. The very fact that this purported confirmation was sought by BunkerEx from AUM at that particular interval further evidences that BunkerEx was unaware of the relationship between the companies at the time of the transaction at issue. Moreover, as seen in Exhibit B at p. 24:12 – 25:9, Tennant admitted that he is aware that charter parties often contain "no lien" clauses, but then confirmed he never bothered to ask the charterer whether there is such a clause in this charter party.

[29] Exhibit C, p. 15:2-17; *see also* Sing Fuels-Ducat Maritime paperwork related to the subject transaction, attached hereto as Exhibit G. As seen, in just the middle of the chain, Three Fifty is four links away from the vessel owner. Notably, each link in this chain above the charterer makes money over the previous one – with the traders and suppliers, by way of a markup in between each link, and then with a broker like BunkerEx, by way of a brokerage commission that is paid once the trader (here, Three Fifty) is paid. And again, AUM also seems to make money on the bunker-related procurement services it reportedly provides for Shimsupa (see Exhibit F, *infra*).

[30] Exhibit A-1; Exhibit B, p. 7:17-22, 8:1-10, 19:9-12, 36:14-18, 39:23 – 40:14, 41:2-5; Exhibit C, 9:1-17, 24:9 – 25:17, 40:9-16; *see* Three Fifty's "KYC" form for AUM, attached as Exhibit E (THREEFIFTYMARKETS 000013-

Lastly, by way of its Verified Complaint, Three Fifty swore to this Court that it believed that AUM was the charterer of the ARGOS M at the pertinent time. Since there is no reason to think Three Fifty would have intentionally misrepresented that position to the Court, it logically follows that it honestly believed that to be the case at the time of filing and thus at the time of the bunker transactions. That is, it believed AUM was the charterer was the case until it was *subsequently* informed by Argos that AUM was not, in fact, the charterer of the ARGOS M at any time, never mind at the time of the transactions. As Three Fifty did not change its belief until sometime after March 2023, it could not have possibly believed ***prior*** *to the time of the transaction and based upon representations* <u>*from Shimsupa*</u> that AUM was not the charterer of the ARGOS M and was instead the apparent agent of a charterer of whose existence it had been wholly unaware.

Regardless, Three Fifty has conceded to date that AUM was never the charterer of the ARGOS M, such that it must establish the requisite element of "apparent authority" in order to prevail against the ARGOS M, *in rem*, in its pursuit of a maritime lien. But it cannot do so, and it thus lacks an essential element of its claim, which in turn warrants summary dismissal.

<u>**Law and Argument**</u>

**I.    *Summary Judgment Standards***

As is oft repeated in the apposite jurisprudence, the summary judgment process set forth by Rule 56 of the Federal Rules of Civil Procedure is designed to eliminate trials on undisputed issues of fact. Summary judgment is required when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving party identifies those portions of the record which it believes demonstrate the absence of genuine

---

47), specifically at 000015 (listing Nair as General Manager), 000017 (stating majority shareholder is Jamal Nasser Almatrooshi), 000024 (listing Nair as Managing Director); *see also* email attached as Exhibit F.

dispute of material fact, the non-movant must do more than show that there is some metaphysical doubt as to the material facts. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-22 (1986). Of import, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment[,] [as] Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (emphasis in original). A factual dispute is considered genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" and considered material "if it might affect the outcome of the suit under the governing substantive law." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (citing *Anderson*, 477 U.S. 242 (1986)).

While summary judgment evidence is viewed in the light most favorable to the non-moving party, that opposing party's burden "is not satisfied with some metaphysical doubt as to the material facts, conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Willis*, 61 F.3d at 315. Importantly, courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (stating also that "[w]e resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy…"). Instead, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323).

And critically, Fifth Circuit courts routinely recognize that unsupported assumptions and uncorroborated conclusory statements are insufficient to avoid summary judgment, even if they happened to be contained in a deposition transcript – the fact that such assumptions or conclusory statements might appear in a deposition does not alter their inadequate character. *E.g.*, *Cordovi v. Ne. Med. Ctr. Hosp.*, 95 F.3d 50 (5th Cir. 1996) ("Cordovi's assumptions and speculations are

insufficient to defeat Northeast's motion for summary judgment."); *Aguirre v. Valerus Field Sols. LP*, No. 4:15-CV-03722, 2019 WL 989413, at *1 (S.D. Tex. Mar. 1, 2019) (reminding in the summary judgment context that "[e]ven when specifically referred to, the 'evidence' must be proven according to the rules of evidence (e.g. must be authenticated and/or not be hearsay) and cannot be based upon assumptions and speculation") (collecting Fifth Circuit cases); *Chun-Sheng Yu v. Univ. of Houston at Victoria*, No. 4:16-CV-03138, 2019 WL 652368, at *10 (S.D. Tex. Feb. 15, 2019) ("The Fifth Circuit has made clear that bare assertions from deposition testimony, without evidence supporting the claims made during the deposition, are insufficient at the summary judgment stage.") (collecting Fifth Circuit cases).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (cleaned up); *see also, e.g., In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017). And that's the case here – Three Fifty bears the overall burden of proof at trial, so to avoid summary judgment dismissal where (as seen herein) Argos has pointed to an absence of evidence, it "is required to identify ***specific*** evidence in the record, and to articulate the '***precise*** manner' in which that evidence support[s] their claim." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)) (emphasis added); *see also, e.g., Holder v. Brannan*, No. SA-21-CV-01029, 2022 WL 4001973, at *2 (W.D. Tex. Aug. 31, 2022).

Relevant to this action in admiralty, Fifth Circuit jurisprudence recognizes that the Court has somewhat greater discretion to weigh evidence presented in conjunction with the present motion. "When deciding a motion for summary judgment prior to a bench trial, the district court

has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321-22 (5th Cir. 2019) (quotation omitted). Put another way, "[w]here the evidentiary facts are not disputed, a court in a nonjury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions." *Overton v. M/V ALTRO DONNA, LLC*, No. CV 18-6338, 2019 WL 1959827, at *3 (E.D. La. May 2, 2019) (Africk, J.) (quotations omitted). As the present matter is indeed set for a bench trial and the testimony is what it is, the above standard affords the Court greater discretion with which to consider the evidence presented by Argos and draw inferences as it sees fit. *Manson Gulf, L.L.C v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017). After considering the incontrovertible material facts and the governing law set forth herein, Argos submits that summary judgment is proper.

## II.   *Governing Legal Principles*

### A.   *Maritime Liens*

Under U.S. maritime law, "[t]he Commercial Instruments and Maritime Liens Act ("CIMLA") governs the circumstances under which a party is entitled to a maritime lien," with CIMLA found at 46 U.S.C. §31341 *et seq*. *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018). Extrapolating from 46 U.S.C. §31342(a), to prove that a maritime lien exists under the CIMLA, a lien-pursuing party such as Three Fifty "must show it is: (1) a person providing necessaries; (2) to a vessel; and (3) on the order of the owner or a person authorized by the owner." *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 273 (4th Cir. 2022). Bunkers are necessaries, with nonpayment for same potentially giving rise to a maritime lien (*see id.*), and it is undisputed that the bunkers were provided to the ARGOS M. Thus, the maritime lien question here turns on the third element – whether these bunkers were ordered

by "a person authorized by the owner" of the ARGOS M.

The Fifth Circuit has explicitly instructed courts to "apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not lightly extended by construction, analogy, or inference." *Valero Mktg. & Supply Co.*, 893 F.3d at 292 (quotation omitted); *see also Sing Fuels*, 39 F.4th at 278 (quoting *Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979)). This mandated strict construction makes commercial sense – such a security device is often assessed against an entity (the vessel owner) lacking contractual privity and/or communication with the party seeking the remedy, and the jurisprudence recognizes that maritime liens encumber commerce and are disfavored under the law. *E.g.*, *Temara, supra*; c*f. Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switz.) SA*, 239 F.Supp.3d 674, 684 (S.D.N.Y. 2017) (noting this "strict approach" to maritime liens protects against "[p]erverse incentives [that] are also possible; for example, parties confident that they have a lien on a vessel may be less likely to conduct due diligence or carefully memorialize their agreements"), *ultimately aff'd sub nom. Nippon Kaisha Line Ltd. v. Nustar Energy Servs., Inc.*, 745 F. App'x 414 (2d Cir. 2018). And "a maritime lien is not automatic for suppliers of 'necessaries' but instead depends on the relationships between the parties involved." *ING Bank, N.V. v. M/V Charana Naree*, 446 F.Supp.3d 163, 169 (W.D. La. 2020).

Section 31341(a) lists a number of individuals "presumed to have authority to procure necessaries for a vessel." That list includes "an officer or agent appointed by … a charterer," but the presumptive authority provided in Section 31341(a) carries with it some commonsense boundaries. On that note, "[w]hile this list is not necessarily exhaustive, a direct contractual or agency nexus between the supplier and the vessel or its agents is typically required." *Clearlake Shipping*, 239 F.Supp.3d at 684. Phrased another way, "under the CIMLA's terms, the rebuttable presumption of authority to bind a vessel is only applicable if an agency relationship indeed exists,

including one involving apparent authority." *Sing Fuels*, 39 F.4th at 275.

Critically here, even where the presumption may be applicable, the jurisprudence reflects that it is rebuttable in a few ways, including two that are potentially relevant here: 1) with competent evidence that the entity procuring the necessaries did not act with the requisite authority to encumber the vessel (*see, e.g.*, *Sing Fuels, supra*); and 2) where an entity in the supply chain had received actual notice of a "no lien" clause in the relevant charter (*see, e.g.*, *M/V Charana Naree, supra*, and *Hampton Bermuda Ltd.*, *infra*). As explained herein, any potential application of presumptive authority is rebutted under the facts here, since neither actual nor apparent authority to bind the vessel existed on the part of either AUM or BunkerEx.

    B.   *Actual or Apparent Authority*

Maritime law embraces typical agency principles, such that the authority required to warrant a maritime lien can be of the actual or the apparent variety, and the agency inquiry considers the roles of the parties involved in the transaction. *E.g.*, *Lake Charles Stevedores, Inc.*, 199 F.3d at 226; *Sing Fuels, supra*. The persuasive *Sing Fuels* decision discussed herein notes that actual authority to create a lien on the vessel is negated by the presence of "no lien" clauses in the operative charter party, like here. *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI*, 534 F.Supp.3d 551, 566 (E.D. Va. 2021), *aff'd sub nom.*, 39 F.4th 263 (4th Cir. 2022).

Apparent authority determinations turn on manifestations by the principal to the third-party, and a third party's subjective beliefs are irrelevant to the inquiry. *M/V Charana Naree*, 446 F.Supp.3d at 171. "A party relying on apparent authority is therefore required to show that (1) the principal's conduct caused it to believe that the agent had this authority and (2) as a direct consequence thereof, it reasonably relied on the agent's purported authority." *Id.* Or, as stated by this Honorable Court in denying an earlier motion by the other consolidated plaintiff, "[a]pparent

authority is created as to a third person ***by conduct of the principal*** which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." 2023 WL 8283689, at \*4 (citing Restatement (Second) of Agency § 27) (emphasis added).

Said differently, "[a]pparent authority is present only when a third party's belief is traceable to **manifestations of the principal**." *Sing Fuels,* 39 F.4th at 275 (quoting Restatement (Third) of Agency § 3.03 cmt. b) (emphasis added). This tenet has been uniformly stressed by federal courts in the context of authority questions, with numerous appellate courts emphasizing that apparent authority absolutely cannot be based solely on the statements of the purported agent. *E.g.*, *Sing Fuels*, 534 F.Supp.3d at 562 ("[I]t is well-established that 'agency can be established, under United States law, only by evidence of overt acts on the part of the principal that would indicate an agency relationship; the subjective beliefs of the persons dealing with the alleged agent are thus irrelevant to the inquiry.'") (quoting *Hawkspere Shipping Co. v. Intamex*, S.A., 330 F.3d 225, 235 (4th Cir. 2003)); *Garanti Finansal Kiralama A.S.*, 697 F.3d at 73; *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985) ("Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling.").

"The burden of proving an agency relationship is on the party who asserts the existence of the relationship," which here is Three Fifty, and at this summary judgment stage, it must identify specific evidence that can support the existence of same in light of the governing legal standards. *Temara*, 203 F.Supp.3d at 363 (citing *Garanti Finansal Kiralama A.S.*, *supra*). Moreover, timing is everything – the existence or not of apparent authority depends upon what the third party knew and/or relied upon *at the time of the transaction*. *E.g.*, *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d

64, 70 (2d Cir. 2003); *Adler v. Solar Power, Inc.*, No. 16-cv1635, 2018 WL 1626162, at *7 (S.D.N.Y. Mar. 30, 2018); *Coffey v. Fort Wayne Pools, Inc.*, 24 F.Supp.2d 671, 682 (N.D. Tex. 1998); *accord GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1128 (8th Cir. 2022) ("Also, apparent authority must be based on facts that exist at the time of the transaction and may not be based on facts that arise later." (quotation omitted)).

      C.   <u>Applicable Burdens</u>

      Particularly germane to this Motion, as the party seeking to establish a maritime lien, Three Fifty (of course) overarchingly bears the burden of proof on its maritime lien claim. *E.g.*, *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005). In other words, Three Fifty bears the burden of proving all of the essential elements of a maritime lien claim, one of which is that Three Fifty provided the bunkers to the ARGOS M "at the order of either the owner of the Vessel or an individual authorized by the owner." 2023 WL 8283689, at *4; *see also, e.g.*, *Sweet Pea Marine, supra*; *Sing Fuels*, 39 F.4th at 273-74; *Econ. Stone Midstream Fuel, LLC v. M/V A.M. Thompson*, No. CIV. A. 4:08-CV-127, 2009 WL 2767681, at *6 (N.D. Miss. Aug. 27, 2009) ("The United States Supreme Court has stated that a party asserting a maritime lien for the provision of necessaries bears the 'burden of proving that the supplies in question were furnished to [the vessel] by [the claimant] upon order of the owner or of some one acting by his authority.'") (quoting *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 12 (1920)).

      This case intertwines an apparent authority question with that third essential element. And as noted above, under federal agency law, Three Fifty bears the burden of proving the existence of apparent authority, as the party seeking to take advantage of apparent authority bears the burden of proving the authority relationship. *E.g.*, *Sing Fuels, supra*; *Cactus Pipe, supra*; *Temara, supra*.

      Integrating the apparent authority burden with Three Fifty's burden as a summary

judgment opponent, without some evidence to prove that it can meet its burden at trial to show that it reasonably relied on manifestations *of the principal* as to the authority of AUM / BunkerEx to bind the vessel at the time of the transaction, Three Fifty cannot survive summary judgment, and its maritime lien claim must be dismissed with prejudice, as Argos has met its burden to establish that the claimant lacks evidence of a required element of its claim.

### III. Because Three Fifty lacks evidence of the essential authority element of its maritime lien claim, summary judgment is mandated.

A. There is no evidence that Three Fifty provided bunkers to the vessel on the order of the owner or a person authorized by the owner.

Considering that the essential element at issue under 46 U.S.C. § 31342(a) is whether Three Fifty, as the lien-seeking party, provided the bunkers to the ARGOS M "on the order of the owner or a person authorized by the owner," the initial possibility of those bunkers being provided in either of those fashions must be considered. Yet the evidence forecloses that avenue, by Three Fifty's own admissions.

Three Fifty's Loveman clearly testified *he never dealt with or had any communications directly with Argos* (and neither did BunkerEx's Tennant, for that matter).[31] Instead, Loveman admitted that Three Fifty acted only on the instructions and order of BunkerEx's Tennant.[32] There has also been no evidence presented during this litigation that could even possibly establish that Three Fifty provided bunkers "on the order of the owner," Argos.[33] Ergo, as in *Sing Fuels, supra*, "[t]hese concessions make clear that [Three Fifty] never ordered the [November] bunkers 'on the order of the owner,' [Argos], as required by the CIMLA." 39 F.4th at 274; *see also Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 845 (9th Cir. 2018).

---

[31] Exhibit B, p. 13:7-9; Exhibit C, p. 22:19-22.
[32] Exhibit C, p. 10:18 – 11:15, 12:24 – 13:7, and p. 33:14-16 (stating Three Fifty contracted with AUM).
[33] *See generally, e.g.*, R. Docs. 50 and 64. Indeed, if Three Fifty had any evidence that tended to show it provided bunkers on the order of Argos, it would have included in its motion for summary judgment.

"Because [Three Fifty] did not provide the [November] bunkers at [Argos's] request, it is only entitled to a maritime lien if it can show it ordered them 'on the order of ... a person authorized by the owner.'" *Sing Fuels*, 39 F.4th at 274. There likewise exists no evidence that either AUM or BunkerEx was authorized by Argos to order bunkers, considering it is undisputed that Argos did not have a contractual relationship with either entity and that Three Fifty provided bunkers on the order of BunkerEx (purportedly on behalf of AUM).[34] Since Three Fifty lacks evidence that the bunkers were ordered by Argos or an entity authorized by Argos, it must present evidence of an applicable agency relationship yielding authority to bind the vessel. Yet as seen below, it cannot do so, warranting summary judgment.

    B.    *The evidence establishes that neither AUM nor BunkerEx (nor Shimsupa, for that matter) had actual authority to bind the vessel.*

A time charter, like the one here between Argos and Shimsupa, is a contract controlled by the terms therein. *E.g.*, *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 552, n.1 (5th Cir. 2004); *Sing Fuels*, 534 F.Supp.3d at 566. It is undisputed that the Argos-Shimsupa charter contained multiple "no lien" clauses, specifically at lines 112-113 of the Main Body as well as Clauses 52 and 109 of the Riders.[35] Like in *Sing Fuels, supra*, where the charter likewise specifically precluded authority to bind the vessel, the terms of the time charter between Argos and Shimsupa negates the presence of actual authority to bind the vessel. *Id.* at 566-67.[36]

In light of the express preclusion of authority to bind the vessel, Shimsupa could not possibly grant actual authority to any agent, whether AUM or BunkerEx, to bind the vessel, since

---

[34] Exhibit A, ¶ 4 (affirming that Shimsupa was Argos's contractual charter party partner, not AUM); *see also* Exhibit B, p. 13:7-9, 66:8-19; Exhibit C, p. 11:4-15.
[35] Exhibit A-1, ARGOS M 000139, 000156, and 000185.
[36] Also like in *Sing Fuels*, "[Three Fifty] never reviewed a time charter because [its] representative never asked for copies of the charter parties," "[Three Fifty] ignored the charter party even though it knew that charter parties could contain such no-lien language," and "[a]lthough [Three Fifty] had the ability to contact the Defendant, [it] never communicated with [Argos]." Exhibit C, p. 22:19-22, 23:8-11.

it did not have such authority to grant in the first place because of the unambiguous terms of the charter party.[37] Phrased differently, where a principal does not have authority to take a particular action, it follows that such principal cannot engage an agent to take an action is prohibited from taking; otherwise, an agent would be allowed to circumvent governing contractual terms that bind its principal, which would be an illogical outcome and defy all pertinent law. Especially so where the agent has actual knowledge of an authority limitation, like here where AUM had a copy of the Argos-Shimsupa charter and knew that Shimsupa could not authorize it to bind the vessel. Ergo, Three Fifty cannot present any evidence of any agent – whether AUM or BunkerEx – having had actual authority to bind the ARGOS M. *E.g.*, *id.*

In all, like in *Sing Fuels*, because the charter party precluded any actual authority for the charterer or its agents to incur liens against the vessel, neither AUM nor BunkerEx could have had authority to bind the vessel for the purpose of 46 U.S.C. § 31342(a).

    C.    *Three Fifty lacks any evidence that it received any manifestations from the principal that would justify reliance upon BunkerEx's or AUM's purported authority to bind the vessel.*

Because Three Fifty did not provide bunkers on the order of Argos or of an entity authorized by Argos, and because there was no actual authority for the charterer's agents to incur liens against the ARGOS M, Three Fifty must "rest[] its entitlement to a maritime lien entirely on [BunkerEx] being [Shimsupa's] apparent agent," "[a]s opposed to grappling with the CIMLA's explicit requirement under § 31342(a)." *Sing Fuels*, 39 F.4th at 275. But problematically for Three Fifty, it cannot overcome the fact that "broken links to the chain of apparent authority needed for the bunker purchase [] exist," *Three Fifty Markets*, 2023 WL 8283689, at *6, and Three Fifty does not have any evidence that could possibly serve to meet its burden at trial.

---

[37] Exhibit A-1.

Again, as this Honorable Court stated, the creation of apparent authority necessarily requires evidence that "***the conduct of the principal***, which reasonably interpreted, cause[d] the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." 2023 WL 8283689, at *4 (emphasis added). The relevant jurisprudence reinforces that "[a]pparent authority is present only when a third party's belief is traceable to **manifestations of the principal**" (*Sing Fuels,* 39 F.4th at 275 (emphasis added)), with the manifestations made by the principal to the third party controlling the inquiry (*Cactus Pipe, supra*).

Applying that standard here, in order to prevail at trial, Three Fifty will have to present evidence to prove that the conduct of Shimsupa (the charterer-principal), *traced to manifestations made by Shimsupa to Three Fifty* before the bunker sale, caused it to believe that Shimsupa consented to BunkerEx (the only party it dealt with) acting on its behalf. *E.g.*, *Maymar Marine Supply, Inc. v. Arab Mar. Petroleum Transp. Co.*, No. 4:20-CV-3804, 2021 WL 5155700, at *1 (S.D. Tex. May 4, 2021) ("To demonstrate apparent authority, Maymar must prove that (1) the charterer, as principal, made some representation or manifestation directly to the supplier, and (2) the supplier reasonably relied on the intermediary's purported authority as a direct consequence of those direct representations.") (quoting *Crescent City Marine, Inc. v. M/V Nunki*, 20 F.3d 665, 668 (5th Cir. 1994) (cleaned up).

Yet Three Fifty's own testimony reveals that it will **never** be able to meet that burden. Once again, and critically here, ***Loveman testified that he did not have any communications whatsoever with anyone at Shimsupa or anyone at AUM*** (for that matter) – all his communications relating to the stem were <u>*only*</u> with Tennant at BunkerEx, in Tennant's role as bunker broker.[38] In short, Three Fifty never received ***any*** manifestation from the charterer-

---

[38] Exhibit C, p. 10:18 – 11:15, 12:24 – 13:7.

principal, Shimsupa.[39] Put differently, Three Fifty only ever communicated with an agent and never with a principal; yet, "[i]t is hornbook law that [Tennant] cannot deem himself [Shimsupa's] apparent agent without any manifestation coming from [Shimsupa]." *Sing Fuels*, 39 F.4th at 277; *see also Lake Charles Stevedores*, 199 F.3d at 228; *M/V Charana Naree*, 446 F.Supp.3d at 171. Therefore, Three Fifty lacks evidence as to an integral element to its claim, warranting summary dismissal.

The relevance and consequent persuasiveness of the decisions from the recent *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI* litigation in the Fourth Circuit resound on this issue. Given the striking similarities between the two fact patterns, as the plot of *Sing Fuels* likewise centered on a marine fuel trader that sought a maritime lien against a vessel based upon dealings *only* with a fuel broker, wherein the governing charter party precluded the charterer from binding the vessel and the fuel trader had no communications with any principal, an identical outcome is warranted here.

Highlighting that the *Sing Fuels* plaintiff, fuel trader Sing Fuels, dealt **exclusively** with a fuel broker in regard to the bunker transaction at issue (like here), and after determining actual authority did not exist, the district court likewise rejected the fuel trader's apparent authority argument, finding that its effort to establish same by way of communications it had just with the fuel broker was woefully insufficient in light of the governing law. 534 F.Supp.3d at 567-69.

First, the contractual chain in the Virginia case is markedly similar to the chain here:

**Owner (Autumn Harvest) → charterer (Bostomar) → sub-charterer (Medmar, Inc.) → third party (M.A.C. Shipping) → fuel broker (Mylonakis/Windrose Marine) → fuel trader (Sing Fuels) → physical supplier.**

*Id.* at 557-58, 567-68. In light of that chain, the following facts led to the court's conclusion:

i) "the evidence at trial demonstrated that Sing Fuels only communicated with Mr. Mylonakis, the fuel broker," **like here** where Three Fifty testified that it only ever

---

[39] *Id.*

communicated with BunkerEx's Tenant;

ii) "rather than obtain information about the charter party, Sing Fuels only spoke with Mr. Mylonakis, the fuel broker, and relied solely on its interactions with him," **like here**;

iii) the broker "revealed he was only dealing with M.A.C. Shipping and that *he believed* they were the same entity as MedMar Inc.," **like here** where Tennant dealt only with AUM and merely *believed* AUM and Shimsupa were effectively one and the same;

iv) Sing Fuels never made any effort to confirm the relationship between the subcharterer and its supposed affiliate, **like here**;

v) "nothing in the record suggest[ed] that [affiliate] M.A.C. Shipping is the same company as [subcharterer] MedMar Inc.," **like here** where AUM and Shimsupa are demonstrably separate companies; and

vi) "[c]ritically, Sing Fuels admitted that it never dealt directly with MedMar Inc. and always had several intermediaries in the relevant transaction," **just like** Three Fifty lacked direct contact with Shimsupa here.

*Id.* at 567-68 (quoted emphasis in original). Ultimately, the court held that "Sing Fuels' unfounded reliance on Mr. Mylonakis' agency cannot meet the requirements of presumed authority under 46 USCS § 31341," defeating its effort to establish a maritime lien. *Id.* at 568-69.

The Fourth Circuit affirmed, finding that "Sing Fuels failed to carry its evidentiary burden" on apparent authority, thus defeating the existence of a maritime lien. 39 F.4th at 272-73. Relying upon the Fifth Circuit's *Lake Charles Stevedores* decision, the Fourth Circuit reminded that "Section 31341's presumption is not 'conclusive' as to a maritime lien's existence because a party can rebut the statutory presumption with competent evidence," as Argos has done here. *Id.* at 273. The appellate court recognized that, like here, "[u]nder these circumstances, Sing Fuels needed to demonstrate that either Mylonakis or Medmar is 'a person authorized by the owner,' Autumn Harvest," yet "[i]t failed to do so." *Id.* at 274. The court pointed out Sing Fuels itself argued the fuel broker was acting for the subcharterer, *not* the owner, and it submitted no evidence whatsoever linking the owner to the bunker order (identical to the facts of the present case). *Id.* at 274-75.

Turning to the argument that apparent authority on the part of the fuel broker triggered the

statutory presumption, the Fourth Circuit affirmed that Sing Fuels failed to meet its evidentiary burden under the governing legal tenets. *Id.* at 275-78. Noting "Sing Fuels emphasized that it *only* worked with Mylonakis for procuring the July bunkers, and never spoke with Medmar," the appellate court found that wholly inadequate because "[i]t is hornbook law that [broker] Mylonakis cannot deem himself Medmar's apparent agent without any manifestation coming from Medmar." *Id.* at 277. Summarizing the problem, the court decreed:

> So we are left wanting for a manifestation from [sub-charterer] Medmar. Under these circumstances, we believe the district court's decision against apparent authority is well-grounded in the record, particularly with a glaring absence of proof and primarily relying on only witness testimony before it.

*Id.* Tellingly, "'no documentation' suggested an agency relationship between Mylonakis and Medmar," which is especially similar here as neither BunkerEx nor Three Fifty had any documentation whatsoever establishing any kind of agency relationship between Shimsupa and AUM.[40] Ultimately, the Fourth Circuit held it "cannot conclude that Sing Fuels is entitled to a maritime lien when it has failed to adequately prove an agency relationship between Medmar and Mylonakis," fittingly reiterating that "maritime liens are to be strictly construed." *Id.* at 278.

Considering the significant similarities between the present case and the persuasive *Sing Fuels* decisions discussed above, Three Fifty will never be able to meet its evidentiary burden for apparent authority since it never directly received any representations from Shimsupa. Because it lacks evidence of an essential element of its maritime lien claim, it cannot survive summary judgment, and dismissal is warranted.

## Conclusion

The parties' respective burdens are of import here. While Three Fifty's motion for summary judgment was unsuccessful because it could not extinguish the genuine issues of material

---

[40] Exhibit B, p. 19:7-23, 21:18 – 22:6; Exhibit C, p. 9:5 – 10:7, 15:6-24, 17:20 – 19:11, 33:1-11, 35:9 – 36:16.

fact on the elements on which it bore the burden to prove its claim, a significant distinction exists as to Argos's burden now. For Argos to prevail on summary judgment, it need only establish that Three Fifty lacks evidence to prove at least one essential element of its claim at trial. And Argos has done just that, as there is no genuine dispute of material fact that Three Fifty does not possess any evidence to prove up the essential element of "authority."

As the Fifth Circuit has noted, a lack of evidence is not to be mistaken for a genuine dispute of material fact. *Derousselle v. Wal-Mart Louisiana, L.L.C.*, 701 F. App'x 349, 351 (5th Cir. 2017). Because Three Fifty has admitted that it had no direct oral communications with Argos, Shimsupa or AUM and that it never received any written documentation from Shimsupa indicating AUM or BunkerEx could procure bunkers on its behalf that could support the existence of apparent authority, it will be unable to meet its burden at trial on an essential element of its claim. As such, Argos respectfully requests that this Honorable Court grant its motion for summary judgment and dismiss Three Fifty's claim with prejudice.

Respectfully Submitted,

**MURPHY, ROGERS, SLOSS,**
**GAMBEL & TOMPKINS**

*/s/ John H. Musser, V*
Peter B. Sloss          (#17142)
psloss@mrsnola.com
John H. Musser, V      (#22545)
jmusser@mrsnola.com
Tarryn E. Walsh        (#36072)
twalsh@mrsnola.com
701 Poydras St., Suite 400
New Orleans, LA 70139
Telephone:     504.523.0400
Facsimile:     504.523.5574
*Attorneys for Argos Bulkers, Inc., solely as owner and claimant of the M/V ARGOS M, with a full reservation of all rights and defenses pursuant to Supplemental Rule E(8) of the Federal Rules of Civil Procedure*

4864-2787-8298, v. 1