UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THREE FIFTY MARKETS LTD,<br>*Plaintiff,*<br><br>VERSUS<br><br>M/V ARGOS M, her engines, tackle equipment, appurtenances, etc. *in rem*,<br>*Defendant*. | CIVIL ACTION<br><br>NO. 2:23-cv-00595<br><br>SECTION L (5)<br><br>JUDGE ELDON J. FALLON<br><br>MAGISTRATE JUDGE MICHAEL NORTH |

**PLAINTIFF THREE FIFTY MARKETS LTD'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Three Fifty Markets Ltd. ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendant Argos Bulkers, Inc. ("Argos" or "Defendant")'s motion for summary judgment at ECF 94 ("Motion"). Notwithstanding this Court's Order at ECF 75 denying Plaintiff's Motion for Summary Judgment at ECF 50 as a result of disputed material facts regarding the agency relationship between Shimsupa GMBH ("Shimsupa" and/or "Charterer") and Aum Scrap and Metals Waste Trading LLC ("AUM")[1], Defendant has nonetheless filed the current Motion asserting, verbatim, the same arguments it already made in its opposition to Plaintiff's Motion for Summary Judgment at ECF 60. Rather than paying for the bunkers it undeniably consumed, Defendant chose, yet again, to unnecessarily increase the cost of litigation and further harass the Plaintiff and burden the Court.

For the reasons stated below, Defendant's Motion should be denied in its entirety.

[1] The Court's Order was based on the reasons stated on the record during the November 1, 2023 oral argument.

# PRELIMINARY STATEMENT

Plaintiff, a bunker supplier, brought this action to recover $629,600.00, plus interest and costs, due and owing for its supplying necessaries to an ocean-going vessel – the ARGOS M (the "Vessel") - under the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*

On October 11, 2022, Plaintiff arranged for the supply of bunkers (fuel) in the Port of Las Palmas, Spain, on the order of the Vessel's charterer, Shimsupa GMBH ("Shimsupa" and/or "Charterer) through its guarantor/agent Aum Scrap and Metals Waste Trading LLC ("AUM"), and by the request and consent of the Master of the M/V ARGOS M. Both the Charterer and its agent AUM had legal authority from the Vessel's owner, Argos Bulkers, Inc. ("Argos"), to order the bunkers.

On January 12, 2024, Plaintiff took the deposition of Nikos Kekridis, who wears two hats. He is the largest shareholder of Argos Bulker, Inc., the registered owner of the M/V AROGS and, the owner of the Vessel's ship management company Pontos Marine. *See* Deposition Transcript of Nikos Kekridis (hereinafter "Kekridis Tr.") dated January 12, 2024, enclosed as Exhibit A at 10:21 – 12:18.[2] Based on his testimony, the Court may wish to revisit its Order at ECF 75 denying Plaintiff's Motion for Summary Judgment at ECF 50 as a result of disputed material facts regarding AUM having apparent authority to purchase bunkers on behalf of Shimsupa. Before Plaintiff supplied the bunker fuel to the ARGOS M, the Owner, via the ship manager Pontos Marine (i.e., Mr. Kekridis), the Master and Shimsupa were advised by email dated October 11, 2022 that (1) AUM was purchasing the bunkers on behalf of the ARGOS M, (2) Plaintiff was the seller of the bunkers, and, (3) Oryx was the physical supplier. ECF 50-7 at p. 2. *See also* Kekridis Tr. at 71:22 – 75:20. Following receipt of that email, neither the Owner, Master nor Shimsupa contacted

2

Plaintiff or Oryx to advise that AUM was not authorized to purchase the bunkers for the ARGOS M. *Id.* After being advised the bunkers were being purchased by AUM, the Vessel accepted the fuel at the port of Las Palmas, Spain. Accordingly, with the approval and authority of the Owner, Master and Shimsupa, the bunkers were purchased by AUM (Shimsupa's Guarantor) and loaded aboard the ARGOS M.

Plaintiff was not paid for the bunkers, which the Owner later used for their own benefit.

## ARGUMENT

### POINT I

### APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact in the case, and it appears from the pleadings and any supporting affidavits or depositions that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, the nonmoving party must show the existence of genuine factual disputes that are material to the issues to be decided. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In reviewing a motion for summary judgment, the court is to view the evidence in the light most favorable to the non-moving party, and also must draw any reasonable inferences or resolve any doubts in favor of the non-movant(s). *See, e.g.*, *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir. 2009); *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 288 (5th Cir. 2008). In short, "summary judgment is improper if a reasonable factfinder could find in favor of the non-movant." *Lay v. Singing River Health Sys.*, 694 F. App'x 248, 253 (5th Cir. 2017).

Prior to the deposition of Mr. Kekridis, this Court ruled that genuine factual disputes material to the issues to be decided are present preventing the Court from granting summary judgment in the current matter. (ECF 75.) Defendant apparently believes the Court's ruling does

not apply to them – which it does. Moreover, the confirmation by Mr. Kekridis that prior to the delivery of the bunkers to the ARGOS M the Owner and ship manager were aware that AUM – Shimsupa's Guarantor – was buying the bunkers from Plaintiff supports granting summary judgment in Plaintiff's favor.

**POINT II**

**PLAINTIFF HAS A VALID AND ENFORCEABLE MARITIME LIEN**

***1. The Master, Charterer and AUM Had Authority to Order the Fuel Bunkers.***

A maritime lien is a unique remedy. The lien is a proprietary right in the vessel itself as distinct from any personal liability. *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) citing *Riffe Petroleum Co. v. Cibro Sales Corp.*, 601 F.2d 1385, 1389 (10th Cir. 1979); *see also World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F. Supp. 3d 792, 808 (E.D. Va. 2014), aff'd sub nom. *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507 (4th Cir. 2015) ("[i]n the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated") (internal citations omitted).

The Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.* provides as follows with regard to establishing a maritime lien:

> (a) [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1) has a maritime lien on the vessel;
>
> (2) may bring a civil action in rem to enforce the lien; and
>
> (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342. Thus, to establish its lien, Plaintiff only needs to prove that (1) it supplied "necessaries"[3] to the Vessel; and (2) the "necessaries" were on order from someone with authority

[3] Bunkers are "necessaries" within the meaning of CIMLA. Section 31301 of CIMLA defines "necessaries" to include "repairs, *supplies*, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4) (emphasis added).

to bind the Vessel. As a matter of law, the Vessel's master and Charterer "are presumed, to have authority to procure necessaries for a vessel." 46 U.S.C. § 31341. "It is a fundamental tenet of maritime law that '[c]harterers and their agents **are presumed to have authority to bind the vessel** by the ordering of necessaries.'" (emphasis added) *Triton Marine Fuels Ltd., S.A. v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 414 (4th Cir. 2009) (quoting *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1127-28 (9th Cir. 2008)); *see also* 46 U.S.C. § 31341(a). This presumption is only rebuttable if the owner is able to demonstrate that the seller of the necessaries had **actual knowledge** that the person ordering the necessaries lacked authority to bind the vessel. *See Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir. 1985).

Under the current law, a supplier of necessaries to a vessel is entitled to rely upon the statutory presumption of authority under CIMLA unless a vessel owner gives actual notice that the authority is, in fact, lacking. *Marine Fuel Supply & Towing, Inc. v. The M/V Ken Lucky*, 869 F.2d 473, 1989 AMC 380 (9th Cir. 1988). A supplier has neither a duty to inquire, nor an obligation to investigate. It is the responsibility of the vessel owners to convey sufficient notice. S*ee Gulf Oil Trading Co. v. M/V Freedom*, 1985 AMC 2738 (D. Oregon, 1985). Accordingly, a party seeking to bar a supplier's maritime lien has a heavy burden of proving the supplier actually knew of a "prohibition lien" clause in the charter party of other contract. *Empire Scott Stevedoring v. M/V Stevns Pearl (Holandia)*, Civ. No. 96-1818, 1998 U.S. Dist. LEXIS 14607, at *8 (E.D. La. Sept. 10, 1998). Argos failed to offer any evidence to rebut the presumption that AUM was acting within its authority when it ordered bunkers. And, Argos cannot establish – and made no effort to - demonstrate that Plaintiff had actual knowledge that AUM lacked authority to bind the Vessel.

---

Courts have consistently held that "[n]ecessaries include fuel bunkers . . ." *See, e.g., World Fuel Servs. Singapore, Pte., Ltd. v. M/V BULK JULIANA*, 13-cv-5421, 2014 WL 2719252, at *2 (E.D. La. June 16, 2014). *See also ING Bank, N.V. v. M/V Voge Fiesta*, 741 F.App'x 18 (2d Cir. 2018); *Marine Oil Trading Ltd. v. Motor Tanker PAROS*, 287 F. Supp. 2d 638, 641 (E.D. Va. 2003); *World Fuel Servs.*, 12 F. Supp. 3d at 809.

The Defendant argues in its Motion that "There is no evidence that Three Fifty provided bunkers to the vessel on the order of the owner or a person authorized by the owner." (ECF 94-1 at pp. 15-22). Defendant's argument lacks merit because it attempts to switch the burden of proof to Plaintiff. Notwithstanding, there is plenty of evidence in the record establishing that AUM had authority from Shimsupa to purchase the bunkers.

"Maritime law embraces the principles of agency." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985). Under these principles, "[a]pparent authority is created as to a third person (Plaintiff) by conduct of the principal (Shimsupa/Vessel) which, reasonably interpreted, causes the third person (Plaintiff) to believe that the principal (Shimsupa/Vessel) consents to the act done on his behalf by the person (AUM) purporting to act for him." *Id.* (citing Restatement (Second) of Agency § 27). A party relying on apparent authority is therefore required to show that (1) the principal's conduct caused it to believe that the agent had this authority and (2) as a direct consequence thereof, it reasonably relied on the agent's purported authority. *Armit v. Eleni Intern., Shipping*, 201 F.3d 556, 559 (5th Cir. 2000). The existence and scope of an agency relationship can be resolved as a matter of law … if: (1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71-74 (2d Cir. 2012) (citing *Brunswick Leasing Corp. v. Wisc. Cent., Ltd.*, 136 F.3d 521, 526 (7th Cir. 1998).

The central issue in this case is whether AUM had actual or apparent authority from the charterer of the Vessel Shimsupa, or the Vessel, to order bunkers. The record is clear that AUM **had full authority** from Shimsupa to order bunkers on its behalf. See ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 40:21 – 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr. at 11:16-21, 12:10-20, 13:9-12, 14:3-7. See also ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6. It is disingenuous for the Owner of the Vessel to argue otherwise when they know full well that AUM was Shimsupa's

guarantor and that both companies were related. ECF 50-2 at ¶ 5; ECF 60-1 at ¶ 5. *See also* Kekridis Tr. at 59:4 – 60:20. In fact, the relationship between Shimsupa and AUM was well known, not only by the owners but also within the market. ECF 64-2, Tennant Tr. at 18:22 – 21:23; ECF 50-4 at ¶ 3.

Additionally, in prior dealings between Plaintiff, BrokerEx, and AUM, Shimsupa had informed the parties that AUM was acting as Shimsupa's agent when ordering bunkers. ECF 64-2, Tennant Tr. at 40:21 – 41:16, 52:19 – 53:6; ECF 50-4 at ¶ 3; ECF 64-3, Loveman Tr. at 7:14 – 8:3, 8:17-20, 9:18 – 10:1, 11:16-21; ECF 50-3 at ¶ 10. This fact was confirmed by AUM and Shimsupa before and after the transaction in question. *Id.*; see also ECF 50-4 at ¶¶ 6, 10.

Furthermore, the record is clear that both Plaintiff and BrokerEx were aware that Shimsupa was the charterer of the Vessel and that it had authorized AUM to order bunkers on its behalf. ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 22:10-14, 40:21 – 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr. at 11:16-21, 12:10-20, 13:9-12, 14:3-7, 36:16-19. *See also* ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6. The evidence further shows that Shimsupa and AUM are related companies with shared ownership as well as personnel. ECF 50-4 at ¶¶ 5-6; Tennant Tr. 18:22 – 21:23. *See also* ECF 64-4 showing Mr. Fahim Shamsi with email addresses for both Shimsupa and AUM and ECF 50-7 showing Mr. Fahim Shamsi receiving correspondence regarding the bunkering of the Vessel in his Shimsupa email address. Additionally, Shimsupa acknowledged the balance owed to Plaintiff for supplying bunkers ordered by AUM to the Vessel. ECF 50-4 at ¶ 10.

Last, but not least, as noted above, it is undeniable that prior to the bunkers being delivered to the ARGOS M, the Owner and ship manager were aware that AUM – Shimsupa's Guarantor – was buying the bunkers from Plaintiff. Plaintiff arranged and delivered fuel to the Vessel pursuant to the Order Confirmation, and the Master of the Vessel signed and stamped the Bunker Delivery Note confirming receipt of the fuel. ECF 52-2 at ¶¶ 9-10, 15-16. To date, Defendant has **not**

produced any evidence to show that AUM, the Charterer or the Master of the Vessel lacked authority to bind the Vessel, let alone that Plaintiff had actual knowledge of any lack of authority. In fact, Defendant produced contemporaneous correspondence showing that Mr. Kekridis of Pontos Marine, the ship manager, and the Master of the ARGOS M were well aware of the details of the bunkering transaction, as they were provided to him by a company called SS Freight Solutions BV acting "only for and on behalf of AUM/Shimsupa." ECF 52-2 at ¶ 11. The email in question dated October 11, 2022, at 4:25 pm (i.e. prior to the bunkering of the Vessel) states:

> Dear Captain
>
> Good day
>
> Pls note that bunkers are fixed at Las Palmas as per foll details;
>
> +++++
>
> Vessel: ARGOS M (IMO: 9502788)
> Port: Las Palmas
> Dates: 11 October 2022
> Fuel: 800mt VLSFO (max 0.5% sulphur)
> Remarks: None
> Agent: ISS / E.Erhardt y Cia. S.A.
> **Buyer: AUM Scrap and Metals Waste Trading LLC**
> **Trader: Three Fifty Markets Ltd**
> **Physical Supplier: Oryx**
>
> ++++++
>
> As per bunker broker supply is planned for 20:00 hrs today
>
> Kindly get in touch with agents for further details
>
> Best Regards,
>
> Capt. Murat Korkmaz
>
> Operation Manager at SS Freight Solutions B.V.
>
> As Operator only for and on behalf of Aum/Shimsupa

ECF 50-7 at p. 2 (emphasis added). This email was sent by SS Freight Solutions BV to Fahim Shamsi at his Shimsupa email account, to the Master of the Vessel **and** to the owners of the Vessel via its management agents Pontos Marine. *Id.*; *see also* Kekridis Tr. at 10:18 – 11:25, 71:22 – 75:20. To this end, Mr. Nikos Kekridis, the sole director of Defendant Argos Bulker, testified that

Pontos Marine knew **before** the bunkers were provided to the Vessel that AUM had ordered the bunkers and that Plaintiff was the supplier. *Id.* Yet, neither owners, Ponto Marine or Shimsupa ever informed anyone (let alone Plaintiff) that AUM lacked authority to order the bunkers and/or that there was a "no lien clause" in the charterparty between Defendant and Shimsupa. *Id.* Owner's silence is telling but not unexpected as Owners knew full well that (1) Shimsupa and AUM were related companies and that (2) AUM was acting as Shimsupa's agent and guarantor under the Charter, which afforded AUM the right to purchase bunkers on Shimsupa's behalf. *Id.* at 60:7-20, 71:22 – 75:20.

The evidence is clear that AUM had authority – actual or apparent – to act as Shimsupa's agent when purchasing the bunkers. Consequently, both AUM and the Charterer had the requisite legal authority from Argos to order bunkers on behalf of the Vessel.

**2. There were ample manifestations by Shimsupa that AUM was acting as its agents when purchasing bunkers.**

Defendant attempts to shift the burden of proof by alleging that neither Plaintiff nor BrokerEx received notice from Shimsupa that AUM was acting within its authority when ordering bunkers for the Vessel. It is Defendants burden to show AUM was acting without authority, a burden it has failed to meet. To the contrary, Mr. Tennant testified that he had conversations with Fahim Shamsi, an employee acting on behalf of both AUM and Shimsupa. ECF 64-2, Tennant Tr. at 18:22 – 21:23; *see also* ECF 50-4 at ¶¶ 5-6; ECF 64-4 at p. 2 and ECF 50-7 at p. 2. According to Mr. Tennant, both Mr. Shamsi and Mr. Subbiah (founder of both Shimsupa and AUM) confirmed AUM's authority to order bunkers on behalf of Shimsupa. ECF 64-2, Tennant Tr. at 18:22 – 21:23, 40:21 – 41:16, 52:19 – 53:6; ECF 50-4 at ¶ 5. This was explained to Mr. Tennant in prior transactions as well as in the transaction at hand. *Id.* Both Mr. Tennant and Mr. Loveman testified that they were aware that Shimsupa was the charterer of the Vessel and that AUM was acting on Shimsupa's behalf. ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 22:10-14, 40:21

– 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr. 11:16-21, 12:10-20, 13:9-12, 14:3-7, 36:16-19. *See also* ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6. To top it all off, the relationship between the parties was also well known to the owners of the Vessel who themselves demanded a financial guarantee from AUM when they entered into the charter with Shimsupa for the Vessel. ECF 50-2 at ¶ 5; ECF 60-1 at ¶ 5. AUM guaranteed Shimsupa's financial obligations, including the payment of bunkers. Accordingly, Defendant's claim that no one knew of the relationship between AUM and Shimsupa and that Shimsupa never manifested such a relationship is false. Moreover, it is Defendant's burden to establish that Plaintiff received notice that AUM did not have authority when ordering bunkers for the Vessel.

As indicated above, the record is clear in that (1) the charterer of the Vessel was Shimsupa,[4] (2) AUM was authorized to order bunkers on Shimsupa's behalf,[5] (3) both Plaintiff and BrokerEx were informed of the relationship between AUM and Shimsupa,[6] (4) AUM in fact ordered bunkers from Plaintiff on behalf of Shimsupa,[7] (5) Shimsupa and AUM both confirmed such transaction,[8] (6) neither AUM nor Shimsupa objected to the provision of bunkers by Plaintiff,[9] (6) neither AUM nor Shimsupa ever paid for the bunkers even though they both acknowledged that such transaction was legitimate and the amount was outstanding; and, (7) prior to the bunkers being delivered to the Vessel, the Owner, ship manager and Master were made aware that the guarantor AUM was purchasing bunkers from Plaintiff on behalf of Shimsupa and did not object.[10]

---

[4] ECF 50-2 at ¶ 3.

[5] ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 40:21 – 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr. at 11:16-21, 12:10-20, 13:9-12, 14:3-7. *See also* ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6.

[6] ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 40:21 – 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr. at 11:16-21, 12:10-20, 13:9-12, 14:3-7. *See also* ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6.

[7] ECF 50-4 at ¶¶ 4-6. *See also* ECF 64-2, Tennant Tr. at 18:22 – 21:23.

[8] ECF 50-4 at ¶¶ 6-11. *See also* ECF 60-5 at THREEFIFTYMARKETS000112.

[9] ECF 50-2 at ¶ 12.

[10] ECF 50-3 at ¶¶ 18-19; ECF 50-4 at ¶¶ 10-11.

**3. *Sing Fuels* is distinguishable from the current case and in any event, non-controlling on this Court.**

According to Defendant, the Fourth Circuit *Sing Fuels Pte. Ltd. v. M/V LILA SHANGHAI*, 39 F.4th 263 (4th Cir. 2022) decision is analogous to the present dispute. (ECF 60 at p. 15.) At the outset, *Sing Fuels* is not controlling law within the Fifth Circuit. But perhaps most importantly is Defendant's unwavering reliance on *Sing Fuels* is misplaced.

In *Sing Fuels*, the fuel trader, Sing Fuels Pte Ltd, was contacted by the bunker broker Costas Mylonakis, an employee of a company called Windrose Marine, to purchase bunkers for the M/V LILA SHANGHAI, which was under sub-charter by Medmar Inc. 39 F.4th at 267. During trial, Sing Fuels failed to call the bunker broker, Mylonakis, to testify. *Id.* at 269.As a result, the lower court ultimately found that Mylonakis did not possess any actual, apparent or presumed authority to hold the Vessel liable. *Id.* "As for apparent or presumed authority, the [lower] court held the record, at best, showed a 'tenuous relationship' between Mylonakis and Medmar, and 'no documentation' demonstrated Mylonakis as an agent for Autumn Harvest, Bostomar, or Medmar." *Id*. That is not the case here where the evidence establishes unequivocally that AUM was acting with actual authority when it ordered the bunkers for Shimsupa. Additionally, the court found that Mylonakis ordered the bunkers for M.A.C. Shipping, not Medmar, with nothing indicating whether those two entities were related. *Id.* Again, the facts here are very different and Plaintiff has shown that the AUM and Shimsupa are indeed related. On a bare record, the Fourth Circuit Court of Appeals affirmed the lower court's judgment against Sing Fuels. *Id.* at 278.

*Sing Fuels* is not analogous as alleged by the Defendant. As noted above, Plaintiff submitted declarations, deposition testimony and relevant documentary evidence from both its Director (Mr. Loveman) **and from the broker** who facilitated the transaction (Mr. Tennant on behalf of BrokerEx), which establishes Shimsupa and AUM were commonly controlled. ECF 64-2, Tennant Tr. at 8:1 – 9:13, 18:22 – 21:23, 40:21 – 41:16, 52:19 – 53:6; ECF 64-3, Loveman Tr.

at 11:16-21, 12:10-20, 13:9-12, 14:3-7. *See also* ECF 50-3 at ¶¶ 9-11; ECF 50-4 at ¶¶ 4, 6. Additionally, unlike Mylonakis in *Sing Fuels*, here BrokerEx communicated directly with both AUM and Shimsupa about the transaction at issue here as well as about several other prior transactions and confirmed that AUM was authorized to act on behalf of Shimsupa. *Id.*

What is clear from the record before this Honorable Court is AUM had actual authority from Shimsupa to order the bunkers. Contrary to Defendant's position, *Sing Fuels* is easily distinguishable and not applicable here.

**CONCLUSION**

For the reasons fully stated above, Defendant's Motion should be denied in its entirety and the Court should vacate its Order at ECF 75 and grant Plaintiff summary judgment.

Dated: January 23, 2024

Respectfully submitted:

***/s/ R. Chauvin Kean***

Bradley J. Schlotterer (#24211)
R. Chauvin Kean (#36526)
**KEAN MILLER LLP**
BankPlus Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
Telephone (504) 585-3050
Fax (504) 585-3051
brad.schlotterer@keanmiller.com
chauvin.kean@keanmiller.com

- and

William R. Bennett III* (#2513653)
Noe S. Hamra* (#4987996)
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
William.Bennett@blankrome.com
Noe.Hamra@blankrome.com

* Admitted *Pro Hac Vice*

***Attorneys for Three Fifty Markets Ltd.***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on January 23, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record or parties who have registered to receive electronic service.

*/s/R. Chauvin Kean*

**R. CHAUVIN KEAN**