UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **THREE FIFTY MARKETS LTD.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 23-595** |
| **M/V ARGOS M, her engines, etc.** *in rem* | * | **SECTION L** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This suit arises out of an unpaid invoice for fuel bunkers supplied to an ocean-going vessel. On February 16, 2023 Three Fifty Market Ltd., a commodity trading company, filed an *in rem* complaint in this Court against the M/V Argos M alleging that on October 11, 2022 it sold 800 metric tons of Very Low Sulphur Fuel to AUM Scrap Metals Waste Trading LLC acting on behalf of the Argos M M/V's charterer, Shimsupa GmbH, but has not been paid by either the charterer, AUM, or the vessel leaving an amount of $629,600 due plus other costs, such as prejudgment interest, *custodia legis* expenses, and attorneys' fees. As a provider of "necessaries" to the vessel within the meaning of the Commercial Instruments and Maritime Liens Act, 46 USC § 31342 et seq., Three Fifty Markets Ltd. asserts a lien against the vessel. The vessel denies the existence of a maritime lien and denies that it owes the amounts claimed. These conflicting positions give rise to questions of fact which must be resolved by trial. Accordingly, this matter came on for trial before this Court without a jury on February 26, 2024.

After considering the testimony, exhibits introduced into evidence, applicable admissible portions of the record, the Court issues the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court finds it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court finds it as such.

1

**FINDINGS OF FACT**

**I.   The Parties**

1. Three Fifty Markets Ltd. ("Three Fifty") is an international commodity trading company organized under the laws of United Kingdom and is based in the United Kingdom. Uncontested Facts, R. Doc. 110 at Sec. 7 ¶1. Three Fifty supplies marine fuel oil, also known as bunkers to ships. R. Doc. 50-3 at ¶1; Trial Tr. 23:5-10.

2. The Argos M M/V ("the Vessel") is a Liberian-flagged bulk cargo vessel. Uncontested Facts, ¶2. She is owned by Argos Bulkers Inc., ("Argos Bulkers"), "a paper corporation of the Marshall Islands Registry." Kekridis Deposition at 10:21-23.

3. Pontos Marine Inc., ("Pontos Marine") a Greek-based company that managed the M/V Argos, at all pertinent times. Kekridis Depo. 14:4-16; Uncontested Facts, ¶4.

4. Nikos Kekridis, a citizen of Greece, owned and controlled both Pontos Marine, Inc and Argos Bulkers Inc. Kekridis Depo. at 11:12-15:10.

5. The M/V Argos M was time chartered to Shimsupa GmbH ("Shimsupa"), a company formed under the laws of Germany. Uncontested Facts, ¶5.

6. AUM Scrap and Metals Waste Trading LLC ("AUM"), a company formed under the laws of UAE, guaranteed Shimsupa's obligations under the time charter. Both AUM and Shimsupa were founded and controlled by the same person, namely Annamalai Subbiah, a citizen of India, all of which was known by both Pontos Marine and Argos Bulkers. Kekridis Depo. at 60:17-19; Trial Ex. 2; Dean Tennant Deposition, Ex. 28. 18:22-24; Trial Tr. 30:19-23. SS Frieght Solutions B.V. acted as an operator for both AUM and Shimsupa at all pertinent times. Trial Tr. 34:4-9; Kekridis Depo. Ex. 18.

II. **The Charter**

1. On or about July 28, 2022, Argos Bulkers, as owner of the Argos M M/V time chartered the vessel to Shimsupa. Uncontested Facts, ¶7. The charter party was fixed on July 28, 2022 with a recap that incorporated the main body terms from another Argos M form charter as well as riders. Trial Ex. 12.

2. The charter party contained, inter alia, multiple "no lien" clauses:

    i. Lines 112-113 of the Charter provide that "Charters will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel." Trial Ex. 29.

    ii. Clause 52 of the Charter Party's Riders provides that "Charterers undertake to instruct their Agents/Bunker suppliers and in general all parties involved with their services rendered to the vessel, on time Charterers' behalf, to counter sign Master's letter/stamp that they are accepting these services 'As agent on behalf of Charterers only. . .'". *Id.*

    iii. Clause 109 of the Riders incorporates the "Bimco Bunker Non-Lien Clause for the Time Charter Parties 2014" which states:

    (a) The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien, any encumbrance, or any rights of any kind whatsoever over the Vessel in respect of the supply of bunkers

    (b) The Charterers shall:

    (i) prior to ordering any bunkers for the Vessel inform the sellers of the bunkers in writing (the 'Non-Lien Notice') that the bunkers to be

3

supplied to the Vessel are solely for the Charterers' account, and that neither the Vessel, the Owners nor the Master is a party to the bunker supply contract and no lien, encumbrance or any rights shall arise on the Vessel; and

(ii) after ordering bunkers inform the Owners in writing of the name and contact details of the sellers of the bunkers and, if the Owners so request, provide Owners with a copy of the Non-Lien Notice.

*Id.*

3. At the request of Argos Bulkers and Pontos Marine, AUM guaranteed Shimsupa's obligations under the time charter. Kekridis Depo. 36:22-37; Trial Ex. 14.

4. The guarantee executed by AUM confirmed that AUM was guaranteeing Shimsupa's full and timely performance of its obligations as charterer if Shimsupa defaulted. AUM's guarantee read, in pertinent part:

> I hereby unconditionally guarantee and become surety for, the full and timely performance by Time Charterer of each and every obligation of the charterer of every nature under said charter party and in the event of any one or more defaults in performance by the charterer I will promptly meet such obligation or obligations.

Trial Ex. 29. The guarantee was signed and stamped by AUM and AUM received a copy of the guarantee as well a copy of the Time Charter. *Id.*

5. As time charterer, Shimsupa controlled Argos M's route and ports to which the vessel called and/or where she traded. Uncontested Facts, ¶8.

6. Shimsupa was responsible for replenishing the bunkers consumed by Argos M while the vessel traded on its account. Uncontested Facts, ¶9. Shimsupa was authorized to direct its representative, including the guarantor AUM to order bunkers on its behalf.

4

       Kekridis Depo. 37:2-6; 71:22-75:20; Tennant Depo. 8:1-9:13; 18:22-24; 19:7-11. Trial Exs. 12, 14, 23, 24.

7. The terms of the charter party between Argos Bulkers and Shimsupa, including the no lien clauses, were not disclosed to Three Fifty. Trial Tr. 62:2-21.

### III. The Event

1. In early October 2022, an AUM and Shimsupa employee, Fahim Shamsi contacted BunkerEx broker Dean Tennant to inquire about purchasing fuel for the Vessel. Trial Ex. 1. The fuel was to be delivered to the Vessel in Las Palmas, Spain. *Id.*; Trial Tr. 28:25-29:2; 34:19-25.

2. Tennant proceeded to contact Aaron Loveman, president and owner of Three Fifty, and inform him that the Vessel needed 800 metric tons of Very Low Sulphur Fuel ("VLSF"). Trial Tr. 28:6-20.

3. Accordingly, on October 11, 2022, Three Fifty sold 800 metric tons of VLSF at a price of $787 per metric ton to AUM to be provided to the Vessel at Las Palmas, Spain. Uncontested Facts, ¶10.

4. At the time of the transaction, it was known by Argos Bulkers, Pontos Marine and Nikos Kekridis that AUM and Shimsupa were controlled by Annamalai Subbiah and that AUM guaranteed Shimsupa's time charter obligations, including the purchase of bunkers for the Argos M. Love. Kekridis Depo. 21-24, 36:22-37:6, 53:21-24, 54:13-18, 54:25-55:4.

5. The Order Confirmation was addressed to "MV Argos M and/or master and/or owners and/or charterers and/or managers and/or operators and/or Argos Bulkers INC and/or AUM Scrap Metals Waste Trading LLC" and identified the Buyer as "AUM Scrap and

Metals Waste Trading LLC and/or Owner and/or Master of Vessel Argos M" and also identified the seller as "Three Fifty Markets Ltd." Uncontested Facts, ¶11; Trial Ex. 3.

6. The Order Confirmation also stated in relevant part:

> Please note that Three Fifty Markets Ltd.'s General Terms and Conditions of Sale (GTCS) will apply to this contract, a copy of which is available on request. Where Three Fifty Markets Ltd is not the Physical Supplier, the terms of the Physical Supplier are available upon request. Failure to request the terms and conditions of the physical supplier shall be taken as confirmation by the Buyer that it is aware of and accepts the terms & conditions of the Physical Supplier. Uncontested Facts, ¶12.

7. On October 11, 2022, a copy of the Order Confirmation and Three Fifty's General Terms and Conditions of Sale ("GTCS") were sent to AUM and Shimsupa. Tennant Depo. 41:10-13; 60:1-9; Trial Ex. 20.

8. Shimsupa's operator, SS Freight Solutions B.V., also sent an email to the Vessel and Mr. Shamsi copying Pontos Marine, alerting them of the details of the bunkering transaction arranged by AUM, including the quantity of bunkers to be provided, port of bunkering, the name of the buyer—AUM, the name of trader—Three Fifty and the name of the physical supplier. Trial Ex. 5; Kekridis Depo. 72:1-21, Ex. 18.

9. Following receipt of the Order Confirmation and bunkering transaction details, neither AUM, the Vessel, Argos Bulkers, nor Pontos Marine objected to the terms and conditions of the Order Confirmation or the GTCS. Kekridis Depo. 71:22-75:20.

10. Three Fifty Markets' GTCS, in pertinent parts, provides as follows:

> **1. DEFINITIONS**
> e) "Buyer" means the entities or persons identified on the Order Confirmation who have contracted with the Seller to buy Products, which shall include its assignees or successors, Managers (the entity that is operationally or technically or commercially managing the Vessel), Operators (the entity that may be commercially operating the Vessel), Trader (the entity that is buying the Products from the Buyer and selling such to the Owner/Managers/Operator), Owner (the

6

owner of the vessel).

**3. ORDER CONFIRMATION**

a) A Contract shall only be concluded and binding when the Seller sends the Order Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTCS whether or not the Order Confirmation includes an express reference to the GTCS. If the Seller for whatever reason fails to issue or send an Order Confirmation to the Buyer these GTCS shall govern the sale nonetheless and a contract pursuant to these GTCS shall be deemed to have come into existence.

b) Should the Contract be entered into by any party acting as an Agent for the Buyer and/or acting for or on behalf of the Buyer, whether such is disclosed or undisclosed then such Agent with actual or constructive notice of the existence of these GTCS in addition to the Buyer and or holder of any interest in the Vessel receiving the Products shall be jointly and severally liable for and guarantees the proper performance of all the obligations of the Buyer under this Contract, and shall be deemed as a principal and not only acting as an Agent.

c) It is agreed that all orders of all Products are considered to be emanating from the Master of the vessel, even if relayed by the Buyer to the Seller and even if no written request for the Master of the vessel exists, the dues and cost of such supplies and/or deliveries shall be treated as a primary lien on the Vessel.

**4. PRICE / PAYMENT / RISK AND PROPERTY**

d) The Buyer shall become liable for the Marine Fuel immediately upon the Marine Fuel passing the SE's manifold, and risk of the Marine Fuel shall pass to the Buyer at that time. The Buyer shall become liable for Lubricants and related products immediately upon them passing the Vessel's rail or being delivered to the designated place of delivery, and risk shall pass to the Buyer at that time. Title to the Products shall pass only when the Products have been fully paid for by the Buyer and until such time the Seller shall retain title to the Products.

j) Without prejudice to any other rights or remedies available to the Seller the Buyer shall pay interest to the Seller at the rate of 2 (two) per cent per month (compounded monthly for each month, or part thereof,) on all balances that remain unpaid from the date that they were due or, upon the withdrawal of credit, became due for payment. The Seller shall provide regular interest notes which shall be binding as to the amount of interest that is due, but the Buyer's obligations to pay interest shall not be conditional upon such interest notes being issued.

**14. LIEN**

a) In addition to any security the Seller may have, and as this Contract is entered into and product is supplied upon the faith and credit of the Vessel, it is agreed and acknowledged that a lien over the Vessel is created for the price of the Products

supplied together with any interest accrued. The Buyer, if not the Owner of the Vessel, hereby expressly warrants that they have full authority of the Agents/ Traders/Owners/Managers/Operators/Charterers to pledge the Vessel in favor of the Seller and that they have given notice of the provisions of this Contract to them. The Seller shall not be bound by any attempt by any person to restrict, limit or prohibit its lien(s) attaching to a Vessel. The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity, or otherwise, in any jurisdiction where the Vessel may be found.

**19. LAW AND JURISDICTION**

d) The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action. In case of breach of contract by the Buyer, the Seller shall moreover be entitled to take such legal action in any court of law in any state or country which the Seller may choose and which the Seller finds relevant in order to safeguard or exercise the Seller's rights in pursuance of this present Agreement. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity, or otherwise, in any jurisdiction where the Vessel may be found.

Trial Ex. 4.

11. The bunkers were delivered to the Vessel on October 11, 2022, while the vessel was in Las Palmas, Spain. The Master of the Vessel signed and stamped the bunker delivery note confirming that the Vessel received the stated quantity of fuel bunkers. Trial Ex. 6. The Vessel used the bunkers to continue its voyage and operations.

12. On November 7, 2022, Three Fifty issued invoice No. 1054 in the amount of $629,600. Uncontested Facts, ¶15. The invoice was addressed to and delivered to "MV Argos M, and/or Master and/or owners and/or charterers and/or managers and/or operators and/or /Argos Bulkers Inc and/or AUM." Uncontested Facts, ¶16, 17; Trial Ex. 7; Tennant Depo. 41:10-13, 58:25-59:2, Ex. B ¶8.

13. Invoice No. 1054 provides that the due date for payment is November 10, 2022. Trial

Ex. 7.

14. Notwithstanding Three Fifty's requests for payment, neither Shimsupa, nor AUM, or Argos Bulkers, or the Vessel have made payment for the fuel, and the principal sum of $629,600 is still due and owing. Trial Tr. 44:22-24.

15. The GTCS provides that interest will accrue on all unpaid balances at the rate of 2% per month (compounded monthly for each month or part thereof) on all balances that remain due. Trial Ex. 4 at 96, Cl. 4 ¶ j.

16. The GTCS further provides that Three Fifty may recover attorney fees incurred to recover unpaid invoices. *Id.* at ¶ l.

17. Three Fifty arrested the Argos M while she was in the Port of New Orleans on February 16, 2023, and Argos Bulkers posted a security bond for the release of the Argos M in the amount of $775,000. Uncontested Facts, ¶19, 22.

18. Three Fifty incurred *custodia legis* expenses of $31,530.73 due to the Vessel's arrest. Trial Ex. 18; R. Doc. 50-E.

19. Three Fifty has not been paid for the bunkers or the *custodia legis* expenses it incurred nor has it been paid for the interest on any sum it is owed. Trial Tr. 44:22-24, 45:25-46:7.

## CONCLUSIONS OF LAW

A. **Jurisdiction and Venue**

   1. This Court has subject matter jurisdiction under 33 U.S.C. §1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

B. **Whether the Choice-of-Law Provision in Three Fifty's GTCS Governs the Instant Dispute**

The Court finds that United States law governs the instant dispute. "In the absence of a

contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 561 (1953) and its progeny." *Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 413 (4th Cir. 2009) (quoting *Chan v. Soc'y Exped., Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997)). "Where the parties have specified in their contract which law should apply to their transaction, however, 'admiralty courts will generally give effect to that choice.'" *Sing Fuels Pte. Ltd. v. M/V Lila Shanghai*, 534 F. Supp. 3d 551, 559 (E.D. Va. 2021) (quoting *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003)); *see also World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*, No. 13-5421, 2015 WL 575201 (E.D. La. Feb. 11, 2015). "[A]bsent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced." *Triton*, 575 F.3d at 415 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972); *Laurtizen*, 345 U.S. at 588-89).

For reasons explained later in this order, the Court finds that AUM—who had presumptive authority to bind the Vessel—transacted with Three Fifty Markets, via a bunkering service, to purchase the bunkers in question. To confirm this transaction, BunkerEx Broker Dean Tennant testified and produced the email he sent to the AUM representative. Trial Exs. 19, 20. Tennant Depo. Ex. B ¶ 7. Additional recipients of the email include other AUM employees and S.S. Freight Solutions B.V., Shimsupa's operator. Specifically, the October 11, 2022 email stated "Please confirm receipt and notify us of any errors or omissions. If you do not respond immediately you are deemed to have confirmed the bunker order as per the terms below." Trial Ex. 20. There were two salient attachments to the email. First, the Order Confirmation, which listed "Three Fifty Markets Ltd."as Trader and "AUM Scrap and Metals Waste Trading LLC and/or Owner and/or Master of Vessel ARGOS M" as the Buyer. Trial Ex. 3. The Order Confirmation also stated that:

10

> Please note that Three Fifty Markets Ltd.'s General Terms and Conditions of Sale ("GTCS") will apply to this contract, a copy of which is available on request.

*Id.* Second, the GTCS was attached to the email itself. Tennant Depo. Ex. B ¶ 7; Trial Ex. 20. Of relevance, the GTCS expressly states that:

> The laws of the United States, including but not limited to the Commercial Instruments and Maritime Lien Act, shall always apply with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action.

Trial Exs. 4, 20. Additionally, on that same day, a manager at S.S. Freight Solutions B.V. emailed the Order Confirmation to Pontos Marine, Argos M, and Shimsupa employees. Kekridis Depo. 72:1-21, Ex. 18; Trial Ex. 5. At no point after receiving these emails, did AUM, Shimsupa, the Vessel, or Argos object to the Order Confirmation or GTCS. Kekridis Depo. 71:22-75:20. Yet, the Master of the Vessel accepted delivery of the fuel in Las Palmas, Spain, stamped the Bunker Delivery Note confirming the delivery, and the bunkers were consumed by the Vessel. Uncontested Facts, ¶¶13, 14, Trial Ex. 6. Based on these facts alone, the court finds no compelling public policy reason to render the choice-of-law provision in the GTCS as unenforceable. *See Bremen*, 407 U.S. at 12-23 ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power. . . should be given full effect.").

Further, the Court declines to accept the Vessel's argument that the GTCS is not binding on it because it was not a party to the contract. The Fifth Circuit has routinely held that it is common for fuel suppliers to lack privity with vessel owners in bunker transactions. *See e.g.*, *Valero Mktg. & Sup. Co. v. M/V Almi Sun*, 893 F.3d 290, 293 (5th Cir. 2018) ("It is not unusual for an entity supplying necessaries to a vessel to lack privity of contract with the owner of that vessel, and to instead contract with an intermediary."). Because the Court finds that AUM had the authority to

11

purchase the fuel bunkers from Three Fifty Markets for the Vessel's consumption, the Court holds that the Vessel need not be a party to the GTCS for such terms to be binding on it. *Id.*

The presence of "no lien" clauses in the Vessel's charter also does not relieve the Vessel's obligations under the GTCS because no evidence in the record suggests that Three Fifty had actual knowledge of those provisions. *See Triton*, 575 F.3d at 414 (concluding that a sub-charterer had the authority to bind the Vessel to the provisions of a bunker confirmation order and that authority "was not diminished by the existence of a 'no lien' clause in [the vessel's] charter, as there is nothing in the record to suggest that [the fuel supplier] had actual knowledge of that provision."); *see also Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1129 (9th Cir. 2008) (noting that under CIMLA, a "no lien clause" is "void" if "the supplier did not have knowledge of the clause"). In fact, Three Fifty's president Aaron Loveman testified that he did not see the charter party prior to the transaction. Trial Tr. 62:2-21. Without any evidence to suggest that Three Fifty knew of the "no lien" clauses in the Vessel's charter, the Court finds that the GTCS is binding on the Vessel.

Because the GTCS was sent to individuals authorized to make the fuel bunker purchase—who did not object to its terms—and the fuel was accepted, stamped for, and consumed by the Vessel, the Court finds that the choice of law provision contained within as valid and binding on the Vessel. Accordingly, the Court need not delve into the "thorny inquiry" of *Lauritzen* and holds that United States law governs the present dispute.

**C. Whether Three Fifty is Entitled to a Maritime Lien Against the Vessel**

The Court next addresses whether a maritime lien was created in favor of Three Fifty under United States law. To be entitled to a maritime lien under CIMLA, Three Fifty must show that it provided necessaries to the vessel "on the order of the owner or a person authorized by the owner."

12

46 U.S.C. §34341 et seq.; *Valero*, 893 F.3d at 292. CIMLA provides that the following individuals are presumed to have authority to procure necessaries for a vessel:

1. the owner;
2. the master;
3. a person entrusted with the management of the vessel at the port of supply; or
4. an officer or agent appointed by—
    1. the owner;
    2. a charterer;
    3. an owner pro hac vice;
    4. an agreed buyer in possession of the vessel.

46 U.S.C. §34341 et seq. Further, CIMLA provisions are to be applied *stricti juris* "to ensure that maritime liens are not 'lightly extended by contraction, analogy, or inference.'" *Valero*, 893 F.3d at 292 (quoting *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200-01 (5th Cir. 1979)).

As stated, "[i]t is a fundamental tenant of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'" Triton, 575 F.3d at 414, 415. However, this presumption can be rebutted in instances "where the vessel owner can 'show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense.'" *World Fuel Servs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F. Supp. 3d 792, 808 (E.D. Va. 2014) (quoting *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1512 (11th Cir. 1985)). For example, "a vessel owner may rebut the presumption . . . by establishing 'that the supplier of necessaries either had actual knowledge that the person ordering the supplies lacked the authority to bind the vessel or had knowledge of a prohibition of lien clause in the charter.'" *Id.* This type of actual knowledge overcomes a maritime lien because "the supplier is then in a position to make an informed business decision, and may refuse to supply the vessel, make other arrangements for payment, or assume the risk." *Gulf Oil Trading Co. v. M/V*

*Caribe Mar.*, 757 F.2d 743, 749 (5th Cir. 1985). Accordingly, "[t]he party seeking to bar a supplier's maritime lien has the burden of proving that the supplier actually knew of a no lien clause in the charter party or other contract." *Am. Oil Trading, Inc. v. M/V Sava*, 47 F. Supp. 2d 348, 352 (E.D. NY. 1999).

In the instant matter, there is no dispute that the bunkers provided by Three Fifty to the Vessel are necessaries. Oral Arg. Tr., Nov. 1. 2023, 7:6; *see Martin Energy Servs., L.L.C., v. Bourbon Petrel M/V*, 962 F.3d 827, 832 (5th Cir. 2020), ("Fuel may qualify as a 'necessary' to a vessel under CIMLA when it is supplied to refuel that vessel."); *Valero*, 893 F.3d 291, 294 (holding that there is "no dispute that bunkers qualify as necessaries" when plaintiff supplied the bunkers to a vessel that "needed refueling"). The central inquiry before the Court is whether Three Fifty furnished the necessaries to the Vessel "on the order of the owner or a person authorized by the owner." 46 U.S.C. §31341. The Court finds that it did.

At trial, Three Fifty markets introduced ample evidence to demonstrate that AUM, acting on behalf of Shimsupa, ordered the fuel bunkers from Three Fifty Markets via a bunkering service provided by BunkerEx. Moreover, this evidence supports the argument that the Vessel and BunkerEx knew of AUM's authorization to purchase the bunkers. For instance, Kekridis testified that (1) he knew of the working relationship between Shimsupa and AUM, (2) he was aware that AUM guaranteed the obligations of Shimsupa, (3) Pontos Marine received the Order Confirmation for the transaction before delivery of the bunkers, (4) after receiving the Order Confirmation, Pontos Marine and the Master of the Vessel neither objected to AUM being listed as the buyer in the Confirmation or discuss with one another that classification, and (5) the Master of the Vessel accepted the fuel. Kekridis Depo. 37:2-6, 71:22 –75:20. Additionally, BunkerEx broker Dean Tennant testified that prior to this sale (1) he had extensive dealings with AUM, (2) it was his

14

understanding that AUM and Shimsupa were related and (3) AUM had full authority from Shimsupa to purchase fuel bunkers on its behalf. Tennant Depo. 8:1-9:13; 18:22-24; 19:7-11. He further testified that it was well known throughout the market that the two companies, AUM and Shimsupa, were "as good as the same company." *Id.* at 19:11 (cleaned up).

Other trial exhibits that bolster AUM's presumptive authority to purchase the bunkers, include statements in the charterparty recap identifying AUM and Shimsupa as sister companies and the ubo (ultimate benefit ownership) as the same entity and AUM's BIMCO guarantee of Shimsupa's obligations. Trial Ex. 12 at 5 ¶4; Trial Ex. 14. Such exhibits lead the Court to find that the actions of AUM are approved by Shimsupa, if not one in the same. Further, Three Fifty introduced post-incident e-mail correspondence from (1) Mr. Annamalai Subbiah demonstrating that AUM had full authority to purchase the bunkers on behalf of Shimsupa and (2) a member of Shimsupa's Accounts Payable confirming the debt owed to Three Fifty Markets due to AUM's purchase. Tennant Depo. Ex. B , ¶11, Ex. 6; Trial Ex. 23, 24. The Court acknowledges that while the email correspondence alone may not suffice to show that AUM had authority to purchase the fuel bunkers, when paired with the plethora of evidence described above, it certainly strengthens AUM's presumptive authority.

While the Court finds that AUM had presumptive authority to purchase the fuel bunkers, the Vessel may overcome this presumption by demonstrating that Three Fifty Markets had actual knowledge of the no lien clauses in the charter party. *See Hebei*, 12 F. Supp. 3d at 808. However, the Vessel fails to do so. In fact, the Vessel simply states that the charter party contained multiple no lien clauses; however, it provides no evidence that Three Fifty had any knowledge of these clauses. On the contrary, Aaron Loveman testified that he had never seen the charter party before this litigation commenced. Trial Tr. 62:2-21. Thus, the Vessel fails to rebut AUM's presumptive

15

authority.

For the foregoing reasons, the Court finds that Three Fifty Markets is entitled to a maritime lien against the Vessel under United States law.

### D. DAMAGES

The Court turns now to the question of damages. Three Fifty Markets seeks payment of damages in three categories: (1) its Invoice No. 1054 and prejudgment interest on that amount; (2) *custodia legis* expenses; and (3) attorneys' fees.

Presently, the Court is only well-positioned to award damages regarding the invoice and *custodia legis*. Accordingly, the Court will sever the issue of determining attorneys' fees to be addressed at a later hearing.

Based on the foregoing, the Court finds that Three Fifty is entitled to payment of its Invoice No. 1054 in the amount of $629,600.00. Three Fifty seeks prejudgment interest on this amount at the rate of 2% per month (compounded monthly for each month, or part thereof) on this balance pursuant to the GTCS. Trial Ex. 4.

"Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Offshore Marine Contractors v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015) (internal quotation omitted). "Admiralty courts enjoy broad discretion in setting prejudgment interest rates. They may look to the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." *Id.* "To deny prejudgment interest, the court must find circumstances that would make it inequitable for the losing party to pay it." 1 Thomas J. Schoenbaum, *Admiralty & Mar. Law* §3-2, at 121 (5th Ed. 2011) (citing *Inland Oil & Transp. Co v. Ark-White Towing Co.*, 696 F.2d 321, 327-28 (5th Cir. 1983)).

Presently, the Court finds no circumstances that render inequitable a prejudgment interest award to Three Fifty Markets. *Id.* The Court also finds, however, that the contractual interest rate of 2% per month is greater than necessary to compensate Three Fifty Markets for its loss stemming from its unpaid balance. *See Sunrise Shipping, Ltd. v. M/V Am. Chemist*, No. 96-2849, 1999 WL 22857, at *1e ("Courts have consistently held that even if a claimant has a contractual right to collect interest, parties to an *in rem* action may only collect prejudgment interest at the statutory rate."); *Gulf Marine and Indus. Supp., Inc. v. Golden Prince, M/V*, 230 F.3d 178, (rejecting a two per cent a month contractual rate in favor of a statutory rate). *Hebei*, 12 F. Supp. 3d at 815 ("[T]he Court also finds that the contractual interest rate of 2% per month, or 24% per year, is greater than necessary to compensate Plaintiff for its loss."); *Triton*, 671 F. Supp. 2d at 764 (D. Md. 2009) ("[T]he two percent monthly interest rate is greater than necessary to compensate [Plaintiff] for its loss."); *ING Bank, N.V. v. M/V Charana Naree*, 446 F. Supp. 3d 163, 177 (W.D. La. 2020) (finding that plaintiff "present[ed] no justification" for its high contractual interest rate and awarding plaintiff prejudgment interest at a statutory rate).

Beyond stating that there a contractual interest rate, Three Fifty Markets presents little to no evidence to justify why it is entitled to "such a windfall." *Id.* The Court holds, as other have in this district, that is more appropriate to use the statutory rate as to ensure that Three Fifty is fairly compensated. *See, e.g.*, *Gulf Marine*, 1999 WL 670997 at *4; *Sunrise Shipping, Ltd.*, 1999 WL 22857. It further finds that Louisiana's judicial interest rate, is a "reasonable guidepost" to compensate Three Fifty for the "loss of the use of money over time." *Hebei*, 12 F. Supp. 3d at 815; *ING Bank, N.V.*, 446 F. Supp. 3d at 177; La. Rev. Stat. § 13:4202(B)(1).

Keeping these findings in mind, the Court holds that Three Fifty Markets is entitled to $61,511.06 in prejudgment interest. In reaching this conclusion, the Court started its calculations

on November 11, 2022, which is the date that the balance became overdue according to the Invoice No. 1504. Trial Ex. 7. "Prejudgment interest should commence from the date of loss, i.e., the date the invoice[] became overdue." *Hebei*, 12 F. Supp. 3d at 815-16; *ING Bank, N.V.*, 446 F. Supp. 3d at 176-77. The relevant Louisiana judicial interest rates are as follows: in 2022 the rate was 3.5%, in 2023 the rate was 6.5%, and presently the rate for 2024 is 8.75%. Accordingly, in 2022 the unpaid balance accrued $3,079.01 in interest. In 2023, the balance accrued $40,924.00 in interest. And till date in 2024, the balance has accrued $17,508.05. Adding the interest accrued from the three years altogether totals to $61,511.06.

Next, the Court finds that Three Fifty Markets is entitled to *custodia legis* expenses due to the vessel's arrest on February 16, 2023. The parties do not contend that Three Fifty incurred *custodia legis* expenses but rather the fee is not reasonable. *Custodia legis* fees are "incurred when a vessel is in the custody of the law, having been seized by the Marshal." *U.S. v. One 254 Ft. Freighter, M/V Andoria*, 570 F. Supp. 413, 416 (E.D. La. 1983).

Documents in the record show that this Court issued a warrant for arrest of the vessel and appointed National Maritime Services, Inc. ("NMS") as a substitute custodian on February 16, 2023. The Vessel was arrested less than a week later. *PMG Holding SRL v. Argos M M/V*, No. 23-623, R. Doc. 18. Further, evidence introduced at trial indicates that the Vessel was in *custodia legis* from February 21, 2023 to March 25, 2023. Trial Ex. 18. NMS invoiced Three Fifty Markets and another claimant $62,001.46 for its custodial services. *Id.* Accordingly, this amount was split in half and Three Fifty Markets was ultimately responsible for $31,000.73. *Id.*; Trial Tr. 90:6-7. After paying an initial deposit of $9,982 to NMS on February 16, 2023, Three Fifty Markets remitted $24,982.00 on March 22, 2023. Trial Ex. 18. It was then issued a refund of $3,963.27 by NMS because Three Fifty Markets had overpaid its remaining balance. *Id.* In total, Three Fifty Markets

tendered $31,000.73 to NMS.

Additionally, before the Vessel was arrested, Three Fifty made a deposit with the US Marshals in the amount of $5000. R. Doc. 50-2 at 32 n.1. However, it only received $4470.00 of that deposit upon release of the vessel. R. Doc 50-9. As a result, Three Fifty Markets incurred a $530 *custodia legis* expense to the U.S. Marshals in connection with the underlying incident. This fee paired with the expenses paid to NMS totals to $31,530.73.

Unconvincingly, Three Fifty Markets asks this Court for $33,059.75 in its posttrial briefing because it argues that it is entitled to 5% interest on the *custodia legis* fees. The Vessel argues that this amount is unreasonable because it is higher than the amount that Three Fifty Markets has quoted throughout this litigation.

The Court finds that Three Fifty Markets is entitled $31,530.73 and that this amount is reasonable. At trial, NMS' president Alan Swimmer explained that the fees charged for its services were in line with what GSA would have charged if it had seized the vessel. Trial Tr. 90:21-91:21. This is bolstered by the descriptions included in NMS's invoice, which state that for the most part—NMS was charging at the GSA rate. Trial Ex. 18. Additionally, Swimmer testified that charges that are higher than the GSA rate were due to factors outside of his control. For example, during the time that the vessel was seized, Mardi Gras was taking place in the city and thus, he could not find lodging for under the GSA rate. Trial Tr. 91:12. He further testified that the $31,000.73 fee to be reasonable. *Id.* at 91:15-21. Finding the testimony given at trial to be credible, the Court holds that the $31,000.73 Three Fifty Markets paid NMS as reasonable. Further, the Court finds that Three Fifty is entitled to recover the $530 it tendered to the U.S Marshals as well.

However, Three Fifty is not entitled to interest on such fees because it does not justify that argument other than stating that "[i]nterest on *custodia legis* expenses runs at the court interest rate

19

of not less than 5%" without any support. R. Doc. 131 at 12. Accordingly, the Court finds that Three Fifty Markets is entitled to $31,530.73 in *custodia legis* expenses.

### E. CONCLUSION

On the basis of the foregoing Findings of Fact and Conclusions of Law,

**IT IS ORDERED** that the Court finds that Plaintiff Three Fifty Markets Ltd. is entitled to $629,600 for the fuel provided to M/V Argos, plus prejudgment interest at the applicable yearly Louisiana judicial rate described herein, plus *custodia legis* fees at $31,530.73, for a total amount of $722,641.79, plus any postjudgment interest at the federal rate until paid. **IT IS FURTHER ORDERED** that the issue of attorney's fees incurred in connection with this litigation be **SEVERED** and that a hearing be **SET** for May 8, 2024, at 9:00 A.M. to address the amount of attorneys' fees to be awarded.

New Orleans, Louisiana, this 25th day of April, 2024.

_____
United States District Judge